**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **KAREN BIRD,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| **v.** | |
| | **Case No. 2:12-cv-903-PMW** |
| **WEST VALLEY CITY, a political subdivision of the State of Utah; and KELLY DAVIS, in his official and individual capacities,** | |
| **Defendants.** | **Magistrate Judge Paul M. Warner** |

All parties in this case have consented to United States Magistrate Judge Paul M. Warner conducting all proceedings, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit.[1]  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  Before the court is West Valley City ("WVC") and Kelly Davis's ("Davis") (collectively, "Defendants") motion for summary judgment.[2]  The court previously held oral argument on the motion.[3]  April L. Hollingsworth and Ashley F. Leonard appeared on behalf of Karen Bird ("Plaintiff").  Stanley J. Preston, Bryan M. Scott, and Brandon T. Crowther appeared on behalf of Defendants.  At the conclusion of the hearing, the court took the motion under advisement.  After carefully

---

[1] *See* docket no. 11.

[2] *See* docket no. 27.

[3] *See* docket no. 42.

considering the parties' written submissions, as well as the arguments presented by counsel at the hearing, the court issues the instant Memorandum Decision and Order.

## BACKGROUND

The following background facts are taken from Plaintiff's complaint, deposition testimony, affidavits, and other documents that cannot be disputed or controverted.

In approximately August 2001, Plaintiff was hired as an employee by Davis, the Director of Operations for WVC Animal Services, to work as an Animal Shelter Tech in the WVC Animal Shelter.  In December 2001, Plaintiff was promoted to a full-time Animal Control Officer.  In October 2002, Plaintiff was promoted to Animal Shelter Manager by Davis, which was the position she held when her employment was terminated in November 2011.  As Animal Shelter Manager, Plaintiff was supervised by Davis and reported directly to Davis.

Plaintiff admitted during her deposition that she was given a copy of WVC's Policies and Procedures Handbook ("Handbook") in 2002 and that it was her responsibility to be familiar with its contents.  Plaintiff signed an acknowledgment form indicating that she had received a copy of the Handbook and that the information in the Handbook was subject to change.

Part 1.2 of the 2010 version of the Handbook is entitled, "Policies and Procedures Do Not Constitute a Contract."[4]  That provision of the Handbook explicitly states that "[t]he policies and procedures stated in this [H]andbook and in other personnel statements or materials issued by [WVC] do not create a binding contract, agreement, or other obligation of liability on the part of [WVC]."[5]  That portion of the Handbook was in place at the time of Plaintiff's termination.

_____

[4] *Id*., Exhibit 14.

[5] *Id*.

According to the affidavit of Paul Isaac ("Isaac"), the WVC Assistant City Manager and Human Resource Director, the above-referenced provision of the Handbook has been in place since 1994 to the present.[6]

In 2005, an investigation of the WVC Animal Shelter ("2005 Investigation") was conducted by Shirlayne George ("George"), who worked in the WVC Human Resources Department.  The 2005 Investigation was conducted as a result of several complaints from employees in the WVC Animal Shelter and was undertaken to determine if anything was occurring that was inappropriate or that might cause low morale among employees.  During the 2005 Investigation, several employees complained about Plaintiff.  The complaints concerned favoritism by Plaintiff toward certain employees, fear of employees in bringing issues or complaints to Plaintiff, degrading talk by Plaintiff toward employees, retaliation for bringing complaints to Plaintiff, Plaintiff's anger issues, and Plaintiff's poor decision-making at work. During the 2005 Investigation, employees were asked to rate Plaintiff as a supervisor on a scale of 1 to 10.  Plaintiff's average score was 5.5.

During her deposition, Plaintiff admitted that, based upon a review of the 2005 Investigation report, she was having problems with the employees she supervised.  Plaintiff further admitted that (1) Davis never filled Plaintiff's position with a man and that the position was never filled at all after she was terminated; (2) she received pay raises during her employment; (3) she was never denied a pay raise; and (4) at times, at least half of the employees working at the WVC Animal Shelter were women.  Plaintiff admitted that she and Davis had their first disagreement in July 2009 and that, up until that point in time, she had a good working

---

[6] *See id.*, Exhibit 15.

3

relationship with Davis.  When Plaintiff was directly questioned about whether she was fired because she was a woman, she responded, "I feel that's some of it, yes."[7]  However, Plaintiff admitted that her gender was not the "predominant" reason for her termination.[8]  Plaintiff admitted that she never reported to WVC that she had been a victim of gender discrimination and that nothing in the formal complaint she filed with WVC regarding Davis in November 2011, which will be referenced below, mentions anything about gender discrimination.

Davis kept a journal wherein he documented his interactions with Plaintiff from approximately June 2010 through November 2011.  Among other things, that journal indicates that multiple employees complained about Plaintiff, Davis had to ask Plaintiff to do things for him multiple times, Davis backed Plaintiff in a hiring decision in order to support her, employees would report problems to Davis because they did not want to raise those problems with Plaintiff, and Davis had communication issues with Plaintiff.

On December 11, 2010, Davis conducted a performance evaluation of Plaintiff wherein he noted that Plaintiff needed improvement in three different areas:  adaptability, conflict resolution, and team leadership.  On December 21, 2010, Davis sent Plaintiff a memorandum of understanding wherein he outlined, among other things, various issues he was experiencing with Plaintiff, such as Plaintiff not supporting the cleaning protocols outlined by Davis, Plaintiff's deficiencies in dealing with the volunteer program at the WVC Animal Shelter, Davis's perception that Plaintiff had difficulty accepting direction and implementing that direction, and

---

[7] *Id.*, Exhibit 1.

[8] *Id.*

4

Davis's loss of trust in Plaintiff's ability to administer the philosophy and vision of the WVC Animal Shelter.

In October 2011, Plaintiff met with Layne Morris ("Morris"), the person to whom Davis reported, and told Morris that she could no long work with Davis. Thereafter, Morris made the independent decision to discipline Plaintiff based on his personal observations of the interactions between Plaintiff and Davis.

Also in October 2011, WVC received a telephone call from a reporter claiming that he or she had received an anonymous phone call from a person claiming that Davis was ordering a mass-execution at the WVC Animal Shelter because it was overpopulated. During her deposition, Plaintiff was questioned about whether she was the source of the above-referenced information. She responded negatively to all questions in that regard and admitted that she never said anything to the press about the WVC Animal Shelter.

On November 3, 2011, Plaintiff filed a formal written complaint against Davis during a meeting with George. Plaintiff also provided an audio recording to George of a meeting she had with Davis, which she believed demonstrated that Davis was harassing her. However, Plaintiff admitted in her deposition that both George and Morris listened to the audio recording and determined that it did not support Plaintiff's allegations.

In 2011, as a result of Plaintiff's complaint and various issues that had been occurring at the WVC Animal Shelter, George undertook another investigation of the WVC Animal Shelter ("2011 Investigation"). George typed her hand-written notes from the 2011 Investigation, which contain comments about Plaintiff, Davis, and one other employee. Some of the comments made regarding Plaintiff during the 2011 Investigation concerned Plaintiff's decision-making at work;

tension between Plaintiff and another employee; Plaintiff's abrasive, aggressive, belittling, and demeaning behavior; and Plaintiff's favoritism.

After reviewing the 2011 Investigation report, Morris determined that Plaintiff was failing to perform her responsibilities at the WVC Animal Shelter and scheduled Plaintiff for a pre-disciplinary meeting.  Plaintiff and her husband attended that meeting, which was held in November 2011.  Plaintiff presented her side of the story during the meeting and was allowed the opportunity to present evidence and have witnesses present.  After conducting that meeting with Plaintiff and her husband, Morris terminated Plaintiff's employment in November 2011.

The Handbook provides certain grounds for discipline, including insubordination; failure, neglect, or refusal to perform duties; and failure to be courteous or cooperative with the public or fellow employees.  On November 30, 2011, Morris sent Plaintiff a letter notifying her that she was being terminated for cause.  On December 12, 2011, Morris sent Plaintiff another letter that stated that she was being terminated specifically due to insubordination and failure to be courteous or cooperative with the public or fellow employees.  According to an affidavit submitted by Morris, he made the ultimate decision to terminate Plaintiff's employment.  Morris's affidavit further explains that he terminated Plaintiff for various reasons, but that the most significant reasons were Plaintiff's unwillingness to work with Davis, her insubordination toward Davis, and her unwillingness to support Davis as her direct supervisor.

On December 5, 2011, Plaintiff appealed her termination to George.  On December 11, 2011, George denied Plaintiff's appeal based on the grounds that Plaintiff had been insubordinate, neglected or refused to perform duties, and failed to be courteous and cooperative.

On December 22, 2011, Plaintiff appealed her termination to Isaac.  On January 4, 2012, Isaac also denied Plaintiff's appeal.  In his letter to Plaintiff, Isaac stated that Plaintiff continued to blame her circumstances on Davis, but failed to recognize the fact that each of the charges made against her had been substantiated by interviews with other employees.  Isaac further stated that it was clear to him that Plaintiff's professional relationship with Davis had been strained to a point that she could not and would not support Davis in any decision.

On January 17, 2012, Plaintiff appealed her termination to the WVC City Employee Appeals Board ("Board").  During her deposition, Plaintiff admitted that the hearing before the Board lasted 8-9 hours, she was represented by an attorney, she had the opportunity to present exhibits to the Board, she had the opportunity to call witnesses to testify on her behalf, and her attorney had the opportunity to cross-examine witnesses called by WVC.  At the conclusion of the hearing, the Board upheld her termination.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quotations and citation omitted).

"'[T]he burden on the moving party may be discharged by "showing"–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case.'"  *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)) (alteration in original).

"If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quotations and citation omitted).

When addressing a motion for summary judgment, the court "consider[s] the evidence in the light most favorable to the non-moving party." *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (quotations and citations omitted). However, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotations and citation omitted). The Supreme Court has emphasized that "[w]hen the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quotations and citation omitted) (first and third alterations in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## ANALYSIS

Plaintiff initiated this case on September 24, 2012, alleging the following causes of action against Defendants:  (1) gender discrimination and hostile work environment under Title VII; (2) violation of 42 U.S.C. § 1983 under the Equal Protection Clause based on the allegation that she was terminated based upon her gender; (3) violation of 42 U.S.C. § 1983 based on the allegation

that her termination was in retaliation for her protected right of free speech under the First

Amendment; (4) violation of 42 U.S.C. § 1983 based on the allegation that she was deprived of

her rights to due process in connection with the termination of her employment; and (5) breach

of contract and breach of the covenant of good faith and fair dealing based on the allegation that

the Handbook and other unwritten policies created a binding contract between Plaintiff and

WVC, which was allegedly breached when WVC terminated Plaintiff's employment.[9]  The court

will address those claims in turn.

## I.  Title VII

Plaintiff has alleged causes of action under Title VII for both (A) gender discrimination

and (B) hostile work environment.

### A.  Gender Discrimination

Where a plaintiff relies on circumstantial evidence, as in this case, to prove a claim for

gender discrimination, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 800-07 (1973) applies.  *See Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

Under that framework, "the plaintiff bears the initial burden to establish a prima facie case of sex

discrimination, which varies depending on the type of adverse action the employee alleges was

discriminatory."  *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

> Once the plaintiff establishes a prima facie case of discrimination,
> the burden shifts to the employer to articulate a legitimate,
> nondiscriminatory reason for the adverse action.  If the employer
> does so, the burden shifts back to the plaintiff to show that there is

---

[9] *See* docket no. 2.

> a genuine issue of material fact as to whether the employer's
> proffered reasons are pretextual.

*Id*. (citations omitted).

### 1.  Prima Facie Case

Plaintiff has the burden of establishing a prima facie case "by a preponderance of the

evidence," a burden which is "not onerous."  *Plotke*, 405 F.3d at 1099 (quotations and citations

omitted).  In this case, the court concludes that, even if Plaintiff had established a prima facie

case, she has not, for the reasons discussed below, demonstrated that WVC's proffered reasons

for her termination are pretextual.

### 2.  Legitimate, Nondiscriminatory Reason

Plaintiff does not appear to dispute that WVC provided a legitimate, nondiscriminatory

reason for terminating her.  Accordingly, the court turns the issue of pretext.

### 3.  Pretext

With respect to pretext, "[i]f the defendant provides a nondiscriminatory reason for the

employment action, the plaintiff may defeat summary judgment by presenting sufficient

evidence such that a reasonable jury could conclude that the proffered nondiscriminatory reason

for the employment action is pretextual, that is, unworthy of belief."  *Simms v. Okla. ex rel. Dep't*

*of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999) (quotations

and citations omitted).  "A plaintiff can show pretext by revealing such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence."  *Green v. N.M.*, 420 F.3d 1189, 1192-93 (10th Cir. 2005) (quotations and citation

omitted).  "In determining whether the proffered reason for a decision was pretextual, [the court]

examine[s] the facts as they appear *to the person making the decision* not the plaintiff's

subjective evaluation of the situation." *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011)

(quotations and citation omitted). "[M]ere conjecture that the employer's explanation is pretext

is insufficient to defeat summary judgment." *Id*. (quotations and citation omitted). "The relevant

inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it

honestly believed those reasons and acted in good faith upon those beliefs." *Id*. (quotations and

citation omitted).

  The court concludes that WVC's reasons for terminating Plaintiff were not pretextual.  As

noted by Defendants, WVC had the following grounds to terminate Plaintiff.  First, based on the

2005 Investigation and the 2011 Investigation, Plaintiff was having problems with the employees

she supervised.  Second, in October 2011, Plaintiff met with Morris and indicated that she could

no longer work with Davis and that the relationship between the two of them was broken, which

essentially put Morris in the position of having to choose between Davis and Plaintiff.  Third,

prior to the 2011 Investigation, Morris independently made the decision to discipline Plaintiff

based on his own personal observations of the relationship between Plaintiff and Davis.  Finally,

after reviewing the notes of the 2011 Investigation, and based on his own knowledge of events

occurring at the WVC Animal Shelter between Davis and Plaintiff, Morris determined that

Plaintiff was failing to perform her responsibilities as the WVC Animal Shelter Manager and

scheduled Plaintiff for a pre-disciplinary meeting, which ultimately led to Morris terminating

Plaintiff's employment based on her insubordination and her failure to be courteous to fellow

employees.

### 4. Conclusion on Gender Discrimination

Even if the court assumes that Plaintiff has established a prima facie case, the court concludes that she has not carried her burden of demonstrating that WVC's stated reasons for her termination were pretextual. As such, Defendants are entitled to summary judgment on this claim.

### B. Hostile Work Environment

To survive summary judgment on a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. Boulder Reg'l Commc'ns Ctr.*, 388 F.3d 1312, 1326-27 (10th Cir. 2004) (quotations and citation omitted). "The severity and pervasiveness of the conduct must be judged from both an objective and a subjective perspective. The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *O'Shea v. Yellow Tech. Servs.*, 185 F.3d 1093, 1097-98 (10th Cir. 1999) (quotations, citations, and footnote omitted). "Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Chavez v. N.M.*, 397 F.3d 826, 832 (10th Cir. 2005) (quotations and citations omitted). "But severity and pervasiveness are not enough. The plaintiff must produce evidence that she was the object of harassment *because of her gender*." *Id*. at 833 (quotations and citation omitted); *see also*

*Sandoval*, 388 F.3d at 1327 (providing that a plaintiff "must also produce evidence from which a rational jury could infer that she was targeted for harassment because of her gender"). "If the nature of an employee's environment, however unpleasant, is *not due to her gender*, she has *not* been the victim of sex discrimination as a result of that environment." *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) (quotations and citation omitted).

The court concludes that Plaintiff has failed to demonstrate that demonstrate any discriminatory intimidation, ridicule, or insult based on gender. Plaintiff has presented almost exclusively alleged evidence of ordinary intimidation, ridicule, and insult. Indeed, most of the evidence offered by Plaintiff does not reflect gender-based conduct or statements. Further, as noted by Defendants, Plaintiff cannot convert alleged facts supporting an ordinary hostile work environment claim into a Title VII hostile work environment claim merely because she and some of the other complainants were female. As noted by Defendants, the Tenth Circuit has held that "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *O'Shea*, 185 F.3d at 1097. In this case, Plaintiff has failed to show sufficient "overtly gender-discriminatory conduct" and has instead relied on circumstance and the mere gender of complaining individuals to support her claim. *Id*.

Furthermore, as noted above, the Tenth Circuit has held that "[i]f the nature of an employee's environment, however unpleasant, is *not due to her gender*, she has *not* been the victim of sex discrimination as a result of that environment." *Gross*, 53 F.3d at 1537. "[A] single statement which engenders offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id*. at 1542-

43 (quotations and citation omitted) (final alteration in original).  Further, "[t]o demonstrate that she was subject to a hostile work environment, [the plaintiff] ha[s] to present admissible evidence that she was subjected to a steady barrage of opprobrious [sexual] comments." *Id.* (quotations and citation omitted) (final alteration in original).

The evidence that Plaintiff relies upon consists of her own conclusory statements, feelings, and opinions, which are not supported with any compelling examples of Davis's conduct.  As Defendants have noted, of all of Plaintiff's allegations, only four are alleged actions that could be considered overtly gender-based during the time Plaintiff worked at the shelter from August 2001 until November 2011.  It is noteworthy that not a single one of these alleged overtly gender-based actions involved Plaintiff.  In sum, the court concludes that Plaintiff has failed "[t]o demonstrate that she was subject to a hostile work environment" by "present[ing] admissible evidence that she was subjected to a steady barrage of opprobrious [sexual] comments."  *Id.* (quotations and citation omitted) (final alteration in original).

Defendants also point to the facts of *Gross* as they compare to the facts of this case.  In *Gross*, the court addressed the following factual allegations, which took place in about the space of a year, and determined that they were not pervasive or severe enough for a Title VII hostile work environment claim:

> [1]) after Anderson was unable to elicit a response from Gross over the CB radio, he made the following statement to another Burggraf employee:  "Mark, sometimes, don't you just want to smash a woman in the face?"; [2]) on one occasion, as she left her truck, Anderson yelled at her:  "What the hell are you doing? Get your ass back in the truck and don't you get out of it until I tell you."; [3]) Anderson referred to Gross as "dumb" and used profanity in reference to her; [4]) only two women out of the forty who worked under Anderson's supervision completed the 1990 construction season; [5]) Anderson hired Gross solely to meet federal

> requirements against gender discrimination; [6]) Anderson disliked
> women who were not between the ages of 19 and 25 and who
> weighed more than 115 pounds; [7]) Anderson approached Gross
> after work one day and offered to buy her a case of beer if she
> would tell another Burggraf employee to "go fuck himself"; [8])
> Anderson warned Gross that if she ruined the transmission on her
> truck she would be fired; and [9]) Anderson threatened to retaliate
> against Gross because he had heard that she was contemplating
> filing an EEOC claim.

*Id*. at 1536.  In this case, by contrast, Plaintiff has provided much less evidence of a hostile work

environment based on gender, despite her 10 year employment with WVC.

For the foregoing reasons, the court concludes that no "rational jury could find that

[Plaintiff's] workplace [was] permeated with discriminatory intimidation, ridicule, and insult,

that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an

abusive working environment."  *Sandoval*, 388 F.3d at 1326-27 (quotations and citation omitted).

Accordingly, the court concludes that Defendants are entitled to summary judgment on Plaintiff's

Title VII hostile work environment claim.

## II.  42 U.S.C. § 1983 – Equal Protection

Plaintiff's next cause of action is for violation of 42 U.S.C. § 1983 under the Equal

Protection Clause based on the allegation that she was terminated based upon her gender.  The

Tenth Circuit has held that to succeed on a § 1983 equal protection claim based on gender, a

plaintiff "must ultimately prove the essential element of intentional discrimination.  Absent a

discriminatory motive or intent, [the] challenged conduct would not violate clearly established

law." *Lewis v. City of Ft. Collins*, 903 F.2d 752, 755 (10th Cir. 1990) (footnote omitted).  "[T]he

requirements for establishing a § 1983 claim are the same as those for establishing the

underlying constitutional or statutory violations, and purposeful discrimination is an essential

15

element of an equal protection violation." *Id*. at 755 n.1 (citations omitted).  Because Plaintiff's

claims for gender discrimination are against only WVC, she has an additional burden to show

that WVC intentionally discriminated against her based on her gender.  A plaintiff bringing an

equal protection claim based on membership in a protected class, such as gender, is required to:

> show intentional discrimination against h[er] because of h[er]
> membership in a protected class, not merely that [s]he was treated
> unfairly as an individual.  "The decisionmaker [must have]
> selected or reaffirmed a particular course of action at least in part
> 'because of,' not merely 'in spite of,' its adverse effects *upon an
> identifiable group*."

*Huebschen v. Dep't of Health & Soc. Servs*., 716 F.2d 1167, 1171 (7th Cir. 1983) (quoting

*Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)) (final alteration in original).

Furthermore, under Plaintiff's § 1983 claim against WVC, Plaintiff must allege and be able to

establish "that the unconstitutional actions of an employee were representative of an official

policy or custom of the municipal institution, or were carried out by an official with final policy

making authority with respect to the challenged action."  *Camfield v. City of Okla. City*, 248 F.3d

1214, 1229 (10th Cir. 2001) (quotations and citations omitted).  Therefore, Plaintiff must prove

she was discriminated against based on her gender and that said conduct was representative of an

official policy or custom of WVC or was otherwise reaffirmed by WVC.

For the reasons set forth above concerning Plaintiff's Title VII claims, Plaintiff has failed

to demonstrate that she was intentionally discriminated against based on her gender.

Furthermore, Plaintiff has failed to point to establish that there was an official policy or custom

of WVC regarding gender discrimination that was carried out by an official with final policy

making authority.  For those reasons, the court concludes that Defendants are entitled to

summary judgment on this claim.

### III.  42 U.S.C. § 1983 – First Amendment

Plaintiff's next cause of action is for violation of 42 U.S.C. § 1983 based on the allegation that her termination was in retaliation for her protected right of free speech under the First Amendment.  Plaintiff alleges that Defendants retaliated against her based on their belief that Plaintiff had raised with the media her concerns about the effectiveness and cruelty of WVC's methods of euthanizing animals.

> To recover under a First Amendment retaliation claim, [Plaintiff] must establish that (1) she was engaged in constitutionally protected activity, (2) the defendant's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that [protected] activity, and (3) the defendant's actions were substantially motivated as a response to [her] protected conduct.

*McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (quotations and citations omitted) (second and third alterations in original).  Defendants note that numerous jurisdictions have held that where there is no speech by a plaintiff, there can be no First Amendment cause of action.  *See, e.g.*, *Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659, 662-63 (9th Cir. 2000); *Jones v. Collins*, 132 F.3d 1048, 1054 (5th Cir. 1998); *Fogarty v. Boles*, 121 F.3d 886, 890-91 (3d Cir.1997); *Barkoo v. Melby*, 901 F.2d 613, 619 (7th Cir. 1990).

In Plaintiff's deposition, she repeatedly stated that she did not communicate with the media at all concerning the WVC Animal Shelter.  Because Plaintiff did not engage in any speech, the court concludes that Plaintiff's First Amendment retaliation claim must fail, consistent with the above-referenced authorities.  Accordingly, Defendants are entitled to summary judgment on this claim.

### IV.  42 U.S.C. § 1983 – Due Process

Plaintiff's next cause of action is for violation of 42 U.S.C. § 1983 based on the allegation that she was deprived of her rights to due process in connection with the termination of her employment.  Plaintiff concedes that her only pending due process claim should be dismissed.[10]  Accordingly, the court concludes that Defendants are entitled to summary judgment on that claim.

### V.  Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing

Plaintiff's final cause of actions are for breach of contract and breach of the covenant of good faith and fair dealing based on the allegation that the Handbook and other unwritten policies created a binding contract between Plaintiff and WVC, which was allegedly breached when WVC terminated Plaintiff's employment.  "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."  *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).  Clear and conspicuous language disclaiming contractual liability in an employee handbook forecloses a finding of an implied-in-fact contract.  *See, e.g.*, *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991); *see also Cabaness v. Thomas*, 232 P.3d 486, 504 n.9 (Utah 2010) ("If anything, our decision today may cause employers wishing to avoid contractual liability to draft their employee manuals with clear and conspicuous disclaimer language."); *Kirberg v. West One Bank*, 872 P.2d 39, 41 (Utah Ct. App. 1994) ("[W]here an employee handbook contains a clear and conspicuous disclaimer of contractual liability, any

---

[10] *See* docket no. 33.

other agreement terms must be construed in light of the disclaimer." (quotations and citations omitted)).

Defendants argue that these claims must fail because the Handbook never formed or created an enforceable contract with WVC.  The court agrees.  As noted above, Plaintiff admitted during her deposition that she was given a copy of the Handbook in 2002 and that it was her responsibility to be familiar with its contents.  Further, Plaintiff signed an acknowledgment form indicating that she had received a copy of the Handbook and that the information in the Handbook was subject to change.  Also as noted above, Part 1.2 of the 2010 version of the Handbook is entitled, "Policies and Procedures Do Not Constitute a Contract."[11]  That provision of the Handbook explicitly states that "[t]he policies and procedures stated in this [H]andbook and in other personnel statements or materials issued by [WVC] do not create a binding contract, agreement, or other obligation of liability on the part of [WVC]."[12]  That provision of the Handbook was in place at the time of Plaintiff's termination and, according to Isaac's affidavit, it has been in place since 1994 to the present.[13]

Based on those facts, the court concludes that the WVC's express disclaimer of any contractual obligation in the Handbook forecloses the possibility that the Handbook created a valid contract between WVC and Plaintiff.  *See, e.g.*, *Morton Thiokol, Inc.*, 818 P.2d at 1003; *see also Cabaness*, 232 P.3d at 504 n.9; *Kirberg*, 872 P.2d at 41.  Further, because there was no valid contract based on the Handbook, WVC could not have breached the covenant of good faith and

---

[11] *Id.*, Exhibit 14

[12] *Id.*

[13] *See id.*, Exhibit 15.

fair dealing because that covenant can be implied only in a valid, enforceable contract. *See Republic Group, Inc. v. Won-Door Corp.*, 883 P.2d 285, 289 (Utah Ct. App. 1994) (providing that, Under Utah law, "to find a breach of the covenant of good faith and fair dealing, there must be some type of preexisting contractual relationship" (quotations and citation omitted)); *see also Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991) ("Such a covenant cannot be construed, however, to establish new, independent rights or duties not agreed upon by the parties.").

For those reasons, the court concludes that Plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing fail. Accordingly, Defendants are entitled to summary judgment on those claims.

## CONCLUSION AND ORDER

Based on the foregoing, the court concludes that Defendants are entitled to summary judgment on all of Plaintiff's causes of action. Accordingly, Defendants' motion for summary judgment[14] is **GRANTED**. All of Plaintiff's claims in this case are **DISMISSED WITH PREJUDICE**. The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED**.

DATED this 3rd day of February, 2015.

BY THE COURT:

_____
PAUL M. WARNER
United States Magistrate Judge

---
[14] *See* docket no. 27.

20