## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KAREN BIRD, an individual,<br><br>    Plaintiff,<br><br>  v.<br><br>WEST VALLEY CITY, a political subdivision of the State of Utah, and KELLY DAVIS, in his official and individual capacities,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR NEW TRIAL (ECF NO. 169)**<br><br>Civil No. 2:12-cv-00903<br><br>Magistrate Judge Evelyn J. Furse |

Before the Court[1] is Plaintiff Karen Bird's Motion for New Trial (ECF No. 169) brought pursuant to Federal Rule of Civil Procedure 59.  Ms. Bird seeks a new trial "due to the misconduct" of counsel for Defendants West Valley City and Kelly Davis (collectively, "West Valley Defendants") that she claims "unfairly prejudiced [Ms.] Bird's presentation of her case."  (Pl.'s Mot. for New Trial ("Mot.") 1, ECF No. 169.) Specifically, Ms. Bird claims that West Valley's counsel improperly (1) questioned Layne Morris, Director of West Valley City's Community Preservation Department, regarding his military experience in an effort to "arouse sympathy" for Mr. Morris, (2) stopped the redirect/cross-examination[2] of Mr. Morris "by falsely claiming he would otherwise not

---

[1] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  (ECF No. 11.)

[2] Ms. Bird refers to the examination as a redirect, but given that both sides called many of the same witnesses, including Mr. Morris, the examination at issue constituted both a redirect and cross-examination.

1

have time to put on Defendants' case," (3) relied on Mr. Morris's military experience during his closing argument to suggest that Mr. Morris would not lie, and in so doing, vouched for his credibility, and (4) suggested during his closing argument that Mr. Morris was the subject of a new movie and portrayed by a famous actor. (Id. at 2–3.) Ms. Bird asserts that "[t]his conduct as a whole was sufficiently egregious that it had the ability to influence the outcome of the case, and likely did, as the jury finding of no liability was against the weight of the evidence."[3] (Id. at 1–2.)

The West Valley Defendants counter that courts highly disfavor motions for a new trial and only grant them "in the face of very serious and prejudicial misconduct." (Opp'n to Pl.'s Mot. for a New Trial ("Opp'n") i–ii, ECF No. 172.) As to the specific instances of alleged misconduct, the West Valley Defendants assert (1) that Mr. Morris's military experience "was admissible background information that bears on his reliability and credibility," and in any event, "provided only a small part of his trial testimony," (2) that counsel did not mislead the Court in arguing that the West Valley Defendants may not have time to put on their case because they only made the strategic decision not to call additional witnesses after Mr. Morris concluded his testimony, (3) that during closing argument, counsel confined his argument to the record and did not vouch for Mr. Morris's credibility, and (4) that counsel did not say during closing argument that Mr. Morris was the subject of a movie or portrayed by a famous actor but instead referred to the movie to make an analogy. (Id. at ii–iii.) The West

---

[3] Ms. Bird does not move for judgment as a matter of law under Federal Rule of Civil Procedure 50. (Id.; Reply in Supp. of Pl.'s Mot. for New Trial ("Reply") 3, ECF No. 173.)

Valley Defendants also claim that the alleged misconduct reflects "a minor part of the case" in any event and does warrant a new trial.  (Id. at iii.)

The Court finds the alleged conduct does not warrant a new trial.  Ms. Bird's complaints relating to the redirect/cross-examination of Mr. Morris and the introduction of testimony concerning his military service lack any basis and do not amount to misconduct by West Valley Defendants' counsel.  However, some of the remarks of West Valley Defendants' counsel during closing argument qualify as improper. Nonetheless, that conduct does not support the extreme remedy of a new trial.  The remarks lasted only a few minutes, the Court instructed the jury on multiple occasions that attorney arguments are not evidence, and nothing indicates that these arguments clearly influenced the verdict or obviously prejudiced Ms. Bird.  Accordingly, as addressed in detail below, the Court DENIES Plaintiff's Motion for New Trial.

## BACKGROUND

In September 2012, Ms. Bird filed this employment discrimination case against her former employer, West Valley City, and Kelly Davis, her former supervisor.  (Compl., ECF No. 2.)  Ms. Bird alleges that on November 29, 2011, West Valley City unlawfully terminated her from her position as the manager of the West Valley City Animal Shelter ("Animal Shelter").  (See id.)  In February 2015, the Court granted the West Valley Defendants summary judgment on Ms. Bird's Title VII claims, § 1983 equal protection claim, contract claims, and § 1983 First Amendment retaliation claim.  (Mem. Dec. & Order, ECF No. 44.)  Ms. Bird appealed that decision, and the Tenth Circuit affirmed as to all the claims except her § 1983 First Amendment retaliation claim.  Bird v. West

<u>Valley City</u>, 832 F.3d 1188, 1213 (10th Cir. 2016).  As to that claim, the Tenth Circuit reversed the grant of summary judgment based on an intervening Supreme Court case and remanded for further proceedings consistent with its opinion.  <u>Id.</u> at 1211–13.

In September 2017, the Court denied West Valley Defendants' motion for summary judgment on Ms. Bird's § 1983 First Amendment retaliation claim.  (Mem. Decision & Order Denying Defs.' Mot. for Summ. J., ECF No. 76.)  The case then proceeded to trial from March 12 to March 16, 2018.  (ECF Nos. 150, 151, 152, 154, & 161.)  The preliminary instructions given to the jury described the case as follows:

> To help you understand what you will see and hear, I will now explain the background of the case.  Karen Bird worked as manager of the West Valley City Animal Shelter until her termination in November 2011.  She worked directly for Defendant Kelly Davis, the shelter's Director of Operations, who worked for Layne Morris, the Director of West Valley City's Community Preservation Department.  On November 29, 2011, Mr. Morris terminated Ms. Bird.  Ms. Bird brought this lawsuit against West Valley City and Mr. Davis, alleging that her termination was motivated by their belief that she was the source of leaks to the media about the animal shelter, in violation of her First Amendment right to free speech.  West Valley City and Mr. Davis claim that Ms. Bird was terminated for legitimate reasons, specifically, for being insubordinate, discourteous, and uncooperative.

(Preliminary Instructions, Instruction No. 1, ECF No. 143.)  On October 17, 2011, several news outlets published articles about a cat named Andrea who twice survived West Valley City's attempts to euthanize her in the Animal Shelter's carbon monoxide chamber.  (Mem. Decision & Order Denying Defs.' Mot. for Summ. J. 4, ECF No. 76.)  Later that month, on October 26, 2011, a reporter contacted West Valley City about an anonymous tip he received that Mr. Davis was ordering a mass execution at the Animal Shelter.  (<u>Id.</u>)  The final instructions to the jury provided:

Ms. Bird claims the City and Mr. Davis deprived Ms. Bird of her rights under the First Amendment of the U.S. Constitution by terminating her because they believed she leaked information to the press regarding: (1) Andrea the cat, and/or (2) a mass execution at the animal shelter allegedly ordered by Mr. Davis, collectively referred to in these instructions as "the speech at issue." Section 1983 provides that Ms. Bird may recover an award of money damages against the City or Mr. Davis if either violated her First Amendment rights under the U.S. Constitution.

The City and Mr. Davis deny violating Ms. Bird's First Amendment rights in any way, and allege that they terminated Ms. Bird for legitimate reasons, specifically, for being insubordinate, discourteous, and uncooperative.

You will be asked to return a verdict on Ms. Bird's First Amendment claim with respect to both the City and Mr. Davis.

(Jury Instructions, Instruction No. 10, ECF No. 160.)

The jury returned a verdict in favor of the West Valley Defendants. (Special Verdict Form, ECF No. 166.) The jury found that Ms. Bird proved by a preponderance of the evidence that West Valley City's belief that she leaked information to the press regarding Andrea the cat was a substantial or motivating factor in the decision to terminate her employment. (Id., ¶¶ 2, 3.) However, the jury also found that West Valley City proved by a preponderance of the evidence that it would have terminated Ms. Bird's employment in the absence of any belief that she leaked information to the press regarding Andrea the cat, (id., ¶ 4), resulting in a verdict in the West Valley Defendants' favor.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 59, a district court may, on the motion of a party, grant a new trial on all or some of the issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal

court." Fed R. Civ. P. 59(a)(1)(A). District courts have "broad discretion" in ruling on motions for a new trial. McHargue v. Stokes Div. of Pennwalt Corp., 912 F.2d 394, 396 (10th Cir. 1990); Shugart v. Cent. Rural Elec. Co-op., 110 F.3d 1501, 1506 (10th Cir. 1997) ("A motion for new trial is addressed to the sound discretion of the trial court . . ." (quoting Canady v. J.B. Hunt Transp., Inc., 970 F.2d 710, 716 (10th Cir.1992))).

A district court is given "'wide latitude with respect to [a] motion for a new trial because [the trial judge] [is] uniquely able to assess the likelihood that the [evidence] was prejudicial.'" Henning v. Union Pac. R. Co., 530 F.3d 1206, 1217 (10th Cir. 2008) (1st, 3d, & 4th alterations in original) (quoting Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 922 (10th Cir. 1992). Likewise, with respect to alleged improper conduct or argument by an attorney, "[t]he decision on whether counsel's misconduct at trial was so egregious as to require retrial is left largely to the discretion of the district court." Abuan v. Level 3 Commc'ns, Inc., 353 F.3d 1158, 1175 (10th Cir. 2003); see also Whittenburg v. Werner Enterprises Inc., 561 F.3d 1122, 1127 (10th Cir. 2009) (stating that "'[t]he trial judge is in the best position to determine' the prejudicial effect of improper arguments, and thus whether a new trial is warranted" (quoting Ketchum v. Nall, 425 F.2d 242, 244 (10th Cir. 1970))).

" 'A motion for a new trial is not regarded with favor and should only be granted with great caution.' " Franklin v. Thompson, 981 F.2d 1168, 1171 (10th Cir. 1992) (quoting United States v. Thornbrugh, 962 F.2d 1438, 1443 (10th Cir. 1992)); see also Moody v. Ford Motor Co., 506 F. Supp. 2d 823, 847 (N.D. Okla. 2007) (stating that granting a new trial and setting aside a jury's verdict "is rarely appropriate"). "Requiring

a new trial is . . . a serious and costly remedy for all involved."  <u>Whittenburg</u>, 561 F.3d at

1128.

**DISCUSSION**

Ms. Bird asserts that West Valley Defendants' counsel engaged in various

instances of misconduct.  The Court addresses each of her arguments below.

### A. Ms. Bird's Argument that the West Valley Defendants' Counsel Cut Off the Redirect/Cross-Examination of Mr. Morris Without Legitimate Basis and for an Improper Purpose Lacks Merit

Ms. Bird argues that the West Valley Defendants' counsel improperly cut off her

counsel's redirect examination of Mr. Morris "without legitimate basis."  (Mot. 5, ECF No.

169.)  She argues that "from early on in the trial" the West Valley Defendants' counsel

"complained about how long [Ms.] Bird was taking to present her case," "demanded that

the court put [Ms. Bird's] case on a timer, which ran out during [the] redirect of [Mr.]

Morris," and "insisted that the court stop . . . further questioning of [Mr.] Morris, claiming

[the West Valley] Defendants needed time to put on their case."  (<u>Id.</u>)  She claims that

the West Valley Defendants' counsel improperly stopped further questioning of Mr.

Morris because they "had no more case to put on" and rested after Mr. Morris's redirect.

(<u>Id.</u>)  Ms. Bird complains that this conduct violated the Utah and Model Rules of

Professional Conduct requiring candor toward the tribunal and fairness to the opposing

party and counsel and that "[t]his tactic was prejudicial" because it stopped counsel from

impeaching Mr. Morris.  (<u>Id.</u> at 5–6.)  Ms. Bird claims "[t]his was undoubtedly [West

Valley] Defendants' intention, as [they] would certainly have known at that point that

they did not intend to put on any more witnesses."  (<u>Id.</u> at 6.)  Ms. Bird cites no case law

7

in either her opening or her reply brief to support this claim of error.  (Mot. 5-6, ECF No. 169; Reply 5-6, ECF No. 173.)

The West Valley Defendants respond that Ms. Bird's "telling of the subject events is misleading."  (Opp'n 5, ECF No. 172.)  They argue that Ms. Bird had ample time to put on her case and that by its calculations, Ms. Bird's counsel had over eleven hours with witnesses compared to under seven hours for the West Valley Defendants.  (Id.) They further point out that the Court repeatedly addressed with the parties the amount of time Ms. Bird was taking to put on her case and that Ms. Bird's counsel went over the additional time the Court allowed for her redirect/cross-examination of Mr. Morris.  (Id.) The West Valley Defendants further argue that Ms. Bird's assertions that they "misled the Court about the time that they needed to put on their case are unwarranted and without merit."  (Id. at 6.)  The West Valley Defendants point out that they intended to call additional witnesses after Mr. Morris but that after Ms. Bird rested they "evaluated where things stood" and made a "strategic decision" not to call any additional witnesses. (Id.)  As addressed below, the Court finds the West Valley Defendants' counsel's conduct with respect to Mr. Morris's redirect/cross-examination and timing issues generally during trial do not provide a basis for a new trial.

First, the Court finds Ms. Bird's argument, made through her counsel, improper. The Utah Standards of Professionalism and Civility state that "[l]awyers shall not, without an adequate factual basis, attribute to other counsel . . . improper motives, purpose, or conduct."  Utah R. Jud. Admin. 14-301(3).  Ms. Bird and her counsel do not provide any factual basis for the assertions that West Valley Defendants' counsel knew

they did not intend to call any additional witness after Mr. Morris's redirect/cross-examination and cut off Mr. Morris's redirect/cross-examination to prevent Ms. Bird's counsel from impeaching Mr. Morris. Ms. Bird's counsel's arguments make objective statements of fact without factual basis and are thus improper since they attribute improper motivations and conduct to West Valley Defendants' counsel without any factual support.

Second, Ms. Bird distorts the events that occurred with respect to time limits imposed in this case. From the outset of this case, both sides maintained that they needed four days for trial. (Stip. Attorneys' Planning Meeting Report 5, ECF No. 15.) The Court relied on these representations in scheduling the trial. (Scheduling Order 4, ECF No. 18 (setting four-day trial); Scheduling Order from Hr'g 2, ECF No. 58(setting four-day trial); Scheduling Order, ECF No. 72 (setting four-day trial); Am. Scheduling Order, ECF No. 77 (setting four-day trial).) The Court's Trial Order indicated that trial would run from 8:30 a.m. to 2:30 p.m. each day, from March 12 to March 15, 2018. (Am. Trial Order 1, 5, ECF No. 82.) At the final pretrial conference, Ms. Bird's counsel raised for the first time extending either the length of each trial day beyond 2:30 p.m. or extending trial into Friday, March 16. At that time, the Court kept the trial set at four days but left open the possibility to extend the trial days past 2:30 p.m. The Court indicated that it would later assess the need to extend the hours for trial but instructed the parties to make every effort narrow their cases, to exchange realistic estimates of time for each witness, and to contact the Court if they needed additional time.

Prior to trial commencing, the parties contacted the Court via e-mail and indicated that after conferring, they agreed to extend trial days to 4:00 p.m. (3/6/18 Preston E-mail, attached as Appendix ("App.") 1.) Despite this extension of trial days, on the second day of trial, West Valley Defendants' counsel expressed concerns about the amount of time Ms. Bird's counsel was taking and the time that would remain to present their case. (3/13/18 Trial Tr. 22:5–22:15, attached as App. 3.[4]) The Court instructed the parties to make every effort to tighten up their examinations so that they could complete as much of the trial as possible the next day. (Id. at 21:12–25:15.)

Halfway through the third day of trial, the Court indicated its concern with timing and West Valley Defendants' ability to present their case. Ultimately, the Court divided the remaining eight hours of trial time between the parties, allocating three of the remaining hours to Ms. Bird's counsel and the other five to the West Valley Defendants. (3/14/18 Trial Tr. 3:8–6:22, attached as App. 4.) By the end of the third day of trial, Ms. Bird's counsel had only thirty-eight minutes left to present the remainder of her case. (Id. at 62:6–17.) The next morning Ms. Bird's counsel asked for an additional half hour and for the Court to extend the trial into Friday. (3/15/18 Trial Tr. 3:6–11:8, attached as App. 5.) She indicated that the Court could inform the jury that it was "[her] fault" that trial would continue an extra day. (Id.) The Court ultimately extended trial into Friday and allowed Ms. Bird an additional half hour, on top of the remaining thirty-eight

---

[4] Neither of the parties requested a complete version of the trial transcript in this matter so the court reporter has not prepared or finalized a complete transcript. The Court requested that the court reporter prepare additional, relevant portions of the transcript for purposes of this Order and attaches those portions of the transcript to this Order as Appendices.

minutes, to complete her case.  (Id.)  Again, Ms. Bird's counsel used up all her time, leaving no additional time for her redirect/cross-examination of Layne Morris.  (Id. at 59:17–61:1.)  Nevertheless, the Court gave Ms. Bird's counsel an additional half hour for the cross examination.  (Id.)  This extension occurred following a discussion at the bench.  (Id.)  During this discussion, West Valley Defendants' counsel indicated he had three witnesses to call.  (Id. at 60:25-61:4.)  Once Ms. Bird's counsel again went over the time limit, West Valley Defendants' counsel objected.  (Id. at 62:6–63:11.) Nonetheless, the Court allowed Ms. Bird's attorney to ask an additional question.  (Id.) Following Ms. Bird's counsel's questioning, West Valley Defendants' counsel conducted a short redirect examination.  (Id. at 63:20-64:21.)

After Ms. Bird rested, West Valley Defendants' counsel then made a motion for judgment as a matter of law, which he argued briefly.  (3/15/18 Trial Tr. 64:24–69:15, App. 5.)  After a minimal recess, West Valley Defendants' counsel returned and informed the Court that after discussing things with his clients they decided to rest their case and not call any additional witnesses:

> Your Honor, I had not anticipated this at all but we feel very good how this ended.  I've talked to my client at length and I don't think -- I think to take another couple of hours to put these last three witnesses on will be, if anything, cumulative.  So we're willing -- we are going to rest when the jury comes in without calling any more witnesses.

(Id. at 70:1–10.)

"A trial court necessarily possesses considerable discretion in determining the conduct of a trial, including the orderly presentation of evidence."  Thweatt v. Ontko, 814 F.2d 1466, 1470 (10th Cir. 1987).  As outlined above, West Valley Defendants' counsel

did not cut off the redirect/cross-examination of Mr. Morris, as Ms. Bird claims.  Ms. Bird's counsel exceeded the time that the Court provided for the examination, which the Court already extended multiple times.  Further, West Valley Defendants' counsel was well within his rights to point out that Ms. Bird's counsel was consuming the majority of trial time presenting her client's case and that she repeatedly exceeded the time limits imposed by the Court to present her case at trial.  Ms. Bird's counsel showed a complete disregard for the time she took to present her case forcing the Court to impose time limits that she then exceeded.  To the extent Ms. Bird's counsel felt she did not have adequate time to impeach Mr. Morris, this problem arose from her own strategic choices about how to use her trial time.

Certainly one could question whether an attorney had not anticipated the possibility of not putting on a defense one hour prior to making that decision when fairly predictable testimony by that attorney's own witness came out over that time.  However, the Court has no reason to doubt the representation of West Valley Defendants' counsel that he did not make his decision not to call any additional witnesses until after Mr. Morris's testimony finished, and he consulted with his client.  <u>See</u> <u>Selsor v. Kaiser</u>, 81 F.3d 1492, 1501 (10th Cir. 1996) (indicating that the court is entitled to rely on representations to the court by the attorneys, because they are officers of the court).  After a break, West Valley Defendants' counsel represented that he discussed the matter with his clients, they were happy with how things went with Mr. Morris's testimony and therefore decided not to call any additional witnesses.  The decision of a defendant to rest immediately following the plaintiff's resting is a big decision that a

party would not likely, and does not have to make, until right before the court asks it to proceed with its case.  In the civil realm, counsel, in consultation with their clients, rarely forgo to opportunity to put on evidence in their case in chief.  Ms. Bird argues that West Valley Defendants' counsel knew he did not intend to call additional witnesses before that time but offers no support for that accusation.

In sum, the moving party bears the burden to show that a reason for a new trial exists based on prior federal law.  Fed. R. Civ. P. 59.  Ms. Bird fails to meet that burden given the complete lack of citation to any case law on the point.  The Court further finds that West Valley Defendants' counsel did not engage in any misconduct relating to the redirect/cross-examination of Mr. Morris or, more generally, with respect to the arguments he made during trial concerning Ms. Bird's disproportionate use of trial time and concerns about his ability to present his clients' case.  Given the lack of misconduct, Ms. Bird's argument fails to support the need for a new trial.

### B. The Court Properly Admitted Mr. Morris's Testimony Concerning His Military Experience as Background Evidence

Ms. Bird argues that West Valley Defendants' counsel improperly introduced Mr. Morris' military experience and consequent recognition for that service during his examination of Mr. Morris.  (Mot. 4, ECF No. 169.)  She claims that evidence concerning his military experience bore no relevance and that counsel introduced it "to paint [Mr.] Morris as a patriot and a war hero, for the purpose of influencing the jury to side with him."  (Id. at 5.)  The West Valley Defendants counter that they properly introduced background information such as military experience at trial because it bears on the credibility and reliability of the witness.  (Opp'n at 4, ECF No. 172.)  They further

argue that the Court already overruled Ms. Bird's objection to the introduction of this evidence during trial and that an appeals court will not disturb such decisions absent a clear abuse of discretion.  (Id.)  Finally, the West Valley Defendants argue that testimony concerning Mr. Morris's military background occupied only a small portion of his examination, which lasted over two hours, and that the introduction of such testimony at worst constitutes harmless error and certainly does not justify ordering a new trial.  (Id. at 4–5.)  The Court agrees with the West Valley Defendants.

District courts enjoy "broad discretion in ruling on the relevancy of evidence." United States v. Alexander, 849 F.2d 1293, 1301 (10th Cir. 1988); see also United States v. Blackwell, 853 F.2d 86, 88 (2d Cir. 1988) (stating that "the trial court is entitled to wide discretion concerning the admissibility of background evidence").  The Advisory Committee Notes to Federal Rule of Evidence 401 state that "[e]vidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding."  Fed. R. Evid. 401, Advisory Committee Note; see also Roger Park & Tom Lininger, The New Wigmore, § 9.1(3) ("[T]he proponent of a witness is allowed to put the witness at ease and to let the jury 'get to know' the witness by bringing out facts such as residence, employment, and military service.")  Further, various courts have found background evidence, including military service, relevant to assessing the credibility of witnesses.  See Blackwell, 853 F.2d at 88 (indicating that courts should admit background evidence to assist the jury "in gauging the credibility of a witness"); Gov't of Virgin Is. v. Grant, 775 F.2d 508, 513 (3d Cir. 1985) (stating that background evidence "bear[s] on the credibility of the witness by

showing the witness to be a stable person"); <u>Wells v. Davis</u>, No. 05-CV-0811-DRH, 2009 WL 3352642, at *2 (S.D. Ill. Oct. 16, 2009) (unpublished) (finding evidence concerning a party's military service relevant and admissible as "[t]he credibility and the reliability of all the witnesses are crucial, relevant and reasonable"); <u>United States v. Deel</u>, No. 1:09CR00022, 2010 WL 519836, at *1 (W.D. Va. Feb. 11, 2010) (unpublished) (finding background evidence, including military service, admissible "for the jury's benefit to judge [a defendant's] credibility").

Mr. Morris's testimony concerning his military experience was relevant and admissible as background evidence. Such evidence helped the jury to get to know the witness and assess his credibility. Notably, Ms. Bird does not cite any cases to the contrary, simply arguing without support that evidence concerning Mr. Morris's military experience is irrelevant, and West Valley Defendants' counsel should not have introduced it. Accordingly, the Court finds West Valley Defendants' counsel did not improperly introduce evidence concerning Mr. Morris's military background. Again Ms. Bird fails to meet her burden in showing the need for the drastic remedy of a new trial.

### C. While Portions of West Valley Defendants' Closing Argument Were Improper, Any Errors Do Not Warrant the Extreme Remedy of a New Trial

Ms. Bird asserts that West Valley Defendants' counsel engaged in improper conduct during his closing argument. She claims that counsel improperly implied that a movie, <u>12 Strong</u>, had Mr. Morris, portrayed by Chris Hemsworth, as its subject. (Mot. at 10–11, ECF No. 169.) Ms. Bird also argues that counsel vouched for Mr. Morris's credibility and improperly based his argument that Mr. Morris would not lie on his military service. (<u>Id.</u> at 6–10.) She further asserts the outcome of the case is a "close

case" and that "[i]mproper vouching and reliance on improper evidence has the most potential to be damaging in close cases that turn on credibility of witnesses," which weighs in favor of granting a new trial.  (Id. at 4, 9.)

"In the Tenth Circuit, vacating a jury award and ordering a new trial on the basis of an inappropriate closing argument is an extreme remedy only to be granted in unusual cases."  Spahr v. Ferber Resorts, LLC, 686 F. Supp. 2d 1214, 1223 (D. Utah 2010), aff'd, 419 F. App'x 796 (10th Cir. 2011) (unpublished); see also Ramsey v. Culpepper, 738 F.2d 1092, 1100 (10th Cir. 1984) (stating that even with an improper closing argument, " 'judgment should not be disturbed unless it clearly appears that the remarks in question unduly aroused the sympathy of the jury and thereby influenced the verdict.' " (quoting Julander v. Ford Motor Co., 488 F.2d 839, 842 (10th Cir. 1973))).  In Whittenburg, the Tenth Circuit identified a number of factors that district courts should consider in determining whether improper closing arguments warrant a new trial:  (1) the extensiveness of the improper remarks, (2) whether the Court gave curative instructions after the remarks, and (3) the size of the verdict.  561 F.3d at 1131–33.  The court also emphasized that

> closing argument need not, nor should, be a sterile exercise devoid of passion.  Parties are entitled to have someone speak with eloquence and compassion for their cause.  [] Arguments may be forceful, colorful, or dramatic, without constituting reversible error.  [] Counsel may resort to poetry, cite history, fiction, personal experiences, anecdotes, biblical stories, or tell jokes. []

Id. at 1133 (internal citations and quotations omitted).

**1. 12 Strong**

Ms. Bird argues that during closing argument West Valley Defendants' counsel "suggest[ed] that [Mr.] Morris was the subject of a new movie out, 12 Strong, and his character was being played by Chris Hemsworth." (Mot. at 10, ECF No. 169.) She claims that "counsel put the jurors in the position of having to find against [Ms.] Bird, or against a war hero who was the subject of a new movie played by Chris Hemsworth." (Id.) The West Valley Defendants counter that counsel stated the movie is about "one group" of first responders, not Mr. Morris's group; so he "never suggested that Mr. Morris was the subject of 12 Strong or that he was played by Chris Hemsworth." (Opp'n at 10, ECF No. 172.) They further assert that the closing argument falls within the permissible parameters of a closing argument, as outlined in the Tenth Circuit's decision in Whittenburg. (Id.)

During the portion of the closing argument at issue, West Valley Defendants' counsel stated:

> There is a movie out called 12 Strong. It's about one group of the first special forces responders that was sent to Afghanistan right after 9-11. . . . Layne Morris was one of the first responders in the Green Berets to go out there as a special forces man to go to Afghanistan. Now, he is not as tall, doesn't have as much hair, and he is not as handsome as Chris Hemsworth who stars in that movie, but Layne Morris is the real deal.

(3/16/18 Partial Tr. 28:2–14, ECF 169-2.) At trial, the Court interpreted counsel's argument as drawing a comparison between Mr. Morris's first responder group and the first responder group in the movie. Counsel did not directly state that Mr. Morris's group was the subject of the movie or that Chris Hemsworth portrayed Mr. Morris. Accordingly, the Court finds Ms. Bird's argument that counsel improperly suggested that

Mr. Morris was the subject of 12 Strong and portrayed by Chris Hemsworth unpersuasive. Further, counsel may properly reference a movie in closing argument. As the Tenth Circuit set forth in Whittenburg, closing "arguments may be forceful, colorful, or dramatic . . . [and] [c]ounsel may resort to poetry, cite history, fiction, personal experiences, anecdotes, biblical stories, or tell jokes." 561 F.3d at 1133 (internal quotations omitted).

This portion of the closing argument formed part of counsel's argument concerning Mr. Morris's credibility, which Ms. Bird attacks on other grounds. The Court recognizes that the jury does not have the benefit of the transcript and may not have parsed the argument the same way. Therefore, below, the Court will assume the impropriety of this portion of the closing argument.

### 2. Vouching/Bolstering

Ms. Bird also argues that during closing, West Valley Defendants' counsel "vouch[ed] for [Mr.] Morris's credibility and integrity, based on his irrelevant military experience." (Mot. 6, ECF No. 169.) Ms. Bird states that counsel also "teared up while arguing about how patriotic [Mr.] Morris is." (Id. at 7.) The relevant portion of the closing argument that Ms. Bird argues is improper states as follows:

> Layne Morris is not a man who would lie. Look at his character. He has been a public servant. He has served this country and the citizens of West Valley City his entire life. You don't become a First Class Sergeant in the Green Beret unless you are a leader and a man of integrity. . . .

> Did you see how emotional he got when I asked him about his oath to defend the Constitution? He knows by firsthand what it is to live and fight against a country, a leadership, a government, that doesn't have these constitutional rights. The Taliban. And he put his life on the line doing that.

But now you're asked to find that he would violate Karen Bird's Constitutional rights and he would lie in a United States Courtroom about it.

(3/16/18 Partial Tr. 27:22–28:2, 28:14–21, ECF No. 169-2.)  The piece of the argument about 12 Strong falls right between these two paragraphs.  (Id. at 28:2-14.)

Ms. Bird claims that Mr. Morris's military experience "has nothing to do with [Mr.] Morris' decision-making in his role at West Valley City, but was invoked (complete with counsel's tears) to play on the jury's sympathies."  (Mot. 7, ECF No. 169.)  Ms. Bird points out that she objected to these remarks, and the Court overruled that objection, but "the fact that the court allowed it signaled to the jurors that they were allowed to consider the evidence/argument."  (Id. at 9.)  Finally, she argues that the jury's decision in the West Valley Defendants' favor "suggest[ed] that the improper evidence and argument prejudiced [Ms.] Bird in her presentation of her case," since "no credible evidence" existed "that [Ms.] Bird was going to be fired absent the public relations problems [Mr.] Davis and [Mr.] Morris believed she created."  (Id. at 9–10.)

The West Valley Defendants dispute that counsel "vouched for the credibility of Mr. Morris."  (Opp'n 7, ECF No. 172.)  They state that counsel "never expressed a personal belief in Mr. Morris' credibility and confined his argument to the evidence already presented to the jury regarding Mr. Morris'[s]" military service.  (Id. at 8.)  Specifically, the West Valley Defendants argue that counsel never used the word "I" when referring to Mr. Morris, so he did not vouch for Mr. Morris's credibility.  (Id.)  West Valley Defendants further state that counsel

appropriately used evidence of Mr. Morris' military record and his oath to defend the Constitution to bolster his already credible testimony that he fired

[Ms. Bird] for legitimate reasons and not in violation of her First Amendment rights.

(Id. at 10.)

In reply, Ms. Bird claims that counsel did not confine his closing argument to evidence in the record. (Reply 8, ECF No. 173.) She claims that no testimony exists in the record that Mr. Morris is a "First Class Sergeant" as counsel stated in his closing remarks and that Mr. Morris's testimony does not make clear that he is a "Sergeant first class." (Id.) Ms. Bird argues that even if counsel transposed the words to "First Class Sergeant," this transposition is "misleading, as it suggests some superior-ranking or award-winning sergeant." (Id.)

First, Mr. Morris testified during trial that he "retired as sergeant first class." (3/15/18 Trial Tr. 14:2–4, App. 5.) West Valley Defendants' counsel transposed the words when he said "First Class Sergeant" during his closing argument. "Closing arguments of counsel[] are seldom carefully constructed in toto before the event[] [and] improvisation frequently results in syntax left imperfect and meaning less than crystal clear . . .[,] [so] a court should not lightly infer that [an attorney] intends an ambiguous remark to have its most damaging meaning." Donnelly v. DeChristoforo, 416 U.S. 637, 646–47 (1974). The Court will not hold a minor change such as this against counsel given Mr. Morris testified as to his military rank during trial.

As to the substantive argument Ms. Bird advances, the Court notes that the parties use vouching and bolstering interchangeably. However, the Tenth Circuit treats them as distinct concepts. See United States v. Bowie, 892 F.2d 1494, 1499 n.1 (10th Cir. 1990) (stating that while "[a] number of courts appear to regard credibility-bolstering

as no different from credibility-vouching, and merge the two concepts. . . . We consider these to be different issues." (citations omitted)).  Vouching occurs where an attorney "personally vouched for the credibility of its witness", and bolstering occurs where an attorney "improperly bolstered the witness's credibility prior to any challenge to the witness's credibility, contrary to Rule 608."  United States v. Lord, 907 F.2d 1028, 1030 n.2 (10th Cir. 1990).

The Court finds that certain of counsel's remarks during closing constitute vouching.  The Tenth Circuit has held that

> impermissible vouching occurs only when "the jury could reasonably believe that [an attorney] is indicating a personal belief in the witness's credibility, either through explicit personal assurances of the witness's veracity or by implicitly indicating that information not presented to the jury supports the witness's testimony."

United States v. Orr, 692 F.3d 1079, 1097 (10th Cir. 2012) (quoting Bowie, 892 F.2d at 1498).  West Valley Defendants' counsel did not use phrases such as "I believe" or "I think" when addressing Mr. Morris's credibility—hallmarks of improper vouching—or directly insert himself into the argument.  However, since no one testified that "Layne Morris is not a man who would lie" one can only interpret counsel's statement as a personal belief and assurance as to Mr. Morris's veracity.  The same holds true for counsel's statement that "[y]ou don't become a First Class Sergeant in the Green Beret unless you are a leader and a man of integrity."  Further, the fact that counsel choked up while addressing Mr. Morris's truthfulness and integrity gave his arguments a more personal tone.  Thus the Court finds these statements constitute improper vouching in this context.

The Court also finds that some of counsel's remarks during closing constitute improper bolstering. While, as addressed above, the Court can admit testimony concerning military service as background evidence as it allows the jury to get to know a witness and establish that he or she is a stable person worthy of belief, counsel's use of that evidence during closing argument to suggest directly that Mr. Morris would not lie presents problems. See Roger Park & Tom Lininger, The New Wigmore, § 9.1(3) (stating that where "background evidence" is used to bolster a witness's credibility, this may run afoul of Federal Rule of Evidence 608). Federal Rule of Evidence 608(a) provides that "evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked." Fed. R. Evid. 608(a). Ms. Bird did not directly attack Mr. Morris's veracity. Therefore, West Valley Defendants' counsel's use of Mr. Morris's military experience to suggest he would not lie crossed the line into improper argument.

The Court notes that other courts have found that military service does not necessarily afford witnesses a higher degree of credibility. See Howard v. Horn, 56 F. Supp. 3d 709, 727 (E.D. Pa. 2014) (stating that the petitioner "offered no support for the conclusion that referring to [witness's] military background would necessarily afford him higher credibility—and other courts have held that it does not."); Illinois v. Lane, 922 N.E.2d 575, 586 (Ill. App. 2010) ("[W]e do not believe that support for members of the military automatically accords them a higher degree of credibility as witnesses."). However, counsel's remarks directly linked Mr. Morris's military experience to his truthfulness thus removing any potential ambiguity about the purpose of the evidence.

Thus the Court finds certain of the closing remarks made by West Valley

Defendants' counsel concerning Mr. Morris improper.  The Court must now consider,

using the factors set forth in <u>Whittenburg</u>, whether those improper remarks, in

combination with the <u>12 Strong</u> comments, warrant the extreme remedy of a new trial.

### a.  Extensiveness of Remarks

The first factor outlined by the Tenth Circuit—the extensiveness of the improper

remarks, or lack thereof—weighs against granting a new trial in this case.  Counsel's

arguably improper remarks during closing argument concerning Mr. Morris's credibility

were very brief, lasting less than two minutes during an almost hour-long closing

argument.  (<u>See</u> 3/16/18 Trial Tr. 7:20–37:11, attached as App. 6 (West Valley

Defendants' entire closing argument).)  Where improper closing remarks are brief,

courts generally find a new trial unwarranted.  <u>See</u> <u>Ramsey</u>, 738 F.2d at 1100 (finding

that an arguably improper rebuttal argument during closing did not warrant reversal of

the jury verdict because the remarks "consumed only a couple of minutes at the end of

a full trial", and the district judge supervising the trial "did not believe that the argument

unduly aroused the sympathy of the jury"); <u>Garcia v. Sam Tanksley Trucking, Inc.</u>, 708

F.2d 519, 522 (10th Cir. 1983) (finding a new trial unwarranted where counsel

improperly referenced the wealth of the parties during closing argument because the

statements reflect "minor aberrations"); <u>Canada Dry Corp. v. Nehi Beverage Co.</u>, 723

F.2d 512, 526–27 (7th Cir. 1983) (finding district court did not abuse its discretion in

refusing to grant a new trial where counsel's improper vouching for the honesty and

credibility of his client "occupied about one minute in a ninety minute closing statement").

In contrast, where improper remarks permeate the closing argument, courts will more likely grant a new trial. For example, in Whittenburg, the court found a new trial appropriate where, among other things, "counsel's improper comments were repeated and emphasized throughout closing argument" and in fact "were the heart and soul of the argument." 561 F.3d at 1131; see also Gilster v. Primebank, 747 F.3d 1007, 1010–13 (8th Cir. 2014) (finding new trial warranted in sexual harassment case where "improper vouching permeated counsel's rebuttal argument," and counsel introduced facts not in evidence when recounting her own similar experiences with sexual harassment).

Courts will also more likely grant new trials where counsel engages in improper conduct throughout trial. See Cadorna v. City & Cty. of Denver, 245 F.R.D. 490, 494–97 (D. Colo. 2007) (ordering a new trial where counsel engaged in "continual, contumacious conduct" throughout trial); Moody v. Ford Motor Co., 506 F. Supp. 2d 823, 831–47 (N.D. Okla. 2007) (ordering a new trial where plaintiff's counsel engaged in misconduct throughout trial, including violating in limine rulings, making personal attacks on defense witnesses and counsel, and asking the jury to place themselves in the plaintiff's position); Stollings v. Ryobi Techs., Inc., 725 F.3d 753, 758–763 (7th Cir. 2013) (finding new trial appropriate where counsel attacked the motivations of opposing counsel throughout trial, beginning with the opening statement and continuing through the closing statement).

Here, the only misconduct by West Valley Defendants' counsel that Ms. Bird raised occurred during a few brief minutes of closing argument. Therefore this factor weighs against the extreme remedy of a new trial in this case.

### b. Curative Instructions

The second factor outlined by the Tenth Circuit—whether the Court gave curative instructions after the remarks—also weighs against granting a new trial. In Spahr, "the court g[a]ve[] weight to the fact that . . . the jury was instructed that attorney argument is not evidence on two occasions: once before the opening statements and once before the closing arguments." Spahr, 686 F. Supp. 2d at 1224. Further, the court provided each juror with a written copy of the instructions, allowing jurors to follow along while the court read them and take their copies to the jury room. Id. The court also stated that "[t]he Tenth Circuit has emphasized that such instructions can mitigate the effects of references to matters not in evidence." Id. (citing Whittenburg, 561 F.3d at 1131 ("[W]e have sometimes suggested that a general instruction at the close of trial, reminding the jury that counsels' arguments are not evidence, can help mitigate an improper closing argument.") (citation omitted)). In affirming the district court's decision in Spahr, the Tenth Circuit recognized "that the jury was instructed that 'statements and arguments of counsel are not evidence.' " 419 F. App'x at 806. Further, other courts have found that such instructions help mitigate improper attorney remarks during closing. See Canada Dry, 723 F.2d at 527 (finding district court did not abuse its discretion in refusing to grant a new trial where the improper remarks during closing were brief, and the trial judge reminded "the jury that statements of counsel are not evidence").

In this case, as in Spahr, the court instructed jurors both before and after trial that arguments of counsel are not evidence. (See Preliminary Instructions, Instruction No. 4, ECF No. 143 ("Statements, arguments and questions by lawyers are not evidence."); 3/12/18 Trial Tr. 7:16–19, attached as App. 2; Jury Instructions, Instruction No. 2, ECF No. 160 ("Statements and arguments of counsel are not evidence in this case."); 3/16/18 Trial Tr. 5:23–24, App. 6.)  The Court also gave copies of the final instructions to the jurors, allowing them to follow along while the Court read the instructions, and to take them into the jury room.  (Id. at 3:11–19.)  Of course such an instruction may not always sufficiently mitigate improper remarks, depending on the context.  Whittenburg, 561 F.3d at 1132 ("Here, where the improper comments were extensive and the district court expressly overruled a contemporaneous objection, we cannot say a general instruction, issued much later and merely reminding the jury that the lawyers' arguments are not evidence, is fairly scaled to the size of the problem.").  However, in this case, similar to Canada Dry, the Court finds that these instructions, combined with the brevity of the arguably improper remarks, helped mitigate any prejudicial effect those comments may have had.  Accordingly, the Court finds that this factor weighs against a new trial.

### c.  Influence on Verdict/Prejudicial Impact

The third factor outlined by the Tenth Circuit—the size of the verdict—is not directly applicable here since the jury found in favor of the West Valley Defendants. Nevertheless, the Court considers whether the counsel's misconduct clearly influenced the verdict or obviously prejudiced the opposing party.  See Lambert v. Midwest City

Mem'l Hosp. Auth., 671 F.2d 372, 375 (10th Cir. 1982) (stating that "even though an argument may be improper, a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict"); Ramsey, 738 F.2d at 1100 (stating that a "'judgment should not be disturbed unless it clearly appears that the remarks in question unduly aroused the sympathy of the jury and thereby influenced the verdict.'" (quoting Julander, 488 F.2d at 842)); Smith v. Atl. Richfield Co., 814 F.2d 1481, 1488 (10th Cir. 1987) (indicating that a new trial is not warranted where counsel makes an improper argument during closing "unless it obviously prejudiced one of the parties"); Moody, 506 F. Supp. 2d at 835 (stating that a court "should consider the prejudicial impact of plaintiffs' counsel's statements when ruling on [a] motion for a new trial"). In considering this factor, the Court also considers the effect of its overruling Ms. Bird's counsel's objection to the 12 Strong argument. (3/16/18 Partial Tr. 28:2-14, ECF No. 169-2.) This factor also weighs against granting a new trial.

First, the verdict itself indicates that the jury did not find Mr. Morris fully, if at all, credible. Ms. Bird claims that the West Valley Defendants' closing argument had the prejudicial effect of forcing the jury to either side with Mr. Morris, "a patriot and war hero," or Ms. Bird. (Reply 2, ECF No. 173; see also Mot. 5, 10, ECF No. 169.) The parties stipulated that for purposes of establishing municipal liability this case, Mr. Morris was the final decision maker in Ms. Bird's termination, and accordingly, the Court instructed the jury that it "must consider Mr. Morris's motivation in terminating Ms. Bird in making decisions about West Valley City's liability." (Jury Instructions, Instruction No. 11, ECF No. 160.) At trial, Mr. Morris unequivocally testified that leaks to the press and

played no role in his decision to terminate Ms. Bird's employment. (3/15/18 Trial Tr. 48:8–58:1, App. 5.) However, the jury found that Ms. Bird proved by a preponderance of the evidence that West Valley City's belief that she leaked information to the press regarding Andrea the cat was a "substantial or motivating factor" in its decision to terminate her. (Special Verdict Form, ¶¶ 2, 3, ECF No. 166); see Trant v. Oklahoma, 754 F.3d 1158, 1166 (10th Cir. 2014) (stating that to prove a First Amendment retaliation claim, "the employee must show that the speech was a 'substantial factor or a motivating factor in a detrimental employment decision.'" (quoting Brammer–Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007))). Thus the jury's decision reflects that they did not find Mr. Morris's testimony credible. Therefore any arguably improper attempts to bolster or vouch for his credibility did not work, as the jury expressly disagreed with Mr. Morris's statements about his motive. Similarly, while a judge's overruling of an objection can make an error worse, Whittenburg, 561 F.3d at 1132, in this case the jury did not allow argument to drive its factual determinations concerning Mr. Morris's credibility.

The jury then went on to find that the West Valley City proved its defense by a preponderance of the evidence—that it would have terminated Ms. Bird regardless of the Andrea the cat incident. (Special Verdict Form, ¶ 4, ECF No. 166); see Trant, 754 F.3d t 1167 (stating that "if the employee establishes that his or her protected speech was a motivating factor in the adverse employment decision, 'the burden then shifts to the defendant, who must show by a preponderance of the evidence it would have reached the same employment decision in the absence of the protected activity' "

(quoting <u>Cragg v. City of Osawatomie</u>, 143 F.3d 1343, 1346 (10th Cir.1998))).  The trial record contains ample evidence concerning Ms. Bird's performance at West Valley City, including problems with her communication and management style, and her contentious relationship with and insubordinate conduct toward her supervisor Mr. Davis, much of which predates the October 2011 leaks to the press concerning Andrea the cat.  (<u>See</u>, <u>e.g.</u>, 3/13/18 Trial Tr. (Bird Testimony) 3:6–21:4, App. 3; 3/14/18 Trial Tr. (Davis Testimony) 7:7–31:12, App. 4; 3/14/18 Trial Tr. (George Testimony)[5] 31:19–59:2, App. 4; 3/15/18 Trial Tr. (Morris Testimony) 14:20–32:8, 32:25–53:8, App. 5.)  Thus a reasonable jury could have and ultimately did conclude that West Valley would have fired Ms. Bird in the absence of any belief that she leaked information concerning Andrea the cat to the press.

Further, the Court recognizes that this case is, as Ms. Bird argues, a "close case" and that improper vouching may prove more damaging in close cases turning on the credibility of witnesses.  However, as explained above, the arguably improper attempts to bolster or vouch for Mr. Morris's credibility during closing arguments did not unfairly prejudice Ms. Bird because the jury's verdict reflects that it did not find Mr. Morris credible.  Accordingly, the close nature of this case does not weigh in favor of granting a new trial.

Second, Ms. Bird's counsel had an opportunity to address—and did in fact address—the remarks that West Valley Defendants' counsel made concerning Mr. Morris's credibility during her rebuttal argument.  (3/16/18 Trial Tr. 40:9–25, App. 6.)

---

[5] Shirlayne George served as the human resources manager at West Valley City.

She argued that while "[c]ounsel talked about that Mr. Morris wouldn't lie about these motivations," the recordings offered during trial "show both Mr. Davis's and Mr. Morris's motivations. That they were concerned about the negative information that was in the press." (Id.) That Ms. Bird's counsel had the opportunity to respond to the arguments West Valley Defendants' counsel made during his closing argument concerning Mr. Morris's veracity lessens any prejudicial impact those comments may have had on the jury. Cf. Gilster, 747 F.3d at 1011 (finding prejudice greater where counsel made improper comments "at the end of rebuttal closing argument, when they would have the greatest emotional impact on the jury, and when opposing counsel would have no opportunity to respond"). Thus this factor too weighs against granting a new trial.

***

Importantly, the Tenth Circuit indicated that its decision to grant a new trial in Whittenburg was "not based on any of these factors singly, but rather their combination after considering the argument as a whole." 561 F.3d at 1133. There, the court found that "the confluence of these three factors—the extensiveness of the improper remarks, the absence of any meaningful curative action, and the size of the verdict" required a new trial. Id.

Here, as addressed in detail above, the three factors weigh against a new trial. The improper and arguably improper remarks of West Valley Defendants' counsel during closing arguments lasted only a few minutes, the Court instructed the jury on multiple occasions that attorney arguments are not evidence, and there is no indication that these arguments clearly influenced the verdict or obviously prejudiced Ms. Bird.

Thus the conduct at issue in this case falls well below the level needed to order a new trial. <u>See</u> <u>Spahr</u>, 686 F. Supp. 2d at 1224 (finding that even where "closing arguments in a few instances crossed the sometimes fuzzy line between proper and improper[,] . . . as a whole, the court is confident that the closing fell considerably and decisively short of the level of impropriety that would merit a new trial.") Accordingly, the Court finds a new trial unwarranted.

## **CONCLUSION**

For the foregoing reasons, the Court DENIES Ms. Bird's Motion for New Trial.

DATED this 28th day of March, 2019.

_____
EVELYN J. FURSE
United States Magistrate Judge

# APPENDIX 1



FW: Case 2:12-cv-00903-EJF Bird v. West Valley City et al
Stanley Preston
to:
'utdecf_furse@utd.uscourts.gov', Lindsey_Pagel@utd.uscourts.gov
03/06/2018 10:00 AM
Cc:
"'HollingsworthLaw (april@aprilhollingsworthlaw.com)'", Kass Harstad, xerniafortson,
"Bryan M. Scott", Brandon Crowther
Hide Details
From: Stanley Preston <sjp@prestonandscott.com> Sort List...
To: "'utdecf_furse@utd.uscourts.gov'" <utdecf_furse@utd.uscourts.gov>,
"Lindsey_Pagel@utd.uscourts.gov" <Lindsey_Pagel@utd.uscourts.gov>
Cc: "'HollingsworthLaw (april@aprilhollingsworthlaw.com)'"
<april@aprilhollingsworthlaw.com>, Kass Harstad <kass@utahjobjustice.com>,
xerniafortson <xerniafortson@gmail.com>, "Bryan M. Scott" <bms@prestonandscott.com>,
Brandon Crowther <btc@prestonandscott.com>
History: This message has been forwarded.

Judge Furse,

As the Court requested, the parties have now conferred about witnesses and the amount of time the parties will need to present their cases-in-chief. The parties have agreed that we will need to have extended trial days until 4:00 p.m. each day, including Tuesday, if that can be arranged. If we are done by 4:00 pm on Tuesday, that will allow me to make my other commitment that evening. Regards, Stan

Stanley J. Preston
PRESTON & SCOTT
111 S. Main Street, Suite 1600
SLC, UT 84111
DD: 801-869-1623
Cell: 801-860-9239
Fax: 801-869-1621
sjp@prestonandscott.com
www.prestonandscott.com

The information contained in this e-mail and any attachments is confidential and solely for the use of the intended recipient. If the intended recipient is our client, then this information is also a privileged attorney-client communication. Unauthorized use or disclosure of this information is prohibited. If you have received this communication in error, do not read it. Please delete it from your system without copying it, and notify the sender by e-mail or by calling 801-869-1620, so that our address record can be corrected. Thank you.

# APPENDIX 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


| | |
|---|---|
| In re: | ) |
| | ) |
| KAREN BIRD, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )  Case No. |
| | )  2:12-CV-903EJF |
| WEST VALLEY CITY, a | ) |
| political subdivision | ) |
| of the State of Utah, | ) |
| KELLY DAVIS, in his | ) |
| official and | ) |
| individual | ) |
| capacities, | ) |
| | ) |
|     Defendants. | ) |
| _____ | ) |



BEFORE THE HONORABLE EVELYN J. FURSE

March 12, 2018


Partial Transcript
Excerpts from Trial




Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

1

**Appearances of Counsel:**

For the Plaintiff:      April L. Hollingsworth
                            Attorney at Law
                            Hollingsworth Law Office LLC
                            1115 South 900 East
                            Salt Lake City, Utah 84105

                            Kathryn K. Harstad
                            Attorney at Law
                            Strindberg & Scholnick LLC
                            Plaza 721
                            675 East 2100 South
                            Suite 350
                            Salt Lake City, Utah 84106

                            Xernia L. Fortson
                            Attorney at Law
                            2935 Duke Of Windsor
                            Atlanta, Georgia 84106

For the Defendants:    Stanley J. Preston
                            Bryan M. Scott
                            Brandon T. Crowther
                            Attorneys at Law
                            Preston & Scott
                            111 E. Broadway
                            Suite 1200
                            Salt Lake City, Utah 84111

1

2   (Whereupon, preceding portion of the trial

3    were not transcribed.)

4   THE COURT:  All right.  So I am -- welcome

00:00:02 5 back.  I am going to read to you a number of

6 preliminary instructions to give you some orientation

7 about what you're going to hear and the rules you

8 need to follow.  And then following that, we will

9 take a half hour break and you can grab some lunch.

00:00:19 10 Then we will come back and we will hear opening

11 statements at that time.

12   So preliminary instruction number one is

13 members of the jury, we are about to begin the trial

14 of this case.  You have heard some details about this

00:00:34 15 case during the process of jury selection.  Before

16 the trial begins, however, there are certain

17 instructions I will give you to better understand

18 what will be presented to you and how you should

19 conduct yourself during the trial.  These remarks are

00:00:49 20 an introduction only and are not evidence in the

21 case.  I will give you some instructions now and some

22 later.  You are required to consider and follow all

23 of my instructions.  Keep an open mind throughout the

24 trial.

00:01:05 25   At the end of the trial you will discuss the

|   | 1 | evidence and reach a verdict as a group.  During the |
|---|---|---|
|   | 2 | trial, you will hear me use a few terms that you may |
|   | 3 | not have heard before.  Let me briefly explain some |
|   | 4 | of the most common to you. |
| 00:01:20 | 5 | You will sometimes hear me refer to counsel. |
|   | 6 | Counsel is another way of saying lawyer or attorney. |
|   | 7 | I will sometimes refer to myself as the court. |
|   | 8 | I will now give you some preliminary |
|   | 9 | instructions to guide your participation in the |
| 00:01:37 | 10 | trial.  First I will explain the nature of the case |
|   | 11 | then I will explain what your duties are as jurors |
|   | 12 | and how the trial will proceed.  At the conclusion of |
|   | 13 | the evidence I will give you more detailed |
|   | 14 | instructions on the required proof and how you should |
| 00:01:54 | 15 | proceed to reach a verdict. |
|   | 16 | This case is a civil case.  A party who |
|   | 17 | brings a lawsuit in a civil case is called a |
|   | 18 | plaintiff.  In this action the plaintiff is Karen |
|   | 19 | Bird.  The party against whom a civil lawsuit is |
| 00:02:09 | 20 | brought is called the defendant.  In this action, the |
|   | 21 | defendants are West Valley City which I or the |
|   | 22 | parties may refer to as the City, and Kelly Davis is |
|   | 23 | also a defendant.  I or the parties may also |
|   | 24 | sometimes refer to them collectively as the |
| 00:02:24 | 25 | defendants. |

4

```
 1         To help you understand what you will see and

 2    hear, I will now explain the background of the case.

 3         Karen Bird worked as a manager of the West

 4    Valley City Animal Shelter until her termination in

 5    November 2011.  She worked directly for defendant

 6    Kelly Davis, the shelter's director of operations,

 7    who worked for Layne Morris, the director of West

 8    Valley City's Community Preservation Department.

 9         On November 29th, 2011, Mr. Morris terminated

10    Ms. Bird.  Ms. Bird brought this lawsuit against West

11    Valley City and Mr. Davis alleging that her

12    termination was motivated by their belief that she

13    was the source of leaks to the media about the animal

14    shelter in violation of her First Amendment Right to

15    free speech.  West Valley City and Mr. Davis claim

16    that Ms. Bird was terminated for legitimate reasons

17    specifically for being insubordinate, discourteous,

18    and uncooperative.

19         Preliminary instruction number two.  Your duty

20    is to find from the evidence what the facts are.  You

21    and you alone are the judges of the facts.  You will

22    then have to apply those -- apply to those facts the

23    law as the court instructs you.  You must follow that

24    law whether you agree with it or not.  Nothing that

25    the court may say or do during the course of the
```

1   trial is intended to indicate nor should be taken by

2   you as any indication of what your verdict should be.

3   Justice through trial by jury must always depend on

4   the willingness of each individual juror to seek the

5   truth as to the facts from the same evidence

6   presented to all of the jurors and to arrive at a

7   verdict by applying the same rules of law as given in

8   the instructions of the court.

9           Generally speaking -- or preliminary

10  instruction number three.  Generally speaking, two

11  types of evidence from which a jury may properly find

12  the truth as to the facts of the case exist.  One is

13  direct evidence, such as testimony of an eyewitness.

14  The other is indirect or circumstantial evidence

15  which is proof of a chain of circumstances pointing

16  to the existence or nonexistence of certain facts.

17  The law makes no distinction between the weight to be

18  given to either direct or circumstantial evidence but

19  simply requires that the jury find the facts in

20  accordance with the preponderance of the evidence in

21  the case both direct and circumstantial.  You may

22  consider both direct and circumstantial evidence.

23  Direct evidence is the testimony of one who asserts

24  actual knowledge of a fact such as an eyewitness.

25  Circumstantial evidence is proof of a chain of facts

or circumstances indicating the existence or
nonexistence of a particular fact, or the occurrence
or nonoccurrence of a particular event.

For example, if someone walked into the
courtroom wearing a raincoat covered with drops of
water and carrying a wet umbrella, that would be
circumstantial evidence from which you could conclude
that it was raining.

Preliminary instruction number four.  The
evidence from which you will find the facts will
consist of sworn testimony of witnesses, documents,
and other things received into the record as
exhibits, any facts the lawyers agree or stipulate
to, and any applicable presumptions outlined by the
court.

Certain things are not evidence and you must
not consider them.  I will list them for you now.
Statements, arguments, and questions by lawyers are
not evidence.  When, however, the attorneys on both
sides stipulate and agree as to the existence of a
fact, the jury must, unless otherwise instructed,
accept that stipulation and regard that fact as
conclusively proved.  Objections to questions are not
evidence.  Lawyers have an obligation to their
clients to make an objection when they think opposing

```
 1   counsel has offered improper evidence under the rules

 2   of evidence.  Neither the objection nor the court's

 3   ruling on it should influence you.  If the court

 4   sustains the objection, ignore the question.  If the

 5   question is overruled, treat the answer like any

 6   other.  If the court instructs you that some item of

 7   evidence is received for a limited purpose only, you

 8   must only consider that evidence for that limited

 9   purpose.

10        Testimony that the court has excluded or told

11   you to disregard is not evidence and you must not

12   consider it.  Anything you may have seen or heard

13   outside of this courtroom is not evidence and you

14   must disregard it.  You are not to consider -- or

15   sorry.  You are to consider only the evidence in this

16   case.  However, in your consideration of the

17   evidence, you are not limited to the bald statements

18   of the witnesses.  On the contrary, you may draw from

19   the facts that you find have been proved such

20   reasonable inferences as seem justified in light of

21   your experience.  An inference is a deduction or

22   conclusion that reason and commonsense would lead you

23   to draw from the facts that are established by the

24   evidence in the case.

25        Preliminary instruction number five.  This is
```

a civil case. The plaintiff has the burden of proving its case by what is called the preponderance of the evidence. That means Ms. Bird has to prove -- has to produce evidence which considered in the light of all of the facts leads you to believe that what Ms. Bird claims is more likely true than not. To put it differently, if you were to put Ms. Bird's and the City and Mr. Davis's evidence on opposite sides of the scales, Ms. Bird would have to make the scales tip toward her side. If Ms. Bird fails to meet this burden, the verdict must be for the City and Mr. Davis.

A preponderance of the evidence is not alone determined by the number of witnesses, nor the amount of testimony or documentary evidence, but rather by the convincing character of the testimony and other evidence and the inferences reasonably drawn therefrom weighted by the impartial minds of the jury.

(Whereupon, the trial proceeded but was
not transcribed.)

# REPORTER'S CERTIFICATE

I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 12th day of March, 2019.


_____
Laura W. Robinson
RPR, FCRR, CSR, CP

# APPENDIX 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| KAREN BIRD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2:12-CV-903EJF |
| WEST VALLEY CITY, a | ) | |
| political subdivision | ) | |
| of the State of Utah, | ) | |
| KELLY DAVIS, in his | ) | |
| official and | ) | |
| individual | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE THE HONORABLE EVELYN J. FURSE

March 13, 2018

Partial Transcript
Excerpts from Trial

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

1

**Appearances of Counsel:**

For the Plaintiff:     April L. Hollingsworth
Attorney at Law
Hollingsworth Law Office LLC
1115 South 900 East
Salt Lake City, Utah 84105

Kathryn K. Harstad
Attorney at Law
Strindberg & Scholnick LLC
Plaza 721
675 East 2100 South
Suite 350
Salt Lake City, Utah 84106

Xernia L. Fortson
Attorney at Law
2935 Duke Of Windsor
Atlanta, Georgia 84106

For the Defendants:   Stanley J. Preston
Bryan M. Scott
Brandon T. Crowther
Attorneys at Law
Preston & Scott
111 E. Broadway
Suite 1200
Salt Lake City, Utah 84111

(Whereupon, the trial was held.  Portions

were not transcribed.)

(The following is an excerpt of Karen Bird's

cross-examination by Mr. Preston.)

Q.   (By Mr. Preston) Do you remember an

investigation being done among employees at the

shelter by Shirlayne George in 2005?

A.   Yes.

Q.   And you remember reading that, don't you,

and thinking that you had reason to improve.  Do you

recall that?

MS. HOLLINGSWORTH:  Objection.  Your Honor,

relevance.

THE COURT:  Sustained.  Or sorry, overruled.

Go ahead.

Q.   (By Mr. Preston)  Did you hear the question?

A.   Could you repeat it?

Q.   Yes, certainly.  You had an opportunity to

review that investigation and when you read it you

knew there were -- you needed to improve?

A.   I had been a manager for about three years

at that time so yes.

Q.   All right.  And, um, when you read the

negative comments that were there, you took that

as --

         MS. HOLLINGSWORTH:  Objection.  Assumes facts

not in evidence.

         THE COURT:  Um --

00:00:52    MR. PRESTON:  Could I just ask the question

and then -- could I complete the question before the

objection is made.

         THE COURT:  Okay.  Go ahead and complete the

question.

00:01:00   Q.  (By Mr. Preston)  Thank you.  When you read

the 2005 investigation, you understood that you were

having problems as a manager, did you not?

         A.  I felt I needed -- that there was areas of

improvement.

00:01:19   Q.  And you were having problems with the

employees that you supervised?

         A.  No, I don't feel so.

         Q.  Do you remember giving a deposition in this

case?

00:01:27   A.  Uh-huh (affirmative), yes.

         MR. PRESTON:  Your Honor, I would publish the

deposition of Karen Bird.

         THE COURT:  Okay.

         Q.  (By Mr. Preston)  Is this a transcript of

00:02:02  the deposition you gave on January 8, 2014?

```
 1        A.   It says so on the front, yes.

 2        Q.   All right.  And you know you were placed

 3   under oath when you gave that deposition?

 4        A.   Yes.

 5        Q.   Is that correct?

 6        A.   Yes.

 7        Q.   And would you agree with me that your memory

 8   was probably better when this was given than it is

 9   today about the events in question?

10        A.   In 2014 is when I gave this.  So, um, my

11   memory does -- I have a good long term and just that

12   immediate recall is sometimes hard for me.

13        Q.   Okay.  Well, let me direct you to Page 59,

14   if you would, of your deposition.  And I would like

15   you to go to Line 11 of Page 59.  Tell me when you're

16   there.

17        A.   I'm there.

18        Q.   Okay.  Would you follow along and make sure

19   I read this accurately.  Question, I'm asking about

20   your performance as a manager and your relationship

21   with the employees that you supervised.  Based upon

22   your review of this, and I'll represent we were

23   looking at the 2005 investigation, did you believe it

24   was an indication that you were having problems with

25   the employees you supervised?  And what was your
```

```
 1   answer?

 2        A.   Here it says yes.

 3        Q.   All right.  That was your testimony in 2014,

 4   correct?

 5        A.   Yes.

 6        Q.   All right.  Um, did you think you were

 7   negative about the employees at the shelter

 8   generally?

 9        A.   Did I think I was negative about the

10   employees?

11        Q.   Yeah.  Did you have a negative attitude

12   about the employees at the shelter?

13        A.   No.

14        Q.   Um, let me hand you what has been marked as

15   Defendant's Exhibit 98.  This is a two-page excerpt

16   from typewritten journal entries that you prepared.

17   Do you recognize it?

18        A.   Yes.

19        MR. PRESTON:  Your Honor, I would move the

20   admission of Defendant's Exhibit 98.

21        THE COURT:  Any objection?

22        MS. HOLLINGSWORTH:  No objection.

23        THE COURT:  It is admitted.

24        (Whereupon, Defendant's Exhibit 98

25          was received into evidence.)
```

00:03:29
00:03:43
00:03:53
00:04:16
00:04:26

Q.   (By Mr. Preston)  Can you bring that up, please.  Okay.  I want to read through some of this with you.  It's dated January 23, 2008.  You say, what a great year it is turning out to be again, in caps, exclamation, exclamation.  Let me state the issues so far this year.  Suzie needs a platelet transfusion or she will die.  She called sick again today.  Chris's medication that she has been on for five years is the wrong kind.  She calls in sick constantly.  Chris is late more days than not.  Nate's going blind again.  Then you talk about the kennels.  And you go down, Kelly hired a 53-year old inexperienced man as the new officer.  Skipping down, Denise, an officer, calls in sick all the time.  She never does her work right, according to others, and is late every day.  And then you list three or four things that are good.  And then you state, I wish I could add more to this but I can't.  I'll try but no promises.  Then the next entry is several months later, August 15, 2008.  A lot has happened of course -- of the course of the months.  David quit, exclamation point.  Were you happy about him quitting?

A.   I didn't really have any opinion about it. He quit.

1      Q.   Why did you put an exclamation point behind

2 it?

3      A.   I don't know.

4      Q.   Kelly hired Issai.  I'm not sure -- how do

5 you pronounce Issai?

6      A.   Issai.

7      Q.   Thank you, paren Spanish, close paren.  And

8 Tom, and the other guy Steve, well not much good to

9 say about him.  He doesn't know how to age an animal.

10 Everything he brings in is either feral or three

11 years old.  Tom is a child.  He is too immature to

12 handle an officer position.

13      Skipping down three lines.  As always, Suzie

14 is out again.  This time she had to have her

15 gallbladder removed.

16      And then we'll skip down to the last

17 paragraph.  On Tuesday morning Chris called in with a

18 migraine headache in roll call.  Denice said

19 something about how stress contributes to them and

20 Kelly made a comment that at some point we need to be

21 responsible for ourselves.  I took that as he was

22 saying that it's our own fault for getting the

23 migraines.  Kathy said that she doesn't get them, I

24 told her you don't work in the office either.  She

25 said she worked in the code office.  I blew her off

at that point.  So the very next day when Chris came

back in, her and Kelly were talking about her

migraine and how about bad it was and Kelly told her

that he knows that she couldn't do anything about it

and that controlling stress isn't as easy to do.

Talk about speaking out of your ass, exclamation

point.  Nate has been on light duty periodically due

to his side and then his back.  He is still going

blind but for the moment he has his contacts right

now.  He was without driving privileges for a few

months because of eye surgery and then because his

contacts weren't ready.  And then he hurt his back.

But when you talk to him it seems pretty gloom and

doom about his health.  He is going to be blind and

paraplegic before too long.

     I see throughout this you're talking about

people's health issues and it appears to me that you

were rather impatient and critical of people's health

issues.  Would you agree with me?

    A.   There was a time at the shelter we had a

total of 53 days the entire year of being full

staffed because of people being out sick or positions

not filled and it was stressful.

    Q.   Okay, I understand that but my question is,

were you impatient with people's health issues and

```
 1   because it was creating a workload problem for you?
 2        A.   I was stressed about it.
 3        Q.   Um, you appear critical about it in this,
 4   wouldn't you agree with me?
 5        A.   I appear impatient or stressed about it like
 6   I said.
 7        Q.   But you didn't think you were being critical
 8   of these folks?
 9             (Whereupon, the trial continued but was
10              not transcribed.)
11             (Whereupon, the following is an excerpt
12              of Karen Bird's cross-examination by
13              Mr. Preston.)
14        Q.   (By Mr. Preston) Okay.  We'll talk about
15   that.  You understood, did you not, from the
16   performance evaluation and from whatever,
17   conversations with Layne Morris, you knew your job
18   was in jeopardy at that point in time, did you not?
19        A.   I didn't think I was -- it was in jeopardy
20   at that time.  I felt that I had a bad eval and
21   because I had given Ed his eval and Kelly said well
22   let's do yours now.
23        Q.   All right.  Well, let's look at the
24   Memorandum of Understanding.  Handing you what has
25   been marked as Defendant's Exhibit 73.
```

00:08:51 (line 5)

00:37:25 (line 15)

00:37:44 (line 20)

00:38:18 (line 25)

1      MS. HOLLINGSWORTH:  This is already in the

2   record as Exhibit 28.

3      MR. PRESTON:  Well, your exhibit has

4   additional documents on it.  I want mine in because

00:38:37   5   it's just the Memorandum of Understanding.

6      THE COURT:  Okay.  So I take it there is no

7   objection then?

8      MS. HOLLINGSWORTH:  No objection.

9      THE COURT:  All right.  We'll go ahead and

00:38:44   10   admit that.

11      (Whereupon, Defendant's Exhibit 73

12      was received into evidence.)

13      Q.   (By Mr. Preston)  This document is dated

14   December 21, 2010, and this is the Memorandum of

00:38:53   15   Understanding that Kelly wrote to you, correct?

16      A.   Yes.

17      Q.   All right.  Let's go through this.  "Dear

18   Karen, over two years ago the Animal Services

19   Division was faced with multiple issues that could

00:39:08   20   have seriously affected the morale, efficiency,

21   professionalism, image, and viability of its

22   existence.  As a result of this situation, a

23   personnel investigation was begun.  And at the

24   conclusion of the investigation, a decision was made

00:39:25   25   to provide training for the entire division and

address the perception of lack of leadership.  A
training session was conducted by human resource
director Paul Isaac where Paul specifically addressed
a team oriented topic.

Layne Morris, the director of the department,
decided that reorganization was necessary to bring
more accountability to management and for management
to address those internal behaviors that were
affecting negatively upon the organization.  As a
result of the re-organization, I was re-assigned and
tasked with focusing more on the Animal Services
Division and relieved of my duties as it related to
Code Enforcement.  The direction given me was to
begin solving the administration's concerns and
directing the organization in a more positive
direction."

So he is explaining here, is he not, what
happened which led two years ago in 2008 to him
coming out to the shelter and focusing on the animal
shelter.  Do you recall those events?

        A.   Paul coming out to the shelter?

        Q.   Kelly.

        A.   Oh, Kelly.  Yes.

        Q.   Okay.  Do you recall Paul coming out, having
this meeting?

1    A.    No.

     2    Q.    You don't recall that?

     3    A.    No.

     4    Q.    All right.  Going down to the fourth

     5  paragraph.  Within that time period you and I have

     6  had discussions where your views were expressed and

     7  our differences of opinions were aired.  Decisions

     8  were ultimately made as a result of yours and others

     9  input.  However, your implementation of those

    10  decisions lacked the appropriate support.

    11         Consequently, the message sent by you to your

    12  staff undermined my authority.  Specifically, when it

    13  came to the cleaning protocol and the level of

    14  priority placed on cleaning you were less than

    15  supportive.  Consequently, I was forced with putting

    16  in writing a daily operation schedule outlining those

    17  priorities I expected you and your staff to meet.

    18  When working with the volunteer program, your actions

    19  and attitude was you didn't have the time to spend

    20  training and doing those things that would welcome

    21  the volunteers' efforts.  My decision to lessen your

    22  involvement in the hiring process was met with

    23  resentment and what I believe to be a bias against

    24  those individuals that were hired when you were not

    25  involved.

1    When our shelter was under fire from animal

2  rights groups regarding the carbon monoxide chamber,

3  you being a member of management, I was surprised to

4  find that your public feelings on the subject were

5  not in line with what both Taylorsville and West

6  Valley leadership had decided in regards to its use.

7    To this day you remain defiant even to the

8  point where you have expressed to other staff members

9  that you would not use the chamber yourself and in

10 effect poisoned those staff members to decide for

11 them as required in policy.  As a manager of people,

12 emphasis should be towards efficiency within the

13 operation with compassion for those individuals

14 tasked with the necessary job of euthanasia.  The

15 chamber is efficient, feasible, and humane to both

16 operator and animal.  For some reason you refuse to

17 accept that.

18    So he is going through specific things here,

19 is he not, where he felt you have been undermining

20 his authority and resisting the direction he wants

21 the shelter to go in.  And you were on notice of

22 these, correct?

23     A.   This was on my desk, yes.  I didn't have an

24 opportunity to discuss this with him.

25     Q.   Are you sure you didn't have an opportunity

14

```
 1  to discuss this with him?

 2       A.   I don't remember discussing the Memorandum

 3  of Understanding with him.

 4       Q.   Okay.  If Kelly Davis were to testify

 5  otherwise, would you say he is not telling the truth?

 6       A.   His memory could be different than mine.

 7       Q.   But whether you had the discussion or not,

 8  this had to put you on notice of issues of

 9  insubordination regarding cleaning, regarding the

10  volunteer program, regarding your resistance and

11  defiance with respect to the euthanasia policy, your

12  poisoning the well to other employees.  You were

13  aware of these things back on December, late

14  December 2010 and he gave you notice of them in this

15  memo of understanding, did he not?

16       A.   He gave me this at the end of 2010, the

17  first of 2011, yes.

18       Q.   Let's look at the second to the last

19  paragraph.  As I reflect upon the entire operation

20  and its ability to perform successfully as a team,

21  I'm troubled that one of my managers is having

22  difficulty accepting direction and implementing that

23  direction with the proper spirit that will promote

24  team building.  There is a level of trust that is

25  necessary between employee and supervisor and
```

1  vice-versa.  The same if not greater trust should be

2  present with managers and their supervisor.  I am

3  sorry to say that I have lost the trust in your

4  ability to administer the philosophy and vision of

5  this organization.  That is what he wrote then,

6  correct?

7      A.  That is what he wrote.

8      Q.  So when your boss tells you that he has lost

9  trust in you and that you're being insubordinate, you

10 have to recognize that your job is in jeopardy, don't

11 you?

12     A.  He didn't tell me I was being insubordinate.

13 He said he lost trust in the ability to administer

14 the philosophy and vision.

15     Q.  Do you mean to tell me that when he tells

16 you that you're undermining his authority, when you

17 are resisting the directions he is giving you, he

18 didn't tell you that you were insubordinate?

19     A.  No.

20     Q.  Okay.  Let's look at your 2010 Performance

21 Evaluation.  I know it is already in but I want to

22 just have the single evaluation as an exhibit.  It is

23 Defendant's Exhibit 72.

24         THE COURT:  Any objection?

25         MS. HOLLINGSWORTH:  No objection.

THE COURT: We'll admit that.

(Whereupon, Defendant's Exhibit 72

was received into evidence.)

Q. (By Mr. Preston) This is your 2000 --
December 11, 2010 performance review, correct?

A. Yes.

Q. And if you look at the paragraph that begins
Karen J, J is your middle initial; is that right?

A. Yes.

Q. Karen J. has been slow to adapt to some
changes in her job or the work environment. Karen
has difficulty accepting my role and responsibility
as director since the re-organization. She
frequently needs help in balancing competing demands
on her time. Karen fails to recognize certain
priorities that are important to her supervisor and
focuses more on those job duties that are of a
priority to her. She tends to not accept feedback or
criticism as well as she could. Sometimes Karen J.
encounters difficulties in adjusting her approach or
method to best fit different situations. So you
recall receiving that, correct?

A. Yes.

Q. Go to the top of the next page, second
sentence. Karen has had difficulty either

1  understanding direction given or chooses not to

2  follow the direction given.  Specific topics that

3  demonstrate this are cleaning protocol, euthanasia

4  policy, personnel evaluation, volunteer program.

5  Then he states, I have noticed some improvement in

6  those areas recently.

7       So you were aware that he was critical of you

8  for not following his direction.  You see that?

9       A.  I can read what he wrote, yes.

10      Q.  And you didn't think he was telling you that

11  you were being insubordinate?

12      A.  No.

13      Q.  Okay.  Go to the next paragraph, second

14  sentence.  However, she could do more to provide an

15  environment that encourages open communication so

16  that her subordinates feel free to discuss work

17  problems.  Feedback from her fellow employees has

18  been she speaks down to them and walks away when

19  employees respond.  When conflicts arise, she

20  sometimes loses her objectivity.  Karen J.

21  occasionally allows herself to express emotions in

22  ways which are not helpful.  Did you feel you had --

23  you needed to improve in some of these areas?  Did

24  you answer?  I'm sorry, what?

25      A.  Did I feel that I was what?

1    Q.  Did you feel, based upon what's set forth in
2  Performance Evaluation Exhibit 72, that you were
3  being put on notice of things that you needed to
4  improve on?

00:49:39    5    A.  It was in my evaluation.  It does say I need
6  to improve in these areas, yes.

7    Q.  Okay.  Did you try to improve in them?

8    A.  I believe I always tried to improve.

9    Q.  Okay.  You get this Performance Evaluation,
00:50:03   10  you get the Memo of Understanding.  Layne Morris
11  tells you that he was ready to fire you.  Kelly said
12  he wanted to give you one more chance, gets you these
13  documents.  You knew at this point your job was in
14  jeopardy, did you not?

00:50:17   15    A.  I knew that Kelly wasn't happy with me.

16    Q.  Let's look at Page 145 of your deposition.
17  Actually go to 144, bottom of the page, line 19?

18    A.  144 line 19?

19    Q.  Yes.

00:50:49   20    A.  Okay.

21    Q.  It says Exhibit 6 was marked.  And I
22  represent this is the Memorandum of Understanding.
23  Did Kelly give this to you at or about the same time
24  that he discussed the evaluation with you?  You say
00:51:03   25  yes.  And on Page 145 I go on and I read from this

1  and I said beginning on Line 19, after reading part

2  of the Memorandum of Understanding to you, now you

3  knew at that point that your job was probably in

4  jeopardy, did you not?  And you answered, I felt that

5  it was.

6       So Ms. Bird, you have told the jury how much

7  you loved this job.  If you loved it so much, why

8  didn't you try to improve your relationship with

9  Kelly Davis?

10      A.   I did try to improve it and it improved in

11  2011.

12      Q.   Isn't it true that in 2011 it got to the

13  point where you couldn't even stand to look at him?

14      A.   After the list, yeah.  When he threw the

15  list back across the table at me, yes.

16      Q.   Okay.  Jon Andrus said he wadded it up and

17  threw it in your face, you just said he threw it back

18  at you.  When you testified earlier, you said he slid

19  it across the table to you.  Which was it?

20      A.   He was here (indicating) and when they gave

21  it to him he slid it across the table to me.

22      Q.   So he didn't throw it at you, did he?

23      A.   He slid it across.

24      Q.   Did he throw it at you, Ms. Bird?

25      A.   No, he did not.  He slid it.

```
 1        Q.   Did he wad it up and throw it in your face?

 2        A.   It didn't hit me in the face, no.

 3        Q.   Did he wad it up?

 4        A.   Not that I remember.

 5          (Whereupon, the trial continued but was

 6           not transcribed.)

 7          (Whereupon, the following excerpt

 8           occurred at the end of the trial day

 9           after the jury had been excused.)

10          THE COURT:  And you may step down and you all

11   may be seated.

12          All right.  So Ms. Hollingsworth, do you have

13   a general estimate on timeframes for the remainder of

14   your case?

15          MS. HOLLINGSWORTH:  Right.  So for our -- for

16   our case, depending on how long cross is, um, and I

17   don't know if Mr. Preston or whoever is planning on

18   doing their putting on their case at the same time

19   because we're using the same witnesses, but for just

20   what we need if we were allowed to just go through

21   everybody tomorrow I think we would be done tomorrow.

22   But like I said --

23          THE COURT:  By the end of the day tomorrow?

24          MS. HOLLINGSWORTH:  Right.

25          MR. PRESTON:  That is without me asking any
```

```
 1   questions?
 2          THE COURT:  Right.
 3          MR. PRESTON:  Is that what you're saying?
 4          MS. HOLLINGSWORTH:  Right.
 5          MR. PRESTON:  So that means that she is not
 6   going to finish her case until midday or later
 7   Thursday.  I obviously have some cross-examination.
 8   She has 12 witnesses and she has done five and barely
 9   started with the sixth, that leaves basically seven
10   witnesses to go.
11          I mean she has gone five and a half hours,
12   5 hours 10 minutes.  I have used 2 hours 35 minutes.
13   So I mean I think she has to really move her case
14   along at this point if we're going to try to get done
15   in four days.
16          THE COURT:  Let me just ask you.  So at this
17   point in your case, sorry, you have got -- that is
18   why okay so you -- you have got -- you have got
19   Mr. Davis on the stand now.  You have four other
20   witnesses identified as will call.  Do you still
21   anticipate calling all four of them?
22          MS. HOLLINGSWORTH:  Well, we were just talking
23   about one of them that we conceivably may not but we
24   want to -- we need to talk about that.  At the
25   moment, yes.
```

```
 1          MR. PRESTON:  There are six others, not four

 2    others.

 3          THE COURT:  Well, there are four other will

 4    calls and there are two other may calls.  I was going

 5    to ask -- I'm asking about the will call first.

 6          MS. HOLLINGSWORTH:  Right now we are still

 7    planning on calling all of the witnesses on our list.

 8          THE COURT:  So the will and the may?

 9          MS. HOLLINGSWORTH:  Right.  The last -- three

10    of them will be very short, Wayne Paul, Tess Hartwell

11    and Jay Breisch.  So there is --

12          THE COURT:  Okay.  So by very short, less than

13    a half hour each?

14          MS. HARSTAD:  Yes, for sure.

15          THE COURT:  So more like 15 minutes each?

16          MS. HOLLINGSWORTH:  Right.

17          THE COURT:  Okay.

18          MS. HOLLINGSWORTH:  So -- and the -- and these

19    main witnesses that are still coming up, so obviously

20    Kelly Davis, Shirlayne George, Layne Morris and Paul

21    Isaac are also defendants' witnesses.

22          THE COURT:  Right.

23          MS. HOLLINGSWORTH:  But he is not a main -- he

24    will be short.

25          THE COURT:  And then your -- and then after
```

```
 1   that you only have one other witness who would not be
 2   included on that list; is that correct?
 3         MR. PRESTON:  Two.
 4         THE COURT:  You have two other witnesses,
 5   okay.  Yeah, I see.  Um, okay.  So we -- the problem
 6   as I see it is we have had -- we have had the jury
 7   here for four days.  We have had delay although we
 8   haven't talked about it I have submitted the court's
 9   jury instructions back to you which do show that any
10   punitive damage award would need to be held -- would
11   need to be -- that there would need to be evidence on
12   that held after a deliberation from the jury.
13         And I am out of town all of next week so there
14   is no possibility for me to run into next week.  Um,
15   as I understand it, um, Mr. Preston also has
16   obligations.  Do you have obligations on Friday as
17   well, I'm trying to remember?
18         MR. PRESTON:  Um, I settled that case.  I will
19   still probably have to appear in front of Judge
20   Jenkins but hopefully it won't be very long.
21         THE COURT:  Okay.  All right.  So right now
22   our jurors are not planning on being here on Friday.
23   So we need to do our best to get through as much as
24   possible tomorrow because we will need to do --
25   obviously there will be time for closings, time for
```

|  | 1 | jury instruction.  How much time, if you have an |
|  | 2 | estimate now at this point, about closing argument. |
|  | 3 | MS. HOLLINGSWORTH:  Probably an hour. |
|  | 4 | THE COURT:  Probably an hour.  Okay.  And |
| 03:41:50 | 5 | Mr. Preston, do you have any thoughts on that?  I |
|  | 6 | realize you haven't -- |
|  | 7 | MR. PRESTON:  I would say 45 minutes to an |
|  | 8 | hour. |
|  | 9 | THE COURT:  Okay.  All right.  So I guess what |
| 03:42:09 | 10 | I would ask you to do is if you can tonight to take |
|  | 11 | -- to go through and see if there is any way you can |
|  | 12 | tighten up your -- your direct exams on any of the |
|  | 13 | folks that you're going to be calling so that we can |
|  | 14 | move through as quickly as possible tomorrow.  All |
| 03:42:26 | 15 | right. |
|  | 16 | Any other concerns about witnesses, order of |
|  | 17 | witnesses, time, things of that nature? |
|  | 18 | MR. PRESTON:  No, Your Honor. |
|  | 19 | (Whereupon, the trial continued but was |
|  | 20 | not transcribed.) |
|  | 21 | |
|  | 22 | |
|  | 23 | |
|  | 24 | |
|  | 25 | |

**REPORTER'S CERTIFICATE**

2

3          I, Laura W. Robinson, Certified Shorthand

4   Reporter, Registered Professional Reporter and Notary

5   Public within and for the County of Salt Lake, State

6   of Utah, do hereby certify:

7          That the foregoing proceedings were taken

8   before me at the time and place set forth herein and

9   were taken down by me in shorthand and thereafter

10  transcribed into typewriting under my direction and

11  supervision;

12         That the foregoing pages contain a true and

13  correct transcription of my said shorthand notes so

14  taken.

15         In witness whereof I have subscribed my name

16  this 12th day of March, 2019.

17

18                    _____

19                    Laura W. Robinson

20                    RPR, FCRR, CSR, CP

21

22

23

24

25

# APPENDIX 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                          )
                                )
KAREN BIRD,                     )
                                )
          Plaintiff,            )
                                )   Case No. 2:12-CV-903EJF
vs.                             )
                                )
WEST VALLEY CITY, a             )
political subdivision of        )
the State of Utah, KELLY        )
DAVIS, in his official          )
and individual                  )
capacities,                     )
                                )
          Defendants.           )
_____         )




BEFORE THE HONORABLE EVELYN J. FURSE

March 14, 2018


Partial Transcript
Excerpts from Trial




Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

**Appearances of Counsel:**

For the Plaintiff:      April L. Hollingsworth
Attorney at Law
Hollingsworth Law Office LLC
1115 South 900 East
Salt Lake City, Utah 84105

Kathryn K. Harstad
Attorney at Law
Strindberg & Scholnick LLC
Plaza 721
675 East 2100 South
Suite 350
Salt Lake City, Utah 84106

Xernia L. Fortson
Attorney at Law
2935 Duke Of Windsor
Atlanta, Georgia 84106

For the Defendants:    Stanley J. Preston
Bryan M. Scott
Brandon T. Crowther
Attorneys at Law
Preston & Scott
111 E. Broadway
Suite 1200
Salt Lake City, Utah 84111

**Salt Lake City, Utah, March 14, 2018**

2        (Whereupon, the trial was held but was not

3         transcribed.)

4        (Whereupon, the following is an excerpt of

5         a discussion held out of the presence of the

6         jury between the Court and counsel for both

7         parties.)

8            THE COURT:  Okay.  And then timing-wise, I am

9    becoming concerned because tomorrow we have a six and

00:00:09    10   a half hour day, if you take out the breaks.  We will

11   have an hour each for closing arguments, probably an

12   hour of reading in the jury instructions, that takes

13   us down to three and a half hours tomorrow.  We have

14   approximately four and a half hours left today.

00:00:27    15       MS. HOLLINGSWORTH:  Okay.  We expect to wrap

16   up today.  The only potential issue would be if our

17   final witness, Jay Breisch, may have to come first

18   thing in the morning.  But we have eliminated one of

19   our witnesses, well, two of our witnesses actually.

00:00:42    20   We have agreed with counsel that a couple of exhibits

21   will -- they have agreed that they can be admitted.

22   We were bringing Tess Hartwell just to introduce a

23   couple of exhibits so we're not going to use her or

24   Paul Isaac.  So remaining --

00:01:04    25       THE COURT:  But you're still going to need to

```
 1   call Paul?

 2        MR. PRESTON:  Yes, absolutely.  This is the

 3   problem, Your Honor.  Kelly Davis is our witness, he

 4   is my defendant.  She has taken an hour-and-a-half

 5   with him, she is going to go another hour with him

 6   that is two and a half hours.  What does that leave

 7   me?  He is my witness.  I need to put my case on.  If

 8   I take anywhere near the time she is taking with my

 9   witnesses, this trial is not going to end on

10   Thursday.

11        THE COURT:  Yes.  Um, and yeah, I -- and so my

12   thought was to try and do an hour divide between the

13   parties at this point, dividing the length of time

14   and then it is up to you how you want to use them as

15   far as which witness.  But so with the three and a

16   half hours from tomorrow, the four and a half hours

17   from today, that's -- that's eight hours.  So -- and

18   given -- and then, um, the time -- let's see so --

19        MR. PRESTON:  Your Honor, the problem is she

20   has already taken seven hours and I have taken two

21   and a half hours.

22        THE COURT:  Right.

23        MR. PRESTON:  So now we're going to divide it

24   evenly.

25        THE COURT:  No, I did not say evenly.
```

MR. PRESTON: Okay. That is what I thought you said.

THE COURT: Give me a minute. I did not say evenly. So we have got eight hours to divide up and um --

MS. HOLLINGSWORTH: Your Honor, I want to point out that we have the burden of proof and these are effectively our witnesses. They're using the same witnesses. So, um, if -- and I have offered Mr. Preston the opportunity if he wants to put on his direct at the same -- when he -- when I am done with Mr. Davis, for instance, but he hasn't answered me on that. So I don't know if that's what he intends or not.

THE COURT: Okay. Um, I still think it makes sense to divide up the hours because I think that the -- there is a significant risk that Mr. Preston ends up with, you know, two hours to put his case on which is clearly unfair.

So what I would say is that the plaintiff should plan to have their case finished within three hours. Now obviously, three hours of your time, so how you're using the time. That is not if Mr. Preston -- that does not include Mr. Preston's cross-examination or direct examination depending how

```
 1    he wants to use it so.
 2              MS. HOLLINGSWORTH:  Okay.
 3              MS. HARSTAD:  Your Honor, can I ask a
 4    clarifying question?  So I understand that you intend
 5    to do punitive damages afterwards?
 6              THE COURT:  Right.
 7              MS. HARSTAD:  Can we put on more testimony at
 8    that stage?
 9              THE COURT:  We would, um, you would -- yes.
10              MS. HARSTAD:  So we can recall witnesses for
11    punitive damage purposes at that stage?
12              THE COURT:  Correct.
13              MS. HARSTAD:  Okay.
14              THE COURT:  I take it there is no objection to
15    that since that was your idea?
16              MR. PRESTON:  That's absolutely correct, Your
17    Honor.
18              THE COURT:  Okay.  So three hours of time left
19    for plaintiffs, and then that would leave defendants
20    five hours of time to put on their case.  And
21    obviously there is no obligation that you use all
22    three hours.  Anything else we need to cover before
23    we bring the jury back in?
24              MR. PRESTON:  No, Your Honor.
25              MS. HOLLINGSWORTH:  No.
```

THE COURT:  Okay.  Thank you.

(Whereupon, the trial continued but was
 not transcribed.)

(Whereupon, the following is an excerpt
 of the cross-examination of Kelly Davis
 by Mr. Preston.)

Q.   (By Mr. Preston) Okay.  Um, you were handed
Exhibit 71, I think that is in evidence.  Do we have
our copy of it that I can provide to the court.

THE COURT:  It is.

MR. PRESTON:  So here is Exhibit 71 which I
understand is now admitted, Your Honor.

THE COURT:  It is.

Q.   (By Mr. Preston)  This is the log that you
prepared starting in June of 2010.  Would you read
the first entry, first paragraph?

A.   Because of various difficulties in
communication with Karen regarding decisions that
have been made operationally, and after sitting down
with Layne, Layne Morris, expressing my concerns with
Karen where I felt she was actively trying to
undermine my authority, I felt it necessary to sit
Karen down and clarify each of our roles as managers.

Q.   Then you go on to state that you discussed
with her a series of topics, correct?

```
 1          A.   Right.

 2          Q.   And the first one has been covered, the fact

 3     that Ed Trimble had complained that Karen had told

 4     him not to use the chamber?

 5          A.   Yes.

 6          Q.   So you discussed that with her, she denied

 7     that.  That was the end of that, correct?

 8               MS. HOLLINGSWORTH:  Objection, leading.

 9               THE WITNESS:  Yes.

10               MR. PRESTON:  Your Honor, this is background.

11     It has been covered.

12               THE COURT:  Okay.  If you could keep it short.

13               MR. PRESTON:  Yeah.  When it is substantive, I

14     make sure I don't lead, Your Honor.

15               THE COURT:  Okay.

16          Q.   (By Mr. Preston)  What was the next topic

17     that you discussed with her?

18          A.   Disgruntled staff.

19          Q.   And what was that about?

20          A.   Three particular employees had come in and

21     complained to me about the frustration they were

22     having about Karen's approachability.  They felt that

23     she was hard -- they had a hard time explaining

24     things to her, that she was curt, that her responses

25     to them were short, and also that in their opinion
```

00:47:47
00:47:55
00:48:04
00:48:13
00:48:35

1    that Karen was favoring a particular employee.

2         Q.   Who was that employee?

3         A.   Tess.

4         Q.   Hartwell?

5         A.   Hartwell, yes.

6         Q.   Did you receive complaints like that on

7    other occasions?

8         A.   Yes.  Those kinds of complaints employees

9    would make from time to time about favoritism or they

10   felt like they were being treated unfairly or this

11   person likes me better than that person, so to speak.

12        Q.   Okay.  The next topic is clinic time change.

13   What did you discuss with Ms. Bird about that issue?

14        A.   I had been -- we ran a clinic at the rear of

15   our shelter every Wednesday, I'm not sure -- or no,

16   every Monday.  And that clinic was run by a vet, a

17   licensed veterinarian and two of my staff people, a

18   clerk and -- no, maybe it was just one of my staff

19   because the veterinarian would bring in his own

20   assistant.

21             So, um, I had those individuals, the

22   veterinarian as well as my staff member come to me

23   and ask if we could move the clinic date from a

24   Monday to a Wednesday because Mondays were very

25   difficult for not only the vet but also for the staff

1  that we -- that was helping at the clinic.  It

2  shortened up our front clerk help.  So I reviewed

3  that with Karen and asked her -- asked her what she

4  felt about that, how did she feel about the fact that

5  there has been a request to move it to Wednesday.

6  And I had -- I asked her what is your input?  And her

7  only input to me was we have always done it on Monday

8  why can't we keep it on Monday.  And I didn't feel

9  like that that was a good enough reason to change it

10  or not change it.  So I decided to go ahead and

11  change it to meet the -- the veterinarian's schedule

12  as well as try to lessen the burden on my staff on

13  Mondays.

14      Q.   All right.  And your last sentence, would

15  you read the last sentence of that paragraph, or last

16  two sentences?

17      A.   Okay.  Um, I decided to change the --

18      Q.   Beginning with "Karen was visibly"?

19      A.   "Karen was visibly upset that I made that

20  decision.  Her facial expression to me at the time I

21  informed her was of disgust and apathy."

22      Q.   And the next topic you discussed with her

23  was her role and your role.  Is that -- is that the

24  next item there?

25      A.   Yes.  Yes.

1    Q.   Okay.  Let me read this and follow along and

2  make sure I have read it correctly.  "Karen has had

3  difficulty recognizing each of our roles since she

4  returned to work after her traffic accident.  Karen

5  was out for over five months on short-term disability

6  and then light duty.  During her absence, I was

7  responsible for the day-to-day operations and overall

8  efficiency of the entire division.  Decisions were

9  made during this time that changed some procedures.

10 When Karen returned, she had some difficulty

11 accepting her limited responsibility.  I felt Karen

12 was not supporting my decisions on various situations

13 with personnel or operational issues."

14    You go on to say, "we discussed specifics about

15 her focus and job duties."  You wrote out the

16 expectations you had of her that needed to be

17 addressed each day and her responsibility for

18 ensuring that they get done.  And you asked her to be

19 more accessible and demonstrate a willingness to

20 listen to employee concerns.  Is that what you did

21 with her?

22    A.   Yes.

23    Q.   And then the last sentence of that entry

24 was, "the message I gave Karen was I encourage

25 communication between myself and her but will not

tolerate division.  She would do herself a favor if she became more of a team player than just a conduit for dissension."

A.  Yes.

Q.  And those were concerns you had in 2010?

A.  Absolutely, yes.

Q.  Okay.  Let's go to the third page, Bird 0404.  There is a June 28, 2010 entry.  And you have a person named Torrie, and do you remember the issue with Torrie that you were concerned about, a new volunteer?

A.  Yes.

Q.  What was that issue?

A.  She came into my office, she sought me out, and came into my office to talk to me about her volunteering.  She had just been volunteering there for a few days, I think it was two to three days.  And I was surprised to hear that she was upset about the way she was being treated.

Q.  And what was her complaint?

A.  I wanted her to be candid with me, I wanted her to explain it because I wanted to know specifics regarding it because I felt it was important to have these volunteers in there helping us.  And she said she was being treated as though she was not needed

1    there, was not wanted.

2        Q.   All right.  And the second paragraph begins,

3    "I have been concerned", if you would follow along,

4    "I have been concerned in the past with other

5    volunteers that this may be happening.  I'm now

6    documenting situations and will specifically address

7    this concern with Karen.  She is the manager and if

8    she is not willing to make this program work, then

9    she is the problem and not the solution."  Did you

10   have that discussion with Karen?

11       A.   I certainly did on many occasions.

12       Q.   This was an ongoing --

13       A.   More than one occasion.

14       Q.   Was it a one time deal or an ongoing issue?

15       A.   Torrie's complaint was an issue that I had

16   heard in private -- in previous concerns.  So this

17   was not the first time that I had heard a volunteer

18   or had a volunteer come in and express the fact that

19   they felt like they were not wanted or that there was

20   no time spent with them explaining things.  So this

21   was not the first time that it had happened.

22       Q.   All right.  Would you go to the next page,

23   this is July 27, 2010, second paragraph, take a

24   moment and read that if you would.

25       A.   Okay.

1    Q.   Do you remember that incident with the pit

2  bull?

3    A.   I do, yes.

4    Q.   And you have testified before about the

5  policy that a paramount issue was safety of the

6  technician, correct?

7    A.   Yes, or the employee conducting the

8  euthanasia.

9    Q.   Okay.  Was this an example?  I mean what --

10  how did you deal with this issue here?

11    A.   Once it was brought to my attention, um,

12  when you say how did I deal with it what do you mean?

13  I am not sure what you mean.

14    Q.   Did you have any discussions with Karen

15  about the fact that the employees needed to have

16  choice?

17    A.   Oh, absolutely.  As a matter of fact, I

18  wanted to hear what Karen had to say in regards to

19  that because right now at that point I only had

20  Nate's side of the story and so I wanted to hear what

21  Karen had to say in regards to it.  And so we

22  discussed the fact that safety was an issue with

23  regards to the reason why this particular animal, the

24  decision was made by Nate to do it that way instead

25  of the other.

1    Q.   All right.

2    A.   And I confirmed that.

3    Q.   And you confirmed that with Karen that the

4 employee had that choice?

5    A.   Absolutely, yes.

6    Q.   And then on July 28th, 2010, it says that

7 you were approached by Russ Cramer and Kathy Harris

8 about a volunteer named Michelle.  Is that Michelle

9 Johnson that we have talked about?

10    A.   Yes.

11    Q.   And it says in the third sentence, Kathy

12 says she has been told by Michelle on a couple of

13 occasions to do things.  Skipping down a sentence,

14 Russ informed me about an instance where Michelle was

15 rude to his mother when they were here visiting and

16 Russ's wife overheard Michelle speaking poorly of

17 Russ regarding a euthanasia incident.  And you say

18 you referred Russ to Karen and you were interested to

19 see how Karen would handle that?

20    A.   Yes.

21    Q.   How did Karen handle it, do you recall?

22    A.   I don't recall how she handled it.

23    Q.   All right.  August 25th, 2010, the bottom of

24 the next Page 0406 you were -- you indicate that you

25 had asked Karen to provide a list of activities.  Do

1  you see that?

2      A.  Yeah.  My request was basically to provide

3  me with a list of those activities that we are

4  involved in as a shelter, outside activities, because

5  I was going to be presenting in the Taylorsville City

6  Council meeting and I wanted to be able to show them

7  or tell them what we were doing as a shelter in

8  efforts of adoptions, going out there and doing the

9  activities that we were doing to make adoptions more

10  involved.

11      Q.  And when you went back to Karen and asked

12  her if it was done, what did she say?

13      A.  Well, when I first asked her if she had got

14  it done she hadn't.  She said she hadn't had time or

15  didn't -- had some reason -- she said -- well let me

16  read it.

17      Q.  Okay.

18      A.  She did not have it done yet and she had

19  other things that she was doing and would try to get

20  to it.  And that's when I informed her that it was

21  important because I needed it at the Taylorsville

22  meeting and it's not only that I needed it that

23  night, Taylorsville needed the information prior to

24  the meeting so that they could put it on the agenda.

25  And so that's when I informed her I said I need that

```
 1    quickly, that needs to be a number one priority.

 2        Q.   All right.  So throughout this -- we're not

 3    going to take the time to read all of these or go

 4    through them all, but were there a number of concerns

 5    you had about Karen's performance as documented here?

 6        A.   Yes.  Yes.

 7        Q.   And, for example, if you go to 0409, the

 8    last own entry on October 4, 2010, it looks like

 9    you're talking about the volunteer issue again with

10    Karen?

11        A.   Yeah.  I, like I said, I just had come back

12    from vacation.  I was approached by three different

13    volunteers complaining to me about how they were

14    being treated which was surprising to me because

15    those three volunteers were pretty satisfied when I

16    left.  I mean they felt they had even told me on a

17    couple of occasions that they loved it and we like

18    what we're doing.

19           And so I asked them tell me what's going on,

20    be specific, let me know what's going on.  I don't

21    want to just approach Karen on a nonspecific issue

22    just that you were rude.  I want to know what it is.

23    And one of them said that Karen would not speak to

24    her, didn't show her any respect.  She said that she

25    yells and is accusatory to her, she is rude and her
```

```
 1    instructions -- with her instructions and did not

 2    take the time to either explain or discuss what she

 3    wants done.  And her perception of Karen's response

 4    to her, her perception was that Karen had no patience

 5    with those who were either volunteers or not

 6    full-time employees.

 7         Q.   If you had to summarize the issues where you

 8    felt you were having or Karen was resisting what you

 9    wanted done, what are the ones that come to mind to

10    you?

11         A.   Um, well obviously the volunteer program.

12    That was a very valuable and important program that I

13    felt was something that we needed to, we as managers,

14    needed to make sure that was successful.  Um, the

15    cleaning procedures, those procedures that we --

16    since we're in new shelter I had put down certain

17    parameters, certain priorities, and we needed to meet

18    those priorities such as having a certain portion of

19    the shelter where the public enters, that portion of

20    the shelter needed to be clean and ready for the

21    public when we opened the doors at 10:00.

22         Q.   Okay.  Let me -- let me stop you here

23    because I want to delve into each of these and I see

24    we're past the noon hour, Your Honor.  Do you want to

25    break now?
```

THE COURT:  If you're good, we can -- the food

is here, right?

THE CLERK:  Yes.

THE COURT:  We can break now if this is a good

time.

MR. PRESTON:  Why don't we do that now and

then we'll pick this up.

THE COURT:  Okay, we'll do that.

THE CLERK:  All rise for the jury.

THE COURT:  I would just remind you all not to

discuss the case during your lunch break and we'll

see you back here in a half hour.

(Whereupon, the jury left the courtroom.)

(Whereupon, the following is a portion of

Cross-Examination of Kelly Davis by

Mr. Preston.)

THE COURT:  And Mr. Davis I will remind you

you are under oath and Mr. Preston you may continue.

MR. PRESTON:  Thank you, Your Honor.

Q.  (By Mr. Preston)  Kelly, when we broke you

had mentioned two areas where you were concerned

about Ms. Bird's attitude and your instructions.  The

first was the cleaning.  I wanted to explore that a

little bit.  You said you wanted the office or the

shelters cleaned by 10:00 a.m. Why was that important

1    to you?

2        A.   Well, I wanted the first -- the part of the

3    shelter that was open to the public and cleaned by

4    10:00 a.m. and it was important to me because we

5    wanted to be in a good situation with the public so

6    that the animals were presented in a nice fashion

7    instead of a dirty messy shelter.  I wanted that

8    shelter clean so that when the public had access to

9    it they would see the environment and it was a

10   receptive environment for the public.

11       Q.   All right.  And what was Ms. Bird's response

12   when you discussed this issue with her.  Well, this

13   was not just a one time issue.  This was an issue

14   that we discussed for a number of days and months

15   basically because we had moved into the shelter in

16   2007, and we were working through the process of

17   making sure that we have that public area clean by a

18   certain time.  And so we had to progressively figure

19   out how that was going to be done with the staff that

20   we had.  So overtime, um, we weren't getting it done

21   it just wasn't happening.  So I was conversing with

22   Karen about we need to get it done by 10, what can we

23   -- what are you going to do to try to make that

24   happen.  I was getting responses like, well we need

25   more staff, we don't have the time to be able to do

01:45:31
01:45:53
01:46:10
01:46:29
01:46:48

```
01:47:06

01:47:22

01:47:40

01:47:53

01:48:13
```

1   that.  I was even coming in and, excuse me I thought
2   you were going to say something.  I was even coming
3   in and viewing videotapes because we have video
4   throughout the shelter, and I was even watching
5   videotapes because my shelter techs started at
6   5:00 in the morning.  And that was a reason why we
7   wanted our shelter techs coming in at five was so
8   they had that head start in the public areas.

9        Well, I was seeing video of my shelter tech
10  never even entering the public area for cleaning, the
11  cat area, until 7:00 in the morning.  So there was
12  two hours that this tech was somewhere in the
13  building.  And that was addressed with Karen.  Karen,
14  emphasize with your techs that that is where they
15  need to start and do their work is in the public
16  areas of the shelter so that we're completely done by
17  10:00.

18       We not only had the cats, we had the community
19  cat rooms.  We had the adoption dog areas and we had
20  the regular dog kennels.  So there was a lot to be
21  done in that five hours before the public entered.
22  And those conversations overtime just seemed to not
23  happen.  I mean it just wasn't getting done.

24       Q.   I think you may have misspoke.  You said we
25  moved into the new shelter in 2007?

1      A.    In the new shelter?

2      Q.    That is what you said.  Did you mean 2009

3   moving into the new shelter?

4      A.    It could be.  I thought it was September of

5   2007 could it have been -- it was 2009, you're right.

6   Because I moved out to the old shelter in 2007.

7   You're right.

8      Q.    Okay.  So did this problem persist

9   throughout the period of time that Ms. Bird was the

10  shelter manager?

11     A.    It continued.  I mean it wasn't an every day

12  thing there were some days we were successful other

13  days we weren't, but there was more often than not

14  that particular issue was not being -- was not being

15  addressed in the spirit that I felt it should be, in

16  the importance that I -- that I tried to place on it.

17     Q.    Okay.  The second category you mentioned was

18  the volunteers and I think you said training them.

19  What was Ms. Bird's response when you talked to her

20  about training the volunteers properly?

21     A.    And again those are not like one time

22  instances, this is over time.  Um, Karen's response

23  to me was well, I don't have the time, um, I am doing

24  other things and my employees don't have the time to

25  do it, my staff or her staff doesn't have the time to

01:48:28
01:48:43
01:48:58
01:49:19
01:49:34

do it.  Um, we need more people.  And I tried to

convince her that that is not going to happen.  I

mean we're not going to increase our staff so we have

got to find ways to make sure that we utilize our

volunteers in -- to the best way possible.  And if

they need that training which they do, they need to

be oriented to the job, then we need to take that

time to do it.  Whether Karen did it or whether

somebody within her staff did it, it needed to -- it

needed to be done.

    Q.   Did you have budgetary limitations on how

much staff you could hire?

    A.   Oh absolutely.  I had no control over the

hiring aspect of it.  I couldn't just fill a position

without that position being authorized by the City.

    Q.   Okay.  Let me direct your attention to

Exhibit 73 which Ms. Hollingsworth discussed with

you.  This is the Memorandum of Understanding.  I am

going to direct your attention to a portion of that

on the second page that was not read to you or

pointed out to you regarding the euthanasia process

and the chamber.  If you go down six lines there is a

sentence that begins, "to this day."  Do you see

that?

    A.   Yes.

1      Q.   Okay.  This is Bird 0401.  "To this day you

2   remain defiant even to the point where you have

3   expressed to other staff members that you would not

4   use the chamber yourself and in effect poisoned those

5   staff members to decide for them as required in

6   policy."  Um, what -- why was that a concern for you?

7      A.   Well, it was disrupting the organization.

8   Obviously the employees themselves that felt like

9   they were being intimidated were now unable basically

10  to have their option.  They felt like they would be

11  retaliated against or would -- there would be

12  pressure placed on them if Karen, the supervisor,

13  would give them -- give them bad looks and, you know,

14  treat her -- treat them improperly because of their

15  use.  So it caused problem in that area.

16     Q.   Did you receive complaints from any officers

17  that were under Nate Beckstead about this issue?

18     A.   Yeah.  All of the officers realized that

19  that was a tool for them.  And so yeah, I had

20  complaints from officers that were saying well, you

21  know, she is looking at me this way or she will be

22  pissed off or whatever it may be and -- if I use it.

23  So, yes, I had those kinds of complaints.

24     Q.   You heard Ms. Bird testify yesterday about

25  using I think she called it a squeeze gate if you're

1    using injection with a ferocious animal.  Was a

2    squeeze gate in the new animal shelter?

3         A.   No.  That was in the old shelter.

4         Q.   All right.  So if you had a ferocious

5    animal, what was the choice that the employees could

6    use to euthanize that animal?

7         A.   Well, because of the policy, the only

8    options that they had was either injection or carbon

9    monoxide unless it was a vicious animal.  So they had

10   that third choice to make a decision as to which one

11   they were to use.  And so if it was a vicious animal,

12   then they could choose on how they wanted to

13   euthanize that animal.

14        Q.   If they wanted to inject it, what would it

15   require?

16        A.   It would require more help obviously or it

17   would require a potential injury, place them in a

18   potential hazardous environment.

19        Q.   Okay.  Did you have concerns about animals

20   being carried out into the front of the shelter?

21        A.   Well, my concern of that was one, it was a

22   directive from City that we wouldn't have animals

23   wondering around in the front of the shelter in the

24   public area where the lobby is.  But -- but so -- but

25   we did, there was the fact that when we adopted an

animal, that animal was brought, after the adoption

process was completed, the paperwork was done and the

payment was made, then the animal was brought out to

that owner at that time which was in the lobby.  And

01:54:42     then they would walk out the front door.

            That was an appropriate time for an animal to

be in the lobby.  But it wasn't an appropriate time

to have animals out from the kennel just in the lobby

area either wandering around or being with -- up

01:54:59     there with the clerks.

        Q.   Was that a topic of discussion with Karen?

        A.   Yes.  That was not only a topic with me, but

she was very well aware of that requirement that the

City had made when we were building the shelter.

01:55:13        Q.   Did you receive employee complaints about

Karen and how she was treating them?

        A.   Treating them individually or personally.

        Q.   Yes?

        A.   Yes.  I would get complaints from various

01:55:26     employees that they felt like she was rude to them or

she, you know, would walk away from them and didn't

listen to them, you know, felt like they were

worthless.  Those kinds of things.

        Q.   Do you remember any of the employees who

01:55:44     complained?

```
 1        A.    He -- well I know Sandra Bayne complained

 2   about it.  Wes complained about it.  Um, Ed Trimble

 3   complained about it.  Um, that's what comes to mind

 4   right now.

 5        Q.    All right.  We won't have you go through all

 6   your notes.  But did there come a time when

 7   Mr. Morris approached you about initiating

 8   disciplinary action against Karen because of

 9   insubordination issues?

10        A.    Layne come to me about that?

11        Q.    Yeah?

12        A.    No.  He has never -- he never confronted me

13   about input in regards to insubordination or

14   anything.

15        Q.    Okay.  Didn't he at the end of 2010 didn't

16   you and didn't he talk to you about getting --

17   releasing her at that point in time?

18        A.    Well, yeah.  Back then when he said well he

19   wanted to fire her for insubordination, he mentioned

20   it back then in 2010.

21        Q.    I wasn't talking about 2011 I wanted to

22   direct your attention to the incident in 2010?

23        A.    Okay, I'm sorry.

24        Q.    I wasn't very clear with that.  Sorry.  So

25   what did you tell him when he approached you about
```

1    that?

2         A.    Well, at that time I -- I told him I wanted

3    to think about it.  I wanted to -- because frankly it

4    was something that I didn't expect him to say.  So I

5    said well let me think about it.  And so I, you know,

6    I did.  I thought about it but I don't know how long

7    it was, a day or two or whatever it may have been,

8    but then I came back with the -- with the suggestion

9    and the recommendation that let me take time to sit

10   down with her, draft a memorandum that explains

11   everything up to this point, get her so that she is

12   understanding where we are right now this time in our

13   lives in the shelter, and how we got there, and then

14   I want to be able to provide her with an evaluation

15   so that she is aware of it, and then observe her for

16   the next year and see how things progress because I

17   don't want -- I wanted her to -- I wanted her to

18   change and I wanted her to know exactly what the

19   issues were so that that opportunity would present

20   itself with her.

21        Q.    Okay.  If you would turn to Page 0412 of

22   your log Exhibit 71 which should be still up there?

23        A.    Okay.

24        Q.    There is an entry December 7, 2010?

25        A.    Okay.

1          Q.   Does this describe what in more detail what

2     you have just told us about?

3          A.   2007.

4          Q.   Maybe I -- I think I directed you to the

5     right page.  But down to 2013, it's on that page.

6          A.   That's not what we were just discussing.

7          Q.   Right.  You say after much thought and

8     consideration I spoke with Layne and --

9          A.   Right.

10         Q.   -- and Layne agreed with this suggestion; is

11    that right?

12         A.   Yeah.  Yeah.  That is when I had discussed

13    with him after thinking this over that this is the

14    direction that I would like to go first and he

15    accepted that.

16         Q.   Okay.  And then Exhibit 72 is that the

17    performance evaluation you gave her and discussed

18    with her?

19         A.   Yeah.  That is -- yes, that's the one.

20         Q.   And you have the Memorandum of

21    Understanding.  Did you discuss that with her as

22    well?

23         A.   Yes, I did.

24         Q.   Now, there was some questioning about having

25    documentation.  Why did you require your supervisors

```
 1    and/or yourself to have documentation if you're

 2    grading someone below a "meets expectations"?

 3         A.   Well, it is a way to help them as a manager

 4    and supervisor to be able to document it on an

 5    evaluation.  In other words, it helps remind them of

 6    those situations that you're evaluating them on.  And

 7    in some instances you had documentation that covered

 8    the evaluation.  Other instances you did.  If you

 9    did, you -- you transposed those concerns on the

10    evaluation.  And if you didn't, then you didn't have

11    any concerns in the evaluation.

12         Q.   All right.

13         A.   So it was more of an administrative tool for

14    the supervisor to assist them in filling out the

15    evaluations since we only do one a year.

16         Q.   All right.  So you said this is an

17    administrative aid to the supervisor, it is meant to

18    be shown to the employee necessarily?

19         A.   No, it is -- it is for the supervisors.  It

20    is a tool for the supervisor to help them put an

21    evaluation together.

22         Q.   Okay.  And you mentioned you did have back

23    up documentation because of the log you prepared; is

24    that correct?

25         A.   Yeah, my documentation for this was the log,
```

yes.

    Q.   But in addition to the log, you also gave Ms. Bird a Memorandum of Understanding?

    A.   Yeah, in addition.

        MS. HOLLINGSWORTH:  Objection, leading.

        THE COURT:  Sustained.

    Q.   (By Mr. Preston)  Did you give her a Memorandum of Understanding?

    A.   Yes, I did.  I provided her with that Memorandum of Understanding which began before the evaluation period too.  It was to bring her up to where we were basically.

        (Whereupon, the trial continued but was
         not transcribed.)

        (Whereupon, the following is excerpts of
         the Direct Examination by Mr. Preston
         of Shirlayne George.)

        MR. PRESTON:  All right.

    Q.   (By Mr. Preston)  Do you recognize Defendant's Exhibit 70?

    A.   Yes, I do.

    Q.   What is it?

    A.   It's my notes to the investigation on the animal shelter.

    Q.   All right.  And when was that done?

```
 1        A.   Um, in 2005.

 2        Q.   All right.  And do you remember what

 3   prompted you to go out there?

 4        A.   I was having lots of -- several complaints

 5   from employees and so I went out to the shelter to

 6   take a look for myself to see what was going on.

 7        Q.   Okay.  And how would you characterize this?

 8   Was this your first real investigation out at the

 9   animal shelter?

10        A.   It was.

11        Q.   Did that provide any sort of background for

12   you and if so, what was it?

13        A.   Well, it was a starting focal point, um, for

14   issues that went -- continued to go on in the

15   shelter.  It was a good basis for me since I

16   continued to get complaints over the next several

17   years.

18        Q.   Did this investigation in any way provide

19   you with a background or context to understand things

20   that were going on?

21        A.   It did.  Because the things that I got in

22   that initial investigation seemed to continue

23   throughout the years.

24        Q.   Okay.  And did you provide this to anyone

25   when it was done?
```

```
 1        A.   I did.   At this point I think it would have

 2   gone to Paul.

 3        Q.   And if you will look at the last page, the

 4   last paragraph, do you address something to Paul

 5   there?

 6        A.   Yes.

 7        MS. HARSTAD:   Your Honor, I am -- this has all

 8   been very leading so I'm going to object to leading.

 9        THE COURT:   Okay.   If you could modify your

10   questions going forward.

11        MR. PRESTON:   Your Honor, it would be nice if

12   she thinks I ask a leading question if she would

13   object to it then so I can determine whether I think

14   it is leading.   It's not appropriate for her to say

15   all of those questions are leading.

16        THE COURT:   Well, okay.   I am --

17        MR. PRESTON:   And so I will be careful --

18        THE COURT:   Thank you.

19        MR. PRESTON:   -- going on.   Your Honor, we

20   would move the admission of Defendant's Exhibit 70

21   based on the testimony of Ms. George to -- not for

22   the truth thereof but what her perceptions were going

23   forward based on what -- based on her investigation.

24        MS. HARSTAD:   And I object to the admission.

25   I would like a sidebar.
```

THE COURT:  Okay.  We can have a sidebar.

         (Whereupon, a sidebar conference was held.)

         MS. HARSTAD:  Your Honor, the 2009
investigation has the -- has who said what.  The 2011
those notes that I admitted says who says what.  We
don't know out of the 2005 investigation, we don't
know who was interviewed, how many employees were
there.  There is nothing -- there is nothing saying
who was interviewed or who said what at all.

         And so I think it absolutely is hearsay.  It
doesn't follow the exception because we don't know
who said anything and I don't -- it lacks indicia of
any reliability whatsoever.

         MR. PRESTON:  Well, it is clearly a business
record.  This is what she does.  She goes out and
does investigations.  So I think it is an exception
to the hearsay any way.  But this is her starting
point.  This is the context she used and reviewed
things.  So when she is criticized for not doing
something with Tess Hartwell, there is reason for
that.  She goes back and she has all this other
information.  This is passed up the line.  This is
institutional knowledge that the City has as to
problems that Ms. Bird had out at the City.

         We are testifying why we terminated her.  This

is part of what people rely upon.  It is information

dating back to 2005, the entire employment history.

Whether it is true or not it is what the City had and

what they relied on.

05:10:31     MS. HARSTAD:  And I mean, so did the -- the

thing is that I can't cross-examine anything in here

because it is not associated with anybody.

MR. PRESTON:  You could ask her if she

recalls.

05:10:42     THE COURT:  That's right.  So okay, um, I need

you if -- to get this exhibit in I need you to lay

the business record exception foundation for this

document which I don't think -- you have laid it

generally but not particularly for this document just

05:11:00     yet.  So if you can do that, then the hearsay within

the document, um, I will allow that in but not for

the truth of the matter and we will -- I will

instruct the jury on -- that the interim doesn't come

in for the truth of the matter and because we have

05:11:19     had this instruction on a couple of things I think it

is something that we should probably include in

instructions to the jury for when they go into

deliberation about what that means when something is

not for the truth of the matter.

05:11:32     MR. PRESTON:  Okay.

```
 1              THE COURT:  Thank you.

 2              (Whereupon, the sidebar conference concluded.)

 3         Q.   (By Mr. Preston)  Ms. George, in your

 4    position as the Human Resource Manager, do you do

 5    investigations as part of your duties and

 6    responsibilities?

 7         A.   Yes, I do.

 8         Q.   And do you take notes of those

 9    investigations?

10         A.   Yes.

11         Q.   What do you do with those notes?  Do you

12    type them up?

13         A.   I type them up and give them to the

14    supervisor or to the Human Resource Director or both.

15         Q.   And this is what you -- and this is -- would

16    you call this a primary duty you have as a human

17    resource manager?

18         A.   Yes.

19         Q.   And are these notes stored within the

20    business records of West Valley City?

21         A.   If it is a formal investigation, yes.

22         Q.   And this was a formal investigation --

23         A.   Yes, it was.

24         Q.   -- in 2005?  And so did the City maintain

25    this record in this particular investigation in its
```

```
 1    records of work done by Human Resources?

 2         A.   Yes.

 3         Q.   In the normal course of its business?

 4         A.   Yes.

 5              MR. PRESTON:  I would move the admission, Your

 6    Honor, at this time as a business record.

 7              MS. HARSTAD:  I do have one voir dire

 8    question, Your Honor.

 9              THE COURT:  I'll allow that.

10              MS. HARSTAD:  Can I just do it from here?

11              THE COURT:  You can.

12                      VOIR DIRE EXAMINATION

13    BY MS. HARSTAD:

14         Q.   So Ms. George it says on here it is

15    August 1st to August 4th of 2005.  Do you know how

16    long thereafter you did that investigation?  How long

17    thereafter you actually typed up these notes?

18         A.   It would have been right away.

19              MS. HARSTAD:  Okay.  No further questions.

20              THE COURT:  Okay, thank you.  There has been a

21    previous objection to this exhibit.  That is noted

22    and I will admit the exhibit over the objection.

23              (Whereupon, Defendant's Exhibit 70

24               was received into evidence.)

25    //
```

## CONTINUED DIRECT EXAMINATION

BY MR. PRESTON:

Q.   Okay.  I want to ask you about some of the notes that you took here.  First let me direct you to the last page.  What did you write in your note to Paul in the last paragraph.  Could you read that?

A.   Paul, Tess --

Q.   Yes, go ahead.

A.   "Paul, Tess is ruthless.  She is protecting Karen as if she were her young.  I did not even include some of the things she said about others because it was obvious she was trying to discredit those that don't seem to be on Karen's perceived favorite list.  There is no doubt in my mind that she has her favorites, but I do agree that most of the problems out there are just because they are under a lot of pressure and working in conditions that most would not put up with.  If you have any questions, call me.  And if I don't answer I will be accessing my messages."

Q.   And you can use this document to refresh your recollection, but did you get a number of complaints about Tess being treated differently because she was one of Karen's favorites?

A.   Yes, I did.

```
 1       Q.   And did you receive complaints about Karen's
 2   ability as a manager?
 3            THE COURT:   I just want to make clear, I
 4   should instruct for the jury, that I -- that the
 5   document I have admitted as a business record there
 6   are statements inside of it that are made by people
 7   who are not in the courtroom and so I am allowing the
 8   document to be considered but it's not for the truth
 9   of the matter asserted it is to show the state -- the
10   perception of Ms. George and where she then
11   proceeded.   And Ms. Harstad did you --
12            MS. HARSTAD:   I want to object to the question
13   as leading.
14            THE COURT:   Okay.   If you --
15            MR. PRESTON:   I will ask it this way.   I will
16   withdraw it and ask it another way.   I was trying to
17   move this along.
18       Q.   (By Mr. Preston) Did you form concerns about
19   Karen Bird's management style based on this
20   investigation?
21       A.   Yes, I did.
22       Q.   What were those concerns?
23       A.   Concerns that she had anger issues, concerns
24   that she treated the employees, some of them,
25   unfairly.   But because it was my first investigation
```

```
      1    I didn't feel -- well it wasn't for me to determine

      2    whether it needed to go further than it did.  That

      3    was up to her supervisor.  But it did -- it did cause

      4    me to have concerns.

05:15:59  5        Q.  All right.  And following this

      6    investigation, did you continue to get complaints

      7    about Karen Bird in her management style?

      8        A.  Yes, I did.

      9        Q.  I want to talk just briefly about

05:16:16 10    Plaintiff's Exhibit 4 which was the 2009

     11    investigation and that will be in the binder there if

     12    you want to look at that for a moment.

     13        A.  Okay.

     14        Q.  So I want you to tell me, you have touched

05:16:39 15    upon this, but I want you to tell me what -- tell me

     16    about your meeting with Mr. Davis.  You said he

     17    became emotional.  What took place there when you

     18    reported this to him?

     19        A.  I was very straightforward with Kelly.  Um,

05:16:57 20    and told him the things that I felt that he needed to

     21    work on.  I told him that if his actions didn't

     22    change that I felt like as a human resource manager

     23    that he could be terminated if not severely

     24    disciplined and that he had to make changes or there

05:17:16 25    was going to be some severe consequences.  And we
```

talked about some of the things that his employees

were saying that he was doing, um, and he was very --

very humble about it and said that he wanted to

change and I did see a change in Kelly.  Was he a

perfect supervisor?  No, but I have worked with lots

of supervisors and there is no such thing as a

perfect supervisor but he tried.  I counselled Karen

and I never got -- I never saw an effort for her to

make those kinds of changes.

    Q.  Did you spend quite a bit of time counseling

with Karen in her relationship with Kelly?

    A.  Not -- I tried to but I never felt like she

was receptive to it.

    Q.  Okay.  Did you think that you had held Kelly

responsible for his conduct with the meeting you held

with him?

    A.  I felt like -- I felt like there were

changes.

    Q.  Well, so you talked about his problem you

say that you thought he improved.  What do you base

that on?

    A.  I got fewer complaints.

    Q.  And you talk about doing an investigation in

2011?

    A.  Yes.

1      Q.   All right.  I want to go through that in

2  detail with you.  So let's look at that exhibit,

3  Plaintiff's Exhibit 34.  I want to lay the

4  foundation.  You look -- you have seen Exhibit 34 it

5  is in the binder there.  This is the e-mail on

6  October 24.  And once you received this, did you

7  contact Karen and if so what did you say?

8      A.   I asked her if she wanted me to do a formal

9  investigation.  I told her what it would entail, that

10  I would have to talk to all of the employees and she

11  said yes.

12      Q.   Okay.  Then if you look at Plaintiff's

13  Exhibit 35, is that the formal complaint that you

14  received?

15      A.   Yes.

16      Q.   And did you in connection with that you have

17  mentioned a CD.  What was the CD she gave you?

18      A.   Okay.  There were two CDs.  There was the

19  one that she did in my office where we talked about

20  the cat, and then there was the one that she did in

21  Kelly's office.  So I think this one was the one that

22  she did in my office where we talked about the cat.

23      Q.   Well, look at Defendant's Exhibit 78.

24  I'll -- I think I will hand it up here.  Do you

25  remember you talked about an e-mail you sent and you

42

```
 1  said it was dealing with the CD?

 2       A.   Okay.   That was the one in my office with

 3  the cat.

 4       Q.   Well, didn't she tell you and give you a CD

 5  of a meeting she had with Kelly where she told you it

 6  was -- it showed how belittling and bullying he was

 7  of her?

 8       A.   Yes.

 9       Q.   Okay.  And you told her you would listen to

10  it; is that right?

11       A.   Okay, yeah.  I'm a little foggy here.

12       Q.   All right.  So lets's see what you said in

13  your e-mail.  This is Defendant's Exhibit 78 and it

14  has already been admitted.  Sorry.  I know I promised

15  you that I would get right back with you, but I have

16  had a hard time making connections with the right

17  people and it has taken me a while for me to listen

18  to the CD you provided.  I have looked at the

19  information you have left with me and I have now

20  listened to the CD.  What did she tell you the CD was

21  going to do?  I'll stop there and ask you that

22  question?

23       A.   That it was going to show that Kelly was

24  belittling her.

25       Q.   Was it a long audio recording?
```

```
 1          A.   Yes.

 2          Q.   And did you listen to the whole thing?

 3          A.   Yes, I did.

 4          Q.   And what opinion did you form after you

 5   listened to it?

 6          A.   That Kelly was trying to counsel her not

 7   belittle her.  That he was trying to help her.

 8          Q.   Did it cause you concern that you're

 9   listening to this CD, Karen is telling you it's an

10   example of how much she is being bullied and

11   belittled and you don't see that?  What conclusions

12   do you draw from that?

13          A.   I was very concerned about that because at

14   that point I had a hard time wondering how I could

15   help Karen because -- because it seemed like she

16   didn't -- she didn't want to accept any help.  It

17   seemed like she had reached a point where there was

18   nothing else that we could do to help her.  Um,

19   I even -- even in the e-mail where I had said to her

20   let me help you with your communication, that led to

21   nowhere.  And so it was just like I was hitting my

22   head against a wall.  I just didn't know what to do

23   to help her any more.

24          THE COURT:  Mr. Preston, I appreciate you are

25   trying to speed us along, but if you could ask
```

```
 1    open-ended questions that would be helpful.

 2          MR. PRESTON:  All right.

 3          Q.   (By Mr. Preston) So did you -- you mentioned

 4    that you had a meeting with her I think it's on

 5    November 3, 2011.  You were played a portion of that.

 6    I want to play another portion of that that is our

 7    Exhibit 93 which is already in the record.  And I

 8    have a transcript that will be on the screen there

 9    you could -- actually I'll just given you a copy

10    here.

11          So let me hand you this before they start

12    playing this.  Tell me if you remember this.

13          (Whereupon, the video was played

14           for the jury.)

15          Q.   (By Mr. Preston)  I'll take that back.  Do

16    you recall that conversation with her now that you

17    have heard it?

18          A.   Yes, I do.

19          Q.   What was the concerns, if any, that you had

20    having heard her say that?

21          A.   As a Human Resource Manager it broke my

22    heart because I didn't know what else I could do to

23    help her.  I felt like Kelly was making efforts to

24    change and I didn't feel like she was.  I didn't know

25    what else to do for her.
```

```
 1        Q.   Did she ever offer any resolution to you?

 2        A.   No.

 3        Q.   As a Human Resource Manager, is it healthy

 4   to have this sort of relationship between a

 5   department -- a director of a division and the

 6   manager under you, is that healthy or unhealthy?

 7            THE COURT:   If you could rephrase in an

 8   open-ended question, please.

 9        Q.   (By Mr. Preston)   Is this the sort of

10   relationship that you would like?

11            THE COURT:   Mr. Preston, open-ended questions,

12   please.

13        Q.   (By Mr. Preston)   What sort of relationship

14   would you like a supervisor to have?

15        A.   They have got to be able to communicate

16   together.  They have got to -- so that is something

17   that reflects on their staff.  Um, supervisors like

18   that can't have an effective relationship with their

19   staff if they can't communicate together and work

20   together.  It just doesn't work.

21        Q.   So how do you deal with it if there is that

22   situation?

23        A.   You try and work with them.  You try and get

24   them help.  Um, we hold classes, we brought in -- we

25   brought in the Employee Assistance Program and had
```

them hold classes for the entire staff for the entire

division.  I believe that they did a class on

communication.

        Q.   This was in the past?

        A.   In the past, uh-huh.  So there are things

that we could do to try and help.

        Q.   Right.  You have been shown the handwritten

exhibits or notes you took of the 2014 or November

14, 2011 investigation.  I am going to hand you now

what has been marked as Defendant's Exhibit 76 and

ask you if you recognize those?

        A.   Yes, I do.

        Q.   What are they?

        A.   Those are my notes that I typed up after my

investigation of the shelter staff.

        Q.   Okay.  So --

        A.   Supervisory staff, excuse me.

        Q.   Is this the investigation that you wanted to

look at the entire shelter and all of the

supervisors?

        A.   Yes, it is.

        Q.   Why did you want to do that?

        A.   Because of what was going on because I had

been getting complaints from so many of the employees

that I wanted to just get an overall picture so that

1    I could have a good idea of what was going on out

2    there so that I could be fair.

3        Q.  And did you type these notes up as part of

4    your duties as the Human Resource Manager?

5        A.  I did immediately following the

6    investigation.

7        Q.  And do you remember who you gave the

8    investigation to?

9        A.  Layne Morris.

10       Q.  Layne Morris.  Had you had any discussion

11   with him about conducting this investigation or

12   informed him about it?

13       A.  Yes.  I told him I was going to do the

14   investigation.

15       Q.  What was his response to you?

16       A.  He was grateful.  I mean he knew there were

17   issues out there and he felt the same way that I did,

18   that it would be a good idea to get to the bottom of

19   it.

20       Q.  Did you approach this with a preconceived

21   idea as to what you would find?

22       A.  No.  No.  I tried to be very open-minded.

23   Um, as a Human Resource Manager you have to do that.

24       Q.  Were you surprised at what you discovered

25   when you did the investigation?

1     A.   Not really.

2     Q.   What were the conclusions that you formed at

3  the end of the investigation?

4     A.   That the issues with Karen were severe to

5  the point that I didn't know if they could be fixed.

6  Um, that there were still issues with both Kelly and

7  Nathan, the other two supervisors, but that they were

8  not as severe as the ones that we were having, I

9  felt, with Karen.

10     Q.   Did what you found out there in this

11  investigation did that cause you to form any

12  perception about how Kelly Davis was doing?

13     A.   I felt like he was doing better.

14     Q.   Why did you reach that conclusion?

15     A.   Because there were fewer complaints in this

16  investigation about him.

17     Q.   Who received the most complaints in this

18  investigation?

19     A.   Karen Bird.

20     Q.   Was it a large disparity or a small

21  disparity?

22     A.   It was large.

23     Q.   Let's go through the investigation.

24     MR. PRESTON:  Your Honor, I would move the

25  admission of Defendant's Exhibit 76.

1     MS. HARSTAD:  No objection.

2     THE COURT:  We'll admit that.

3     (Whereupon, Defendant's Exhibit 76

4     was received into evidence.)

5     Q.  (By Mr. Preston)  All right.  You say that

6  in this third sentence, I summarized the comments due

7  to the fact that they were all about the same.  Do

8  you see that?

9     A.  Yes.

10     Q.  And let's go to the second point here where

11  it says, was extremely harsh, really mean to Ed

12  Trimble, Steve Hulse.  What is that referencing?

13     A.  They were both issues I believe that

14  happened in roll call.  They were both complaining

15  about things that happened in roll call where Karen

16  had yelled at them in roll call.

17     Q.  Okay.  You state in the next line, roll call

18  is very uncomfortable due to the tension between

19  Kelly and Karen.  They tend to antagonize each other.

20  Do you see that?

21     A.  Yes.

22     Q.  And then you state she, who is the she you

23  are referring to?

24     A.  Karen.

25     Q.  Wants to save animals by doing what is best

1    for them, does not follow protocol.  Was that a

2    complaint that you had received?

3         A.   Yes, it was.

4         Q.   Skipping down, Karen's tone of voice is

5    usually very abrasive.  I'm always afraid when I do

6    anything because if she does not like it everybody

7    knows about it?

8         A.   Yes.

9         Q.   The next one, Karen hates the gas chamber.

10   Whenever I have to put an animal down I go to Kelly

11   to get the key because I do not like the way she

12   makes me feel bad for using it.  Did employees inform

13   you of that?

14        A.   Several employees.

15        Q.   Several employees?

16        A.   Yes.

17        Q.   And another one, we all walk on egg shells

18   when talking about our using the gas chamber because

19   of her reaction.  The next comment, she was heard

20   telling her employees not to work with the officers,

21   yet she expected the officers to help her out when

22   she needs it.  Do you remember that comment?

23        A.   Yes.

24        Q.   Does she supervise the officers?

25        A.   No, she did not.

1    Q.   Those are the Animal Control Officers in

2  uniform that go out into the City?

3    A.   Yes.  Yes.

4    Q.   Does that give you any concerns that these

5  sort of comments are being made by a supervisor?

6    A.   Definitely.

7    Q.   Why?

8    A.   Well, because it's insubordinate.  And when

9  they hear -- when employees hear a supervisor talking

10 like that, um, then it just causes contention.

11   Q.   Okay.  The next one, she belittles staff in

12 roll call calling them by name and pointing out their

13 mistakes.  Is that another comment made?

14   A.   Yeah.  That would be in regards -- along

15 with the Ed Trimble and Steve Hulse issue.

16   Q.   All right.  One employee mentioned Karen and

17 Tess talking bad about Kelly in front of the staff

18 while waiting for him to show up for roll call.  It

19 was inappropriate and uncomfortable.

20       Do you have concerns about a manager of the

21 shelter engaging in that conduct?

22   A.   Yeah.  There again, yeah, insubordination

23 and conduct.

24   Q.   Next point, when Kelly's office was changed

25 to the shelter, Karen's personality changed, paren

1   more argumentative, close paren?

2       A.   Yeah.   I think things got worse when they

3   had offices in the same building.

4       Q.   Then states, Karen claims that Kelly yells

5   at her using a very loud tone of voice.   Only one

6   employee claims that they have witnessed that kind of

7   behavior.   Do you know who that was?

8       A.   I don't remember.

9       Q.   You don't recall if it was Tess?

10      A.   I would have to go back to my handwritten

11  notes.

12      Q.   All right.   Let's go to the next page.

13  Third paragraph, third point down.   Karen has two

14  employees that have not had the euthanasia training

15  doing euthanasia on a weekly basis.   This person

16  brought up the liability issue to the shelter and the

17  City.   Do you know if that was a violation of policy

18  to have untrained employees doing euthanasia?

19      A.   I -- I can't say for sure that it was but

20  I'm pretty positive that it was.   It was a great

21  concern.

22      Q.   Skip down to the paragraph that begins,

23  Karen is letting the rescue groups take animals that

24  could be adopted through the city.   This action takes

25  money away from the city shelter.   Next one, Karen is

hard to work with because you never know from

day-to-day what her mood will be.

    A.   That was also an issue that came up in the

2005 investigation.

    Q.   Next, the volunteers are under-supervised --

are under-supervised and asked to do things that they

have not been trained to do or sensitive things that

should be done by an employee.  Is that a complaint

you heard?

    A.   Yes.

    Q.   Skipping down, Karen has been known to load

up the euthanasia schedule on the days the officers

are scheduled to put the animals down.  Next, she

extends the time pit bulls are kept.  Actual

knowledge of some being kept for longer than six

months.  Is that a complaint you heard?

    A.   Yeah.  Employees felt like she liked the pit

bulls the best so she wouldn't put them down.

    Q.   Another paragraph we were told by Jake

Arslanian, who is Jake Arslanian?

    A.   He was the facilities manager for the entire

City.

    Q.   Okay.  That animals were not allowed in the

lobby of the shelter.  Kelly has tried to reinforce

this but Karen and Tess take them in, quote, just to

1  piss Kelly off, close quote.

2      A.    Several employees told me that same thing.

3  I called Jake myself and asked him if that was

4  actually a policy that he had made for that building

5  and he told me yes, it was.

6      Q.    Skip down.   Karen has belittled me in front

7  of others for the tiniest of mistakes.   At one point

8  she said to me, quote, you ought to think about if

9  you should stay or not, close quote.   This was all

10  over an issue of her techs not updating the I.D.

11  cards on the kennels and a kitten was put down that

12  should not have been.   I got yelled at over something

13  that was not my fault.

14      Skipping down, everyone always leaves roll call

15  in a bad mood because of the interaction between

16  Kelly and Karen.   Next one, I was belittled in roll

17  call by Karen because I scan all animals for chips

18  and she thought it was unnecessary.

19      Next, there is definitely a division between

20  the officers and the techs.   I feel that it is all

21  because of the bad attitudes of Kelly and Karen.

22  Next, I think that the communication problem between

23  Kelly and Karen stems from the fact that she gives

24  him no input, does not support him, and does not make

25  an attempt to communicate.

1          The last one on the bottom of that page,

2    Karen comes into roll call in a defensive mood.  Do

3    you see that?

4          A.   Yes.

5          Q.   Let's go to the next page.  Kelly asked

6    Karen to give him a memo stating what supplies she

7    needed for the shelter.  She gave him a typed list

8    and was upset because he would not accept it because

9    it was not in memo format.  She argued with him in

10   front of the staff.  He finally told her that they

11   would discuss it after roll call.

12          Next, Karen has been heard many times saying

13   nothing in the chamber.  She does not like it.  Next,

14   she is aggressive and demeaning to her staff.  She is

15   hard to talk to because she is always so defensive.

16   She is never happy and it shows on her face.  This

17   brings the whole staff down.  Did you accurately type

18   these up from the notes and the comments that were

19   made to you.

20          A.   Yes, I did.

21          Q.   If we go to the next page, these are the

22   comments that you took regarding Kelly and Nate.  Are

23   there less comments for them?

24          A.   Yes, there are.

25          Q.   Looking down on the fourth one that says,

Kelly's temper has subsided immensely in the last two

years.  Is that your perception?

        A.   Yes, it is.  Can I -- can I clarify that?

        Q.   Yes.

        A.   Um, that was a -- that was not my

perception.  That was a comment that was made by an

employee.

        Q.   Right.  But did you have a perception that

he had changed?

        A.   Yes, I did.

        Q.   That's what I was asking.  Thank you for

clarifying that.

        A.   Okay.

        Q.   Did Layne consult you regarding what

discipline he would impose?

        A.   No, he did not.

        Q.   Who had the responsibility to make that

decision under the way the City is organized?

        A.   Layne did.

        Q.   Did you see through this history you've had

with the animal shelter that there was any similarity

between Kelly and Karen's management styles?

        A.   I thought it was very similar.

        Q.   In what way?

        A.   They both had -- I called it gruff

1   personalities.  Um, they didn't have real good

2   communication skills, so similar -- similar those

3   were kind of the big ones that kind of jumped out at

4   me.

05:42:22   5       Q.   What was any difference if there was any

6   between Karen and Kelly?

7       A.   Well, like I said before, when I -- when I

8   tried to help them, Kelly at one point welcomed that,

9   whereas I never felt like Karen did.

05:42:46   10       Q.   How would you evaluate their efforts to

11   change their management styles?

12       A.   Kelly welcomed the help.  When I suggested

13   that we bring in the Employee Assistance Program he

14   really welcomed that.  When I suggested that we sit

05:43:05   15   down and talk about things that he could do to

16   change, he really welcomed that.  So he was just more

17   receptive to getting help.

18       Q.   How was Karen in that regard?

19       A.   I never -- I never -- she never took the

05:43:22   20   opportunity to let me help her.  We talked a lot, um,

21   but there was never -- when I tried to help her she

22   was always very defensive, always jumps to place

23   blame instead of okay, what can I do to make things

24   better.  So I had a hard time trying to help her.

05:43:51   25       Q.   Did you ever get any reports about Kelly

```
 1   being insubordinate?

 2        A.   No, not that I recall.

 3            MR. PRESTON:  Your Honor, if I might have a

 4   moment, I think I'm about done.

 5            THE COURT:  Sure.

 6            (Brief pause in proceedings.)

 7            MR. PRESTON:  Those are all of the questions I

 8   have, Your Honor.

 9            THE COURT:  All right.  Cross?

10            (Whereupon, the trial continued but was

11             not transcribed.)

12            (Whereupon, the follow excerpt contains

13             discussion between the court and counsel

14             at the end of the day.)

15            THE COURT:  You said Exhibit 4.

16            MR. PRESTON:  I'm sorry, instruction four.

17   Sorry.  And you know it's frustrating to me we have

18   spent 35 minutes on ratification which I think is

19   something that is clearly we shouldn't even waste our

20   time on.  And this is critical to our case.  We have

21   the Supreme Court, they're instructing in their case

22   law what it means to be in the absence of a belief

23   particularly where there is mixed motives.  And

24   they're very clear on the fact that there could be

25   some retaliatory animus.  And the jury is not going
```

05:44:03

07:22:45

07:22:57

07:23:16

59

```
1    to be -- that is not going to be put to the jury and
2    that is the law.
3         THE COURT:  I beg to differ.  I think it is
4    very clear that we say even if you find that there is
5    a -- that this is a substantial motive.  We have a
6    separate instruction which say if they prove that
7    they had a basis to fire her in the absence of that
8    motive, then they're not liable.  I will let you
9    argue that.
10        MR. PRESTON:  I want to argue that.
11        THE COURT:  So let's come back then tomorrow
12   morning.  If we had from 7:30 to 8:30, does that give
13   you enough time to put that on the record.
14        MR. CROWTHER:  The doors downstairs don't open
15   until 7:30 so we wouldn't be up here --
16        THE COURT:  At 7:30.  So shortly after that.
17        MR. CROWTHER:  I was just making the court
18   aware.
19        THE COURT:  I appreciate that.  I would not
20   have known.  So if we -- if you could all -- so shall
21   we say 7:45?
22        MR. PRESTON:  Yes.
23        THE COURT:  Does that give you enough time and
24   with an opportunity --
25        MR. PRESTON:  Everything yes.  Sure.  And I
```

07:23:29
07:23:44
07:23:58
07:24:08
07:24:18

```
 1    get to put my key witness on, my whole case rests on.

 2    Judge, you know I'm very frustrated with how this

 3    trial has gone and I'm sorry if it is showing.  But I

 4    got two hours today, they got four.  They have

 5    25 minutes left total examination from them.  They're

 6    going to use that 25 minutes and then they're going

 7    to expect that they can cross-examine my witnesses.

 8         I mean right now they have used twice as many

 9    hours in front of this jury questioning than I have

10    had.  It is simply not fair.  And that has got to be

11    on the record at some point.

12         THE COURT:  I do understand that.

13         MR. PRESTON:  They have the choice on what

14    they want to emphasize.

15         THE COURT:  Okay.  I -- I have thoughts about

16    how to address that in order to -- in order to be

17    fair to your -- to you and your client.

18         MR. PRESTON:  I mean I rushed through

19    Shirlayne George tonight and I forgot to get in a key

20    exhibit with her and she has gone back to St. George

21    because I was rushing to get it in and I forgot.

22         THE COURT:  Well, that -- I'm not -- I'm going

23    to take responsibility for that.

24         MR. PRESTON:  But that's what happens when I

25    feel I have to rush through something.
```

THE COURT:  And I understand that.  But our

court reporter has an appointment that she has to get

to.

                MR. PRESTON:  So we need to get out of there

then.  We don't want to keep Laura waiting.

                THE COURT:  Right.  So 7:45 tomorrow morning.

We will address this jury instruction issue.  And I

will tell you both, I would tell plaintiffs you need

to be prepared to finish your case in the time that

you have left and we will talk about timing before we

start the day and what we might need to do to address

this issue.

                MS. HOLLINGSWORTH:  Okay.  Okay, yup.  So what

is the court's calculation of our time?

                THE COURT:  How much time?  Right it is the --

I don't have -- I don't have it up.  So we have

38 minutes left for the plaintiffs.

                MS. HOLLINGSWORTH:  So did you -- did the

court count my redirect against our time?

                THE COURT:  We did because the time has been

counted for defendants when they have been crossing

as well.

                MS. HOLLINGSWORTH:  Okay.

                MR. PRESTON:  By my record, it is 9 hours and

32 minutes for them and 4 hours and 30 minutes for

```
 1   me.  So that is five more hours they have had.
 2          MS. HOLLINGSWORTH:  Your Honor, but we have
 3   and they have like two witnesses left so --
 4          MR. PRESTON:  Well, I have four witnesses
 5   maybe five.
 6          THE COURT:  Right.  And I mean there is
 7   obviously there is no way that I can -- we can't talk
 8   about this now.  We have to get the court reporter
 9   out.  We'll talk about it tomorrow.  Thank you.
10   We'll be in recess.
11              (Whereupon, the hearing concluded
12               at 6:28 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**REPORTER'S CERTIFICATE**

I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 13th day of March, 2019.


_____

Laura W. Robinson

RPR, FCRR, CSR, CP

APPENDIX 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| KAREN BIRD, | ) |
| | ) |
|       Plaintiff, | ) |
| | )   Case No. 2:12-CV-903EJF |
| vs. | ) |
| | ) |
| WEST VALLEY CITY, a | ) |
| political subdivision of | ) |
| the State of Utah, KELLY | ) |
| DAVIS, in his official | ) |
| and individual | ) |
| capacities, | ) |
| | ) |
|       Defendants. | ) |
| _____ | ) |

BEFORE THE HONORABLE EVELYN J. FURSE

March 15, 2018

Partial Transcript
Excerpts from Trial

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

**Appearances of Counsel:**

For the Plaintiff:      April L. Hollingsworth
Attorney at Law
Hollingsworth Law Office LLC
1115 South 900 East
Salt Lake City, Utah 84105

Kathryn K. Harstad
Attorney at Law
Strindberg & Scholnick LLC
Plaza 721
675 East 2100 South
Suite 350
Salt Lake City, Utah 84106

Xernia L. Fortson
Attorney at Law
2935 Duke Of Windsor
Atlanta, Georgia 84106

For the Defendants:    Stanley J. Preston
Bryan M. Scott
Brandon T. Crowther
Attorneys at Law
Preston & Scott
111 E. Broadway
Suite 1200
Salt Lake City, Utah 84111

1

2      (Whereupon, the trial was held but was

3       not transcribed.)

4      (Whereupon, the following is an excerpt

5       with counsel regarding a timing issue.)

6     MS. HOLLINGSWORTH:  And Your Honor, we have

7 been talking about this and we haven't really

8 discussed it, um, and we haven't addressed this with

9 opposing counsel, but I would like to just throw it

10 out there would it be possible to ask the jury if

11 they would be okay coming for closing arguments in

12 the morning?

13     THE COURT:  Yes, it would be okay to ask that.

14     MS. HOLLINGSWORTH:  Okay.

15     MS. FORTSON:  Take the victory dance.

16     THE COURT:  Yes, it would be okay to ask that.

17 Um, would -- I did want to talk about timing, um,

18 do -- do we need to ask Mr. Preston to come back or

19 are we okay --

20     MR. CROWTHER:  I mean I talked to Mr. Preston

21 about this.  Our big concern is we do not want the

22 jury to feel like this is our fault.  It is our case

23 that is going to be dragging it into the next day,

24 but that's because of how long the plaintiffs have

25 taken on their case.  And if the jury feels like

00:00:09 (line 10)
00:00:21 (line 15)
00:00:34 (line 20)
00:00:46 (line 25)

```
 1    we're the ones keeping them in overtime, I'm not sure
 2    they will react favorably.

 3         THE COURT:  Do you have a proposal as to how
 4    you would like me to prevent that?

 5         MR. CROWTHER:  We might have to wait for
 6    Mr. Preston on that one.  I can express his concern,
 7    I'm not sure I can express his proposal.

 8         THE COURT:  Not sure if you can tell me how to
 9    fix it.  Okay.  All right.  Well, so this -- I'll
10    tell you as I was thinking about it last night, even
11    just looking at -- so with the times that we gave
12    yesterday for each side, um, plaintiff had 38 minutes
13    remaining, defendant has three hours and 4 minutes
14    remaining -- and actually here is Mr. Preston now so
15    I'll restate.

16         We just started talking about timing.  And,
17    um, Ms. Hollingsworth asked if we could ask the jury
18    if they would be -- if they would be able to come
19    back tomorrow morning for closing -- for closing
20    arguments and I said yes and that's -- that is in my
21    contemplation.  And then I did hear the concerns
22    obviously about that not reflecting on you folks.
23    I'm open to your suggestions about how to prevent
24    that, if there is a way in which I present it in
25    order to prevent that or something I would like to
```

00:00:58
00:01:09
00:01:35
00:01:52
00:02:14

4

```
 1   hear about that.

 2        MR. PRESTON:  So what if they can't?

 3        THE COURT:  Um, well, I guess -- I think they

 4   anticipate that that might be where this is going.  I

 5   think they recognize that you haven't had a chance to

 6   put on your case yet and it is Thursday morning.  And

 7   I do think that --

 8        MR. PRESTON:  What about today as far as time

 9   restrictions?

10        THE COURT:  Right.  So that is what I was

11   going to get to.  That's just where I was.  So right

12   now where we are is plaintiff with 38 minutes

13   remaining, defendant with 184 minutes remaining which

14   would be about three hours and four minutes.  What I

15   -- and as noted, well, I guess it wasn't quite noted,

16   it was started to be but my -- while I can put

17   constraints on plaintiff's ability or timeframes I

18   certainly think I would be crossing over in to due

19   process if I didn't give plaintiff the opportunity to

20   cross-examine a witness.

21        So I don't think I can do that and with

22   38 minutes remaining and you yet to call your

23   witnesses I think that is unlikely.  So my theory --

24   my theory is that plaintiffs will have 38 minutes to

25   finish their case today.  You can begin your case and
```

```
 1   what I would like is to have the witnesses finished

 2   by the end of today so that tomorrow morning we can

 3   come in and do jury instructions and closing

 4   arguments and send the jury to deliberate.  And then

 5   as far as restrictions on cross-examination, that

 6   plaintiff's cross-examination of any witnesses be

 7   limited to no more than half the time spent on

 8   direct.

 9        MR. PRESTON:  You know I think with the

10   restrictions you have talked about, I'm -- I think we

11   could still get it done today.

12        THE COURT:  With instructions and closing

13   argument?

14        MR. PRESTON:  Um, yeah.  I mean we're ready to

15   do it all.  I mean I think we ought to try and do it.

16   I think you can ask them, but I think we ought to try

17   to do it.

18        THE COURT:  I'm happy to try and do it.  You

19   know what you're putting on better than I do.  So

20   that is why I don't know where you're --

21        MR. PRESTON:  Right.  But you know make a

22   decision they have 38 minutes until they rest right

23   so that is direct and redirect.

24        MR. CROWTHER:  The court said 32, I think.

25        MS. HOLLINGSWORTH:  Your Honor, if -- if
```

00:04:04 (line 5)
00:04:27 (line 10)
00:04:38 (line 15)
00:04:49 (line 20)
00:05:08 (line 25)

counsel is telling us after saying all this time they
have got five witnesses to put on and it is going to
take so long which frankly I knew all along they're
using the same witnesses so that's just not correct.
We have the burden of proof.  My client has waited
six years for this trial and we should be entitled to
put on our entire case.  And if they can do this
today, they're saying that they don't have that much
left, can I please have more than 38 minutes for the
remaining two witnesses?  We're only going to put on
Layne Morris who was the decision maker, and one
final volunteer who will be short.  But I would, you
know I was telling my volunteer last night, okay, I
have got maybe eight minutes.  It is kind of
impossible to really adequately address those final
witnesses and I am just asking for another half hour.

          THE COURT:  Okay.  So you would like to
have --

          MR. PRESTON:  There is no we'll finish.  It is
going to be tight now as it is.  But there is no way
to do it if you give her more time.  I mean she has
made decisions all the way along how much time she
spends and that -- and just -- and I think I see this
all the time.  It's well, I don't care what the
plaintiff's have to do the judge will give me more

```
 1   time and that's what they do and they just monopolize
 2   the time.
 3        THE COURT:  Well, so I would like to -- I
 4   would like to put on the record that we -- it is the
 5   parties who tell the court how long is needed for
 6   trial.  The court was told it would be four days.  We
 7   talked about this when we came here on the pretrial
 8   that it was -- that that was going to be tight but
 9   that the parties thought we could do it if we did
10   full days.  So we extended from doing an 8:30 to 2:00
11   schedule to an 8:30 to 4:00.  That increased by there
12   is a break that gets added when you increase it to
13   that so that increased by an hour and 45 minutes the
14   time every day.
15        Last night we stayed an extra hour.  We got
16   the jury -- we got the jury selected and seated about
17   as quickly as I think you can.  So you have have had
18   all of the time that you told me would be needed for
19   the entire case.  That's a problem.  I mean it's your
20   case.  I don't know what that is.  I can only go on
21   the representations of counsel.
22        When we asked the jury to stay late, counsel
23   is right it does -- there is this idea that the last
24   person has made them stay.  There is also the
25   potential that you may want to call a rebuttal
```

00:06:46
00:07:04
00:07:21
00:07:43
00:07:58

witness.  Then that's more time.  These concern me.
We start -- we talked about on Wednesday morning when
we came or sorry it was Thursday -- or Tuesday night
we talked about we have got to tighten this up, we
have to get this to them.

     So we have -- we have that issue.  Um, then we
came in yesterday morning and by the time we got to I
think it was our 11:00 break, we were still not
through a significant amount.  And so we then put
time limits in place.  And I understand your thoughts
that you have your case to put on, but it has been
your case.  You have had the opportunity to do
everything that you wanted to do.  We have given
warnings about time, um, and I do think there is
concern about it going over.

     MS. HOLLINGSWORTH:  Your Honor, I am happy to
take the blame.  You can tell the jury it's my fault,
that's fine.

     THE COURT:  Okay.  So how would you propose I
do that?

     MS. HOLLINGSWORTH:  That plaintiff
underestimated how long it would take to put on her
case.  Plaintiff's attorney.  You can put it on me.

     THE COURT:  Okay.  Mr. Preston, what are your
thoughts about my asking the jury if that -- about

```
 1  their ability to go into Friday morning and saying
 2  plaintiff's attorney has underestimated the time it
 3  would take on her case.  We anticipate being able to
 4  finish witnesses today, but we will need to go into
 5  tomorrow morning to do closing arguments and jury
 6  instructions are you available if we do it in that
 7  fashion and then plaintiff only would get an
 8  additional half hour so it would be she would have
 9  one hour and 8 minutes to rest her case.
10       MR. PRESTON:  Well, I am -- it is not my first
11  choice to go on tomorrow, but I think that the court
12  -- I understand the position the court is in so I'll
13  agree to that.  I really don't think they should get
14  an extra half hour.  They chose yesterday and they
15  took two-thirds of the time yesterday.  It went on
16  and on.  And as I said, I had a witness who had to go
17  back to St. George, I had to put her on, I rushed
18  through it, made the jury stay.  I mean it's just not
19  fair to me.  And so I think she should do it in the
20  38 minutes to make sure we get done.  So I think you
21  should see how it goes.
22       THE COURT:  Okay.  So you're -- so I think,
23  um, I'm inclined to allow the extra half hour so then
24  as far as talking to the jury about tomorrow, is it
25  your preference to instruct them about the need for
```

00:10:11
00:10:30
00:10:48
00:11:05
00:11:37

tomorrow why that has happened only once it becomes
obvious that that is what we need to do?  Or would
you do it, if I'm going to give the extra half, do
that this morning?

00:11:55          MR. PRESTON:  Do it this morning.

          THE COURT:  Okay.

          MR. PRESTON:  That's fine.

          THE COURT:  Okay.

          MS. HOLLINGSWORTH:  Your Honor, just one more
00:12:19  thing.  In addition to blaming it on me, and I am
fully willing to take that, but I would also ask for
a curative instruction that it is not to be construed
against Ms. Bird herself.

          THE COURT:  I mean there is no world in which
00:12:37  they are allowed to consider, you know, the
statements of counsel or the acts of counsel against
the client and we have that instruction.

          MS. HOLLINGSWORTH:  Okay.

          THE COURT:  Okay.  All right.  We haven't had
00:12:59  a chance to talk about verdict form yet and we do
need to do that.  Um, let's see how the morning goes.
I might be asking you all if you can bring your lunch
in the courtroom to talk about verdict form if it
looks like we're getting close.  All right.  Let's go
00:13:23  ahead and bring the jury in.

```
 1            THE CLERK:  All rise for the jury.

 2            (Whereupon, the jury returned to

 3             the courtroom.)

 4            THE COURT:  Good morning.  Before we get

 5    started with testimony this morning, I would like to

 6    ask you folks about your schedules.  We are on what

 7    was the scheduled last day for the trial, the fourth

 8    day.  Um, plaintiff's counsel has underestimated the

 9    length of time it would take to put on her case and

10    so we are not sure we're going to be able to finish

11    up today.  We are going to try, but we're not sure

12    that we're going to be able to do that.

13            There is a chance if we can't get finished

14    with everything to get the deliberation to you today

15    that we would need to come back tomorrow morning and

16    in the morning we would finish with testimony today

17    and then in the morning have the instructions read to

18    you, hear closing arguments, and then you would

19    deliberate at the close of that.  Does that pose a

20    hardship for any of you?  Okay.

21            JUROR #6:  As long as I get notice.  I gave my

22    work until today so as long as I know for tomorrow

23    I'm fine.

24            THE COURT:  Yes, we can do that.

25            JUROR #12:  Same here.
```

JUROR #11:  Yes.

2     THE COURT:  We can -- we will do that for

3   everyone so that you all have it whether you need it

4   or not.  We will make sure that you have that.  Thank

5   you very much for your willingness and ability to be

6   flexible.  We appreciate that.  All right.  And with

7   that we will get started.  Ms. Hollingsworth, if you

8   could call your --

9           (Whereupon, the trial continued but was

10          not transcribed.)

11          (Whereupon, the following is an excerpt

12          of Layne Morris's examination

13          by Mr. Preston.)

14     Q.   (By Mr. Preston) And Kelly's responsibility

15   with his skill set?

16     A.    That was Kelly's skill set.  And in addition

17   to running a division which he had an extensive

18   experience at the police department, he also had a

19   level of professionalism gained through experience so

20   that he was able to explain to people no, you know,

21   you can't do this, or you can't do that and hold

22   people accountable in ways that he was used to doing

23   that could get those people to be able to perform as

24   a team and do so professionally where it would cut

25   down on some of the little complaints that had gone

```
 1  to HR during that time.
 2       Q.   I forgot to ask you one question about your
 3  military experience.  What rank did you obtain?
 4       A.   I retired as a sergeant first class.
 5       Q.   So you were a noncommissioned officer?
 6       A.   That's the only way to go.
 7            MR. PRESTON:  Your Honor, would this be a
 8  convenient time to stop, to break for our morning
 9  break?
10            THE COURT:  Do we have our stuff here?  We
11  actually don't have our treats for the jury here yet.
12            MR. PRESTON:  I thought after an
13  hour-and-a-half we were -- a recommendation but that
14  is fine, I am happy to go forward.
15            (Whereupon, the trial continued but
16             was not transcribed.)
17            (Whereupon, the following excerpt is
18             a portion of Layne Morris's trial
19             testimony.)
20       Q.   (By Mr. Preston) Okay.  So do you remember a
21  time when -- let me ask this question.  When the new
22  -- when the division was moving into this new
23  shelter, did that create any challenges for the
24  division?
25       A.   Yes.  It was -- there was a lot of growth in
```

the division.  We were hiring people.  The end result

was the Code Enforcement Animal Services Division

prior to splitting had a total of like eight people

and, um, and the Animal Services Division alone went

from that up to double that.  I think right now we

have got, I don't know, 18 people in the Animal

Services Division so we were hiring officers, hiring

shelter personnel to run the -- run the shelter

itself so there was all kinds of change that of

necessity had to occur.

Q.   Do you recall that Karen Bird was off work

for several months with an auto accident, do you

recall that event?

A.   Yes.  It was an -- it was a tragic, a tragic

accident and we all felt badly for Karen.

Q.   When she came back, did you notice any

tension between her and Kelly?

A.   Yes.  I think that tension had started

before, prior to her accident, but it was certainly

exacerbated by -- after her accident or increased or

the level was accelerated after the accident.

Q.   Okay.  And tell me about what you perceived

that tension to be?

A.   Well, my perception was based on just visits

from Karen and visits from Kelly.  And so, you know,

```
 1   after the accident, Karen would come over about, I

 2   don't know, starting out maybe once every six months

 3   and just generally complain that she didn't like

 4   working for Kelly, he didn't listen to her, he

 5   treated her ideas as if they were not good ideas and

 6   didn't -- didn't follow any of his suggestions -- or

 7   her suggestions, and she was just generally unhappy

 8   with his leadership of the shelter and any of the

 9   changes that he continued to make there.

10        So those -- those visits with Karen were, you

11   know, started out at six months and by the time I

12   ended up holding the hearing, we were down to, you

13   know, every week or biweekly visits from Karen to

14   complain about Kelly and the things that had gone on.

15        Q.   So what did you do to try to remedy this

16   tension?

17        A.   Well, you know, these two had history

18   before -- before I got there.  They had worked

19   together successfully as a team for like eight years.

20   And so as I said, um, I looked at Karen as a high

21   performer and part of the management team.  And so

22   when, you know, when Karen would come over and just

23   make these complaints about Kelly, um, I would

24   explain to Karen because most of the things she would

25   complain about are things that Kelly and I had
```

1   discussed as him being my direct report.  And so he

2   and I had made a decision on that and he would tell

3   me, um, what Karen thought about it and sometimes we

4   agreed, sometimes we didn't.  And so my observations

5   were based on my interactions directly with Karen.

6   And would then go to Kelly and say hey Kelly, you

7   know, just FYI Karen came over to me see me and we

8   talked about these couple of issues, she gave me some

9   information I didn't know, what do you think about

10  this and then we would make a decision.

11          And that -- frankly as that relationship

12  started to deteriorate, and Karen's visits to my

13  office became more frequent, at one point I said to

14  Kelly, Kelly, whether or not Karen is right or wrong

15  about any particular issue, she doesn't feel like you

16  listen to her and give her any acknowledgment to

17  knowing what she is talking about and she doesn't

18  feel like she is part of your management team.  And

19  it is part of your job to make her feel as if she is

20  part of your management team.  So you need to work on

21  that.  And to Kelly's credit he did try and work on

22  that.  Um, I observed that firsthand.

23          So during this time, I would meet with Kelly

24  individually, I would meet with Karen individually, I

25  would meet with them both together.  At one point I

met together with both of them.  And as this
situation continued to deteriorate and I told them
both, guys this is -- this -- I need you both -- we
have to get this job done and Kelly you need to
listen to Karen.  Karen, you need to do what Kelly
tells you to do and he is the boss, he needs to take
input from you and you need to give him input.  And
despite -- regardless of the fact whether he never
accepts anything you have to say, it is still your
responsibility to provide him that input so he can
make a good decision.  And I'm very happy if you guys
can't come up with a decision yourself and you want
to come run it by me, I'm happy to sit down and be
the tiebreaker or whatever it takes.  But my problem
was that this manager and subordinate relationship
was deteriorating for whatever reason, and the only
one who appeared to be trying to salvage it or make
it work was Kelly.  And all I got from Karen was the
complaints that I don't -- I don't, you know, I don't
like Kelly, Kelly doesn't like me, and he wants to
fire me.  And at one point after I had told Kelly,
Kelly this has gone far enough, we need to have -- we
need to have -- I need to do a disciplinary hearing
with Karen but I want you to be on board with that,
he said okay, I'll go home and think about it.  And

```
 1  it was over the weekend and he came back on Monday
 2  and said I just I don't want to -- I don't want to go
 3  that far yet.  And it wasn't I think the next day
 4  Karen was in my office complaining about Kelly's
 5  behavior again.
 6       And I finally bluntly said to Karen, Karen you
 7  need to understand here I just told Kelly that we've
 8  got to fire you last week and he came back and said I
 9  don't want to do that.  So I understand you think
10  Kelly doesn't like you and he wants to be all that,
11  but Kelly has just been your biggest benefactor here
12  over the last week because if it was up to me, if I
13  had to work with you on a daily basis under the
14  conditions that you're both describing to me, um,
15  when I have you both in my office and you can't even
16  speak to Kelly, you can't even look at Kelly Davis,
17  the loathing is so strong coming from you, that it
18  is -- it is clear that this relationship is
19  completely broken and we can't run a division where
20  frankly people are being forced to choose.  Do I
21  support the big boss Kelly Davis or do I support the
22  littler boss Karen.  And people were at a point where
23  they all felt like they had to make that decision and
24  people were treading between those two land mines of
25  how do I keep Karen happy but not let Kelly know that
```

```
 1    I'm not doing what Kelly said to do.  And so it was

 2    an untenable -- it was literally and I should have

 3    frankly I should have taken action about a year and a

 4    half earlier, um, but it was Kelly's division.  I was

 5    trying to -- you know his management style is his

 6    management style.  If he wants to try and make a

 7    division work with this conflict where people are in

 8    open conflict, well I'll let that go for a little

 9    while.  But at some point, you know, it is my

10    department and I'm going to make sure that division

11    runs like it's supposed to.  And we quickly got to

12    that point by 2011 where when Kelly declined to fire

13    Karen that it was very quickly after that where I --

14    I made the decision myself and, you know, frankly I

15    didn't at that point I didn't care what Kelly wanted

16    to do.  I had to make a decision.

17         Q.  So you're talking about the ultimate

18    termination in November of 2011 at this point?

19         A.  Right.

20         Q.  So to be clear, you're describing a process

21    that just did it continue to deteriorate and get

22    worse and worse?

23         A.  It did.  It got -- we would try, we would

24    meet together and we would talk about an issue.  And,

25    you know, 2000 -- whatever 2009, 2010 they could at
```

01:44:34
01:44:54
01:45:14
01:45:25
01:45:42

least be in the same room and discuss their different

perspectives. Um, but by 2011, like I said, she

couldn't even stand to be in the same room as Kelly

and he is her boss. And frankly, I was, you know, I

mean I guess I'm a military guy and chain of command

is important, but I don't -- I don't think that is

asking too much in any organization to say, you know,

when your boss finally tells you you're going to do

this, then you need to jump on board and make it

happen.

Q. Why is chain of command important to you?

A. Well, you know, I don't necessarily think it

is any more important to me than it is to anybody

else.

Q. Okay.

A. But certainly I see the evidence on a daily

basis in any -- in all of the organizations I have

been a part of, that we have got to have that

continuity from where the rubber meets the road, that

shelter technician, those animal services officers

all the way up to me, that we're all on the same

page. That's how you get an efficient and well run

organization where people understand their role and

they're happy to operate with that role and be

successful. And until Kelly physically moved out to

```
 1    the shelter, um, I thought that was Karen.

 2         Q.   Okay.   The event where you suggested that

 3    you thought it was time -- first time to do some

 4    disciplinary action towards Karen and you described

 5    how you went to Kelly and he wanted to think about

 6    it, do you remember the day of that?

 7         A.   I don't, sorry.

 8         Q.   I think the record reflects it was the end

 9    of December of 2009?

10         A.   Um --

11         Q.   I'm sorry, 2010.   I apologize.   Are you --

12    did Kelly say that he -- that he wanted to give her

13    another chance?

14         A.   He did.   He did.   He said let me -- I want

15    to try a couple of things, um, and I think that was

16    the -- where he -- where he -- wanted to try and get

17    on the same page with Karen and I think he asked her

18    to write down, you know, take some time and write

19    down what you think your job description is.

20         I mean he tried -- he tried to do a couple of

21    things to engage Karen in a constructive way that

22    they could have something to discuss, to resolve this

23    whatever this was between them so that they could --

24    they could be successful like they had been for about

25    eight years or something.
```

1    Q.   All right.  Do you recall him doing a

2  memorandum of understanding and a performance

3  evaluation to assist her in knowing what she needed

4  to do?  Did you ever see those documents?

5    A.   I -- I saw -- I saw them.  I'm pretty vague

6  on it.

7    Q.   Sure.  When you sat down, we actually have a

8  recording by the way of a meeting where you

9  informed --

10    A.   I had no idea about all these recordings.

11    Q.   Karen never told you she was recording all

12  these conversations?

13    A.   No.  Never.

14    Q.   When you had this discussion I believe it

15  was January 12 or 13 of 2011, so it was right after

16  that performance review, how did she respond when

17  you're putting her on notice that, you know, there

18  are problems, you were considering disciplinary

19  action, Kelly essentially saved her job, what was her

20  response to that?

21    A.   You know, I am -- I was always from day --

22  from 2009 I was always looking for Karen for

23  something along the lines of hey, I know he's my boss

24  and I need to -- I need to do what he says and I need

25  to work with him and I can do better at this.  And I

```
 1   just never got anything other than Kelly Davis is the

 2   problem and it is -- you know I felt like she was

 3   telling me it is your job to provide me with a

 4   supervisor that's acceptable to me.  And, you know, I

 5   wish we all had that.  But my current boss is great,

 6   I just want to say that.

 7           But -- but, you know, it -- it's not -- it's

 8   not -- it's not always possible.  So I told both of

 9   them look frankly I don't really care if you guys

10   don't like it each other, you're not best buddies,

11   but you have to get along and we need to be

12   professional about this.  And Karen, you need to --

13   you need to do what Kelly says.  And Kelly, you know,

14   you need to make Karen feel like she is part of the

15   team.  And I always felt Kelly, any time I had those

16   conversations with him, would make an effort to reach

17   out to Karen to find -- try and find ways to

18   compromise with her that would make her feel as

19   though the things that she wanted to do mattered and

20   try and do them.  Many of the things that Karen

21   wanted to do were just not possible for a variety of

22   reasons and to try and explain that to her.  So I

23   always got that from Kelly that he was trying.  And I

24   never, right up until the end, even when I gave Karen

25   that disciplinary notice, and she said you know I
```

01:50:26
01:50:42
01:50:57
01:51:18
01:51:36

just listened to this I didn't realize it was being

recorded either, but I said, you know, that this

is -- this is broken and I am going to -- I'm going

to do -- I'm going to act.  And she said well I just

don't, you know, feel like he ever listens to me and

he is trying to make me feel like he is the boss and

I said well, he is the boss.  And she said well, I

know, but well there is no -- there is no but there.

He is the boss and you might not like it.  Typically

when people have had enough of their boss, they quit

and go get a job where they do like the boss.  But

Karen's attitude seemed to be, this is just my

perspective, that she felt like because she loved

animals the most, that anything she wanted to do was

right and anything else that somebody else wanted to

do was secondary to that, and we all needed to just

get on board.  And like I said, um, we need people

like that, I want people I'm always looking for

people like that, but they need to be able to

understand the parameters that we're operating under.

    Q.   So if you recall in towards the end just

prior to the decision being made by you to terminate

her, getting a CD from Shirlayne George?  Does that

ring a bell with you?

    A.   Yes.

```
 1        Q.   Tell me about that?

 2        A.   Well I -- when I -- when I decided that I

 3   was going to -- I was going to conduct the -- do a

 4   pre-disciplinary hearing I called HR, that is the --

 5   that is the policy, you know.  You need to coordinate

 6   those things.  So I called HR and said hey, I need to

 7   do a disciplinary hearing for Karen Bird and

 8   Shirlayne George said to me, you know she made a

 9   complaint, formal complaint here a couple of days ago

10   about Kelly Davis.  And I said no, I didn't know

11   that.  She said yes, she has a recording she has

12   surreptitiously made of Kelly Davis that she says is

13   evidence of Kelly's misbehavior and harsh and rude

14   treatment of her.  And so at that point I said well,

15   great, I would love if it is possible for me to hear

16   that.  You know, you HR you got to do whatever it is

17   you do in these investigations, but I would love to

18   hear that if that's possible.  And Shirlayne said

19   sure, I'll make you a copy of it.  And so I wanted to

20   use that because that was going to help me in my

21   hearing with Karen.  I wanted to hear her side of it.

22   Um, I had never heard Kelly speak in that manner to

23   Karen and so if there was, you know, regardless of

24   how she obtained it, if there was that hard evidence

25   that Kelly was behaving that way, then that would
```

1  certainly be a factor in my decision on what to do.

2  So I got that CD and listened to the whole

3  thing. And frankly by the time I was done with it, I

4  wanted to go pat Kelly on the back and say, wow, you

5  are a man of patience and I'm very impressed

6  especially since you didn't know you were even being

7  taped. But to me it was -- it was hard evidence not

8  only of Kelly Davis's patience and attempt to work

9  with Karen, but the fact that Karen viewed that as

10  evidence of what a terrible person Kelly was, was

11  indicative to me of how far off base Karen was and

12  her perspective of how the world ought to work was

13  just really out of whack.

14  Q. Let me show you what has been marked and

15  entered as Exhibit 78. Are my exhibits over here?

16  This is an e-mail that Ms. George wrote to Karen Bird

17  on November 9th, 2011. Take a moment and just read

18  that, it's a short e-mail and it's already an

19  exhibit.

20  A. Okay.

21  Q. Did you -- do you see that Ms. George says

22  here that --

23  MS. HOLLINGSWORTH: Your Honor, I just object

24  to this questioning because he hasn't established

25  this witness has any personal knowledge of the

```
 1   e-mail.

 2          MR. PRESTON:  Well, we have already seen it.

 3   I won't comment.

 4          THE COURT:  Okay.  Um, let's go ahead and I'll

 5   wait for -- at this point I don't see a problem.

 6          MR. PRESTON:  All right.

 7      Q.   (By Mr. Preston)  What I'm asking you this

 8   for, Mr. Morris, is I wanted to -- did you talk to

 9   Shirlayne and get her opinion about that as well?

10      A.   About the --

11      Q.   The CD?

12      A.   No.

13      Q.   Okay.  Were you aware that she sent this

14   e-mail.  What I want to know is she states in here

15   that I've determined you have not been placed in a

16   hostile work environment.  Are there problems?  Yes.

17   Skipping down, I listened to the recording.  I felt

18   as though he was really trying to help you.  Did you

19   share a similar or a different view of that CD than

20   Ms. George expresses in this e-mail?

21      A.   No, I didn't.  I mean I probably didn't put

22   it in that nicely.  It was a long -- it was a long

23   meeting and yeah, frankly as a manager by the time it

24   was over I was frustrated.  You know, I -- I didn't

25   have -- I guess I don't have the patience that Kelly
```

1    does under -- under those circumstances because I

           2    wouldn't have handled it quite that gently.

           3         Q.   Were you aware of an investigation in 2009

           4    into Kelly Davis and anger management issues raised

01:58:48   5    against him?

           6         A.   I believe so.

           7         Q.   Ms. George testified that you were given a

           8    copy of that investigation.  Do you recall receiving

           9    it?

01:58:58  10         A.   Yes.

          11         Q.   What was -- had you ever seen Mr. Davis act

          12    in an angry or yelling or unprofessional manner?

          13         A.   No.

          14         Q.   Did you trust that investigation?

01:59:14  15         A.   At that point I didn't.  I didn't.  I

          16    remember seeing that investigation and it was fairly

          17    dramatic I guess.  And, um, at that point I felt like

          18    that division was pretty strongly split and so there

          19    was lots of I guess drama going on.  So, you know, if

01:59:41  20    I remember right the -- the -- I think Shirlayne had

          21    -- the conclusion she came to -- had come to was that

          22    Kelly had an issue with his temper and he lost it and

          23    he had lost it on occasion and spoken loudly or more

          24    loudly than he should have.  And so I -- I took that

02:00:05  25    with a grain of salt I guess is the best way to say

                                                                   29

```
 1   it.  I mean Kelly is an ex-police officer so, you
 2   know, he is not a wilting personality, you know, he
 3   is a strong personality and so he had to get his
 4   point across.  I'm sure he speaks -- his voice tends
 5   to get elevated.  I have the same problem myself.
 6   And so I would not characterize that as a man who is
 7   on the verge of losing his temper or behaving
 8   inappropriately, but yeah sometimes we all need to
 9   get a hold of ourselves and say all right maybe I was
10   a little too strong with -- or spoke a little bit I
11   didn't need to get to -- reach that decibel level.
12       Q.   Okay.  You said that there was a split in
13   the division in your perception.  What did you mean
14   by that?
15       A.   Well, like I -- well the employees were
16   really essentially forced to decide who am I going to
17   make happy today?  Kelly or Karen.  Because Kelly is
18   telling me one thing in our staff meeting, our daily
19   staff meeting, here is what is going on, you know, I
20   want this guy assigned to do that.  Animal services
21   there is -- because there are, you know, animals have
22   got to get fed and so it is one of the only divisions
23   where you show up and you might be the office clerk
24   but since somebody was sick that day you end up
25   having to clean kennels.  Or if you are an Animal
```

1   Services Officer and you're used to being out on the

2   road, maybe you have got to come in and cover for a

3   clerk.  So there is a daily briefing that goes on

4   there to kind of get organized for the day.  And so

5   when you have got Kelly making decisions based on who

6   is there and what we're going to do today and who

7   needs to do what and how they need to do it, and when

8   that meeting is over and employees go their own way

9   and now it is just them and Karen and Karen is

10   telling them well no, we need to do -- I want you to

11   do this instead.  Now an employee is forced to chose

12   all right well, you know, I got Karen right here

13   telling me one thing, and I know that's different

14   than what Kelly wants me to do, but, you know, I

15   don't want -- I don't want to get in trouble with

16   either one of them so how do I -- how do I -- I've

17   got to pick a side.  And the people that had more

18   interaction with Karen picked Karen.  And the people

19   that had more interaction with Kelly I think picked

20   Kelly.

21       Q.   Is that healthy for the division?

22       A.   No, obviously you can't run a -- you can't

23   run a division based on two people where one refuses

24   to recognize the legitimacy of the other one as the

25   -- as the boss.  And so it was literally tearing that

1  division apart.  And so, um, when people are asked by
2  HR, you know, their opinion of what's going on, um,
3  you get a wide swing in what people think.

4       Some people think Karen is the most terrible
02:03:08   5  person on earth, and some people think Kelly.  And I
6  think it was much closer to the middle.  So I took
7  that investigation with a little bit of a grain of
8  salt.

9       MR. PRESTON:  Your Honor, would now be a
02:03:21   10  convenient time?
11       THE COURT:  It would be.
12       THE CLERK:  If the jury could rise.  Or sorry,
13  if we could all rise for the jury.
14       (Whereupon, the jury left the courtroom.)
02:03:30   15       THE COURT:  The jury can rise, too.  We'll
16  have a 15-minute break.
17       MR. PRESTON:  Thank you, Your Honor.
18       THE COURT:  Thank you.
19       (Recess.)
20       (Whereupon, the trial continued but
21        was not transcribed.)
22       (Whereupon, the following excerpt is
23        a portion of Examination of Layne Morris
24        by Mr. Preston.)
03:02:19   25       Q.   (By Mr. Preston) You will see the last

```
 1    statement on this says someone writes back, "West

 2    Valley sure likes to murder."  Are those the sorts of

 3    comments that you would get when these statements

 4    would go out?

 5         A.   Exactly.

 6         Q.   Anybody ever suggest that you use the

 7    chamber on yourself?

 8         A.   Probably.

 9         Q.   So in this meeting, what did you observe

10    about the way Kelly and Karen interacted on

11    October 31, the meeting that you had?

12         A.   That was when I -- that was when I realized

13    that this was a completely broken relationship.  I

14    mean I really had been operating too long in my

15    opinion in hindsight but I had been operating on the

16    -- on the premise that these two had gotten along

17    famously for, you know, eight years, and that

18    whatever was -- whatever was occurring now they would

19    get over it and get back to operating efficiently

20    like they had been.

21              So this was the meeting when I realized,

22    looking back that Karen had gone just over the last

23    six months from someone who could at least comment

24    and in a civilized way comment or address Kelly or

25    talk to him in my presence.  She, in that meeting,
```

```
 1    she literally she couldn't even look him in the eye,

 2    she refused to look, even glance his direction.  She

 3    would look at me and talk at me and talked over him.

 4    But I mean the -- like I said it before, the loathing

 5    was so strong that it was obvious to me that this is

 6    not going to get better, this is one of those ugly

 7    divorces, and Kelly is trying and Karen is not

 8    trying.  And I really didn't think I had much choice.

 9         Q.   Okay.  So the next day did you talk to Karen

10    about that after your meeting with Karen and

11    Michelle.  Do you remember that?

12         A.   I believe so.

13         Q.   Okay.  This would be a November 1 meeting.

14    Let me hand you what has been marked as Exhibit 92.

15    It is a brief clip.  There is a transcript here.

16         A.   It's another recording.

17         Q.   Yes, it's another recording that was made

18    and.  This is just a clip from it but you will see a

19    transcript right here (indicating) and we'll ask

20    Mr. Crowther if you will play that for us and you can

21    follow along.

22              (Whereupon, the video was played

23               for the jury.)

24              (Whereupon, the trial continued but

25               was not transcribed.)
```

34

04:17:46
04:18:07
04:18:18
04:18:35
04:18:52

1     (Whereupon, the following is an excerpt

2          of examination of Layne Morris by

3          Mr. Preston.)

4     Q.    (By Mr. Preston)  Thank you.  Mr. Morris

5  when we broke, when I last had you on the stand, we

6  were just talking about the November 1 meeting and

7  there had been the clip played about you telling

8  Karen that you didn't know how this was going to work

9  out, that they were -- that their planets were

10  different, were in separate orbits.  Do you recall

11  that testimony?

12     A.    I do.

13     Q.    Now, did you meet with her again on

14  November 9th?

15     A.    Would that have been my pre-disciplinary

16  meeting or --

17     Q.    No, it was before that.  Do you remember

18  having a meeting with her talking about whether or

19  not her relationship was broken with Kelly?

20     A.    Right.

21     Q.    Okay.  We have, again, a recording of this

22  conversation.  What do you recall -- why were you

23  meeting with her on that occasion, November 9th, if

24  you recall?  We can pull the recording out if you

25  don't.

```
 1        A.   I'm sorry I don't remember.  So this would
 2   have been after we had had the conversation where I
 3   had remarked to her that it appeared to me to be
 4   irretrievably broken?
 5        Q.   No, this would be that conversation.
 6        A.   Okay.
 7        Q.   Tell me about that conversation?
 8        A.   I think it was -- this was my informing
 9   Karen that I was going to take disciplinary action.
10   Is that what we're talking about?
11        Q.   Yes.  Yeah, November 9th.  So from
12   November 1, okay you had the meeting on October 31,
13   you observed how they were, you talked to her about
14   that the next day after the meeting with Michelle.
15        What was your thought process leading up to
16   November 9th when you informed her about a
17   disciplinary process?
18        A.   That was really I think it solidified it in
19   my mind was based on that prior meeting where, as I
20   said, she couldn't even interact with Mr. Davis in
21   any -- in any way.
22        Q.   Okay.  And you mentioned that there was
23   something about the relationship being broken.  Did
24   you have that discussion with Karen?
25        A.   Yeah, I believe she has got a recording of
```

1   that.  I think I told her, Karen, it appears to me

2   just from our meeting the other day that this is

3   irretrievably -- it's broken.  You can't do it.

4   Kelly can't do it.  This relationship is not going to

04:20:30   5   -- not going to work any longer.  And if I remember

6   right, she agreed and said yeah, you're right, it is

7   broken.

8       Q.   Did she -- she didn't deny that it was

9   broken?

04:20:40   10      A.   No.

11      Q.   Let me hand you what's been marked as

12   Exhibit 94.  This is an audio clip of a meeting on

13   November 9th.  It's a short clip.  The meeting isn't

14   all that long and the document is already in so you

04:21:08   15   can follow along in the transcript and Brandon if you

16   would please play that.

17           (Whereupon, the Audio Clip 94 was played

18            for the jury.)

19      Q.   (By Mr. Preston)  Did she ever explain what

04:21:38   20   those perspectives were, that you recall?

21      A.   Not in this meeting but I knew what her --

22   what her perspective was.

23      Q.   And how did you know that?

24      A.   Because we had been talking about it for at

04:21:54   25   least a year at varying -- varying frequencies and

```
 1   intensities.

 2       Q.   And what did you understand her perspective

 3   was?

 4       A.   Well, her perspective was that Kelly was a

 5   bad manager and she didn't like to work with him and

 6   he didn't do things the way she wanted them done or

 7   thought was her -- it was her right to do them how

 8   she wanted to do them.  I mean there was a whole

 9   litany of issues where she just didn't -- she just

10   chaffed at his leadership in general, the way he

11   directed and the way he approached her and the things

12   that he wanted her to do or not to do.  And she just

13   didn't like it and thought it needed to change.

14       Q.   Did she ever suggest to you how it should

15   change?

16       A.   Um, no.  No, not that I -- that I recollect.

17   It was more just that Kelly is wrong.

18       Q.   Did she ever recognize that she might be at

19   fault here somehow?

20       A.   No, which was one of the troubling things to

21   me.  I mean if you are going to -- if you're going to

22   level allegations that your supervisor should be

23   fired or terminated or you can't work with him and

24   you need somebody you can work with, um, there ought

25   to be some of that that you could sit down and talk
```

04:22:06
04:22:25
04:22:45
04:23:04
04:23:25

1   about and we can kind of reason these things out and

2   a willingness to say look I recognize that I'm --

3   that I'm the subordinate here and, um, his decisions,

4   even though I might not agree with them, I'll

5   implement what he wants me to do but I don't like it.

6   And I sure appreciate a second set of eyes on it.

7   And we didn't get that very often.

8       Q.   Did you, sitting here today, I know it has

9   been a long time ago you have a lot of

10  responsibilities, but can you think of some of the

11  instances where you felt she was being resistant to

12  him or not doing the things that he wanted done?

13      A.   Sure.  Things like personnel schedules, um,

14  care of the animals, feeding schedules, what you can

15  afford to purchase for the animals.  Simple things

16  like do we spend some money on buying toys for the

17  dogs to play with in the kennels or do we spend it on

18  blankets for the dogs in the kennels or better food.

19  Do we buy wet food versus dry food?  I mean just a

20  what I would say is purely an opinion based --

21  opinion based decisions where there is -- there is

22  not necessarily a right or a wrong answer, it is all

23  of us got together and here's what after taking input

24  from everybody we decided that we needed to do.

25      Q.   Okay.  So once you had made the -- informed

1   her of a disciplinary process, did you come to find

2   out that Ms. George was, in fact you may have

3   mentioned this earlier in your testimony, that she

4   was conducting an investigation at the shelter?

5      A.  Right.  Right.  I, um, prior to having that

6   I needed to check in with HR and legal just to let

7   them know what I was -- what my intentions were, what

8   I was doing.  And when I called Shirlayne to tell her

9   Shirlayne said oh, you know that Karen made a formal

10   complaint, I think is how she put it, about Kelly, I

11   think it was about Kelly not just that shelter, about

12   Kelly specifically here, you know, a couple of days

13   ago or something.

14      Q.  And did she -- what did she tell you she was

15   doing in response to that?

16      A.  She said I'm going to do -- I told Karen

17   that I would do an investigation and it wouldn't just

18   be Kelly, it would be -- I was going to -- I was

19   going to really talk to everybody at the animal

20   shelter and get their opinion of it.  And I think at

21   that point is when she told me that as part of

22   Karen's complaint, Karen had submitted this long --

23   this recording that she had secretly taped of a

24   conversation between her and Kelly that she said was

25   demonstrable of Kelly's abuse towards her.

```
 1        Q.   Okay.  And did she conduct that
 2   investigation?
 3        A.   She did.
 4        Q.   And did she provide you with a copy of that?
 5        A.   She did.
 6        Q.   Let me hand you what has been marked as
 7   exhibit -- Exhibit 76.  It's already in evidence.
 8            Do you recognize that as the investigation
 9   that Ms. George did?
10        A.   It looks like it.
11        Q.   Okay.  So when you read through this, you
12   might take a moment just to look at it and let me
13   give you just a few minutes to glance through it.
14   And if there is anything that comes to mind that was
15   significant to you, would you please let us know.
16        A.   Well, and I think I mentioned before, that
17   the -- the things being referred to are -- are --
18   they're either, um, it's evident going through this
19   that everybody out there in the -- at the shelter was
20   taking a side, you know.  There was no -- there was
21   no neutral -- no neutrality there.  Um, and to me
22   that was a -- I have seen other -- other
23   investigations before and typically you have a whole
24   bunch of people that are pretty neutral, don't care
25   one way or another, and some people are then pretty
```

```
 1   vociferous about it and others are one way and the

 2   others are the other way.  So this was kind of

 3   striking that it was so clearly divided.

 4        Q.   Do you remember recalling against whom most

 5   of the complaints were levelled?

 6        A.   Um, most of them were about Karen.

 7        Q.   And did -- so when you saw that, what did --

 8   what did you take away from it?  What were the

 9   conclusions you drew or how did it affect this

10   process that you're going through as trying to decide

11   what discipline, if any, you will institute?

12        A.   Well, I mean from my own experience with --

13   with Karen and Kelly, that was for me the

14   decision-making or the decider that I needed to take

15   disciplinary action against Karen.  That was based on

16   me.

17             In this investigation many of these items I

18   kind of heard about from other employees, but, um,

19   not in any kind of specificity.  I mean I knew that

20   the place was tearing itself apart because I got that

21   on a near weekly basis from both Karen and Kelly.  So

22   when I saw this and how human resources their

23   investigations kind of identified Karen as a huge

24   part of the problem, that simply gave me a reason to

25   say well I better include this as part of my
```

```
 1   disciplinary action with Karen.  So I included that,
 2   some of these items that I thought were legitimate
 3   and worth talking about with Karen.
 4        Q.   And you have already been shown your -- your
 5   pre-disciplinary letter where you identified five
 6   potential policy violations.  Do you recall that?
 7        A.   I do.
 8        Q.   And so following up with this then did you
 9   have a pre-disciplinary meeting with Ms. Bird?
10        A.   I did.  From the investigation and my
11   personal experience with Ms. Bird is how I came up
12   with the notice of the pre-disciplinary hearing.
13   There was -- there was things in the HR investigation
14   that I frankly just dismissed either because I
15   thought it was hopelessly biased one way or another
16   and I didn't consider it.  I forget what the word is
17   but legit, I guess.
18        Q.   So how long was this pre-disciplinary
19   meeting with Karen Bird, do you remember?
20        A.   Um, I bet it was -- I bet it was an hour.
21   I'm sure there is a recording of it out there
22   somewhere.
23        Q.   There is.  I think it goes like an hour and
24   40 minutes, something like that.  Does that sound
25   about right?
```

1     A.   Sure.

2     Q.   And what was the purpose of this meeting?

3     A.   The purpose of this meeting is for Karen to

4 explain her side of the story, so to speak, to give

04:31:26   5 me mitigating factors that will help me make a

6 decision on what to do in her case.  I had a lot of

7 options, it doesn't have be to termination, it could

8 be any -- a whole bunch of different types of

9 discipline.  And so it was my chance to get her side

04:31:45  10 of it regarding all of these allegations I listed in

11 there.  And if I remember right, we went through

12 Shirlayne's investigation just point by point and I

13 wanted to get her comment on everything that was

14 listed there just to help me out to where she was

04:32:03  15 coming from.

16     Q.   Had you formed a decision, made a decision

17 as to whether termination would be prior to this

18 pre-disciplinary hearing?

19     A.   No.

04:32:16  20     Q.   And I think your letter says -- your notice

21 says that you were going to hold it on November 21.

22 But from the termination letter it says that the

23 meeting actually took place on November 22.  So it

24 was about six days after you had delivered this

04:32:34  25 pre-disciplinary notice to her that you met with her.

1 So what was your take away from that meeting with

2 Karen, after you heard what she had to say about it?

3     A.   I didn't -- I didn't feel that there was

4 again any way that she could co-exist in Animal

5 Services with Kelly and she never took any kind of

6 ownership of any of the problems in Animal Services

7 or her role in them.  It was just a complete denial

8 that there was any issue with her at all.  It was all

9 Kelly, it was all Kelly's fault.  And if -- if it

10 wasn't for Kelly everything would be great.  And if

11 we could just go, you know, back to that situation

12 where it was just her it would be wonderful.  Um, you

13 know, it has been a few years I haven't -- I haven't

14 listened to that recording so I -- I'm kind of going

15 from my memory, but I did not hear any mitigating

16 factors that I thought gave me any room to say let's

17 continue this situation with Karen as an employee.

18     Q.   Did she offer to change in the meeting?

19     A.   Not that I remember.

20     Q.   Did she -- well, in this courtroom she has

21 testified under oath that she did not do anything

22 wrong in her employment.  Would you agree with that?

23     A.   I would not agree with that.

24     Q.   Why wouldn't you agree with that?

25     A.   Because of my personal experience with

1    Karen.  You know I think I have said people have

2    asked me well give me an example of her

3    insubordination.  In my opinion she was in a state of

4    insubordination for a couple of years frankly, and it

04:34:40    5    was really simply a matter of how much do you want to

6    tolerate.  And Kelly's tolerance for that

7    insubordination went beyond what mine was.

8         So yeah, that was my -- that was my -- that

9    was my problem in a nutshell.  It was -- this is a

04:35:02    10    situation where one employee is just continually

11    insubordinate in her attitude, in her words, in her

12    actions, everything that I observed.  And even though

13    she has a lot of great qualities, loves those animals

14    and we need that, you know, that doesn't -- that

04:35:20    15    doesn't give you the right to just ignore your boss

16    or deliberately try and undermine him.

17         Q.   Okay.  So who made the decision to terminate

18    Karen Bird?

19         A.   I did.

04:35:36    20         Q.   Did you consult with Kelly Davis about it?

21         A.   I didn't.  I mean at that point I was

22    frankly probably I was irritated with Kelly, um,

23    because this should have happened probably a year

24    earlier in my opinion.  And so, you know, I had been

04:35:53    25    working with Kelly to try and get him to the point

1   where he could -- where he could be on board with me

2   disciplining Karen.  I don't need his permission to

3   discipline Karen, but I wanted his acknowledgment and

4   support that it needed to be done.  And until it

5   finally just got to the point with that earlier

6   meeting we just talked about where I no longer cared

7   what Kelly thought about the situation and I was

8   going to -- I was going to fix my department.

9       Q.  So you believe that Karen Bird was given

10  opportunities to correct her behaviors and her

11  deficiencies?

12      A.  Karen Bird was given too many opportunities

13  frankly.

14      Q.  So did Kelly Davis participate in any way

15  personally in this decision to terminate?

16      A.  No.  I am not -- I am not even sure how

17  Kelly found out about it.  I mean I -- I discussed

18  some of my options with Human Resources and legal and

19  probably the City manager, but Kelly wasn't involved

20  in those discussions at all.

21      Q.  Did he recommend that you terminate her?

22      A.  I don't think Kelly ever recommended.  One

23  time he -- he was vocal about he wanted to work with

24  her some more.  Um, I don't ever remember Kelly

25  saying to me, other than that one time where I said I

think we need to discipline her he said all right

well let me think about it.  And that was on a

Friday.  And Monday he came back and said no, I want

to -- I -- let me try a couple of things.  But I

04:37:44  don't ever remember Kelly saying to me I think we

need to discipline her, I think you need to

discipline her.

Q.  Okay.  So sitting here today in front of the

jury, please articulate for the jury what was the

04:38:02  motivation, your reason, for terminating her at this

point?

A.  It was almost solely I think in my -- in the

big long list that Shirlayne had and the list that I

included that things that I would consider, the only

04:38:18  thing I found was her insubordination.  And as part

of that, probably being -- not being nice to people.

But the only thing that I had personal

experience with and frankly the only thing that

mattered to me is do I have a functioning team over

04:38:38  there.  And by Kelly and Karen's admittance that it

was a non -- it was broken and neither one of them

had a solution as to -- as to how to fix it, and so,

um, I had to fix it.  And I was happy -- I was happy

to fix it.  I knew that something needed to be done

04:38:59  long before I actually did something as far as the

48

1  discipline.  But the only reason Karen Bird was

2  terminated was because of that insubordination, that

3  just -- that just complete refusal to acknowledge

4  that there was any problem on her part and that she

5  had a, from her perspective, she had a manager that

6  she didn't like and she seemed to think that we owed

7  her a manager that she liked.  And there was some

8  perfect situation out there that she was going to

9  continue to agitate for until she got.  And, you

10  know, you just can't do that.

11      Q.  What role did your personal observations of

12  the interactions of them together play in your

13  reaching this decision?

14      A.  Well, like I said it was a -- it was a

15  gradual thing over -- we're talking about over a year

16  where it starts out back in 2009 where Karen had

17  expressed this fear that she was going to be fired

18  because I didn't need her or want her there.  Or

19  Kelly didn't need her or want her there.  At that

20  point, you know, we could all three sit down as the

21  management team of Animal Services and make decisions

22  and accomplish things.  So we went from that

23  situation all the way to the point where to get them

24  in the same room together was difficult.  And when

25  they were in the same room together, Karen was unable

```
 1   to function with Kelly in any way at all and barely

 2   with me in trying to probably because she was

 3   recording our conversations is why she was reluctant

 4   to say anything, but it was difficult to get her to

 5   make a statement, to give us her opinion, to tell us

 6   what she -- what she thought should happen.

 7          And so it was -- it was tough to have any kind

 8   of a communication with somebody who has that kind of

 9   I guess underlying motive going on and they're second

10   guessing everything they want to say or should or

11   shouldn't say.  And so it made it very difficult to

12   even figure out what Karen wanted other than she

13   wanted something to change and it just wasn't her.

14          Q.   Let me hand you two letters.  Start with

15   Plaintiff's Exhibit 16.  It's already in the record.

16          This is a letter you wrote to Karen Bird dated

17   November 30th, 2011, informing her of the

18   termination.  Do you recall this letter?

19          A.   I do.

20          Q.   Here is where you say, "thank you for

21   attending the disciplinary hearing last Tuesday,

22   November 22, 2011."  And then in the second

23   paragraph, "after careful consideration of our

24   discussion and your input, it is my decision to

25   terminate your employment for cause with West Valley
```

1  City effective November 29, 2011."  You don't specify

2  what the cause was there, do you?

3       A.   No.

4       Q.   So let me hand you what was -- what is

5  marked as Plaintiff's Exhibit 19.  And is this a

6  subsequent letter you wrote to Karen?

7       A.   Yes.

8       Q.   It is dated December 12, 2011 and you state

9  in the second paragraph here, "as per the voicemail I

10 left you on November 29th, 2011," and you informed

11 her of the decision.  Did you try to call her to tell

12 her personally what the decision was?

13      A.   Yeah.  I think at first I tried to meet with

14 her and couldn't -- couldn't -- I mean you know you

15 never want to terminate somebody over the phone but

16 we couldn't get a hold of her if I remember right.

17 And so I couldn't have a meeting.  So, um, I think I

18 left her several voicemails and didn't hear back from

19 her.  And so finally I didn't feel like I had any

20 choice but to do it by voicemail because she wasn't

21 answering the phone.

22      Q.   Okay.  And here you do say -- state, "due to

23 insubordination and failure to be courteous or

24 cooperative with the public or fellow employees."

25 And you state that "the termination is effective

1  November 29, 2011."  Were those the sustained grounds

2  in the five listed in your pre-disciplinary letter

3  that you sustained?

4          MS. HOLLINGSWORTH:  Objection, leading.

5          THE COURT:  Sustained.

6      Q.  (By Mr. Preston)  Mr. Morris, what were the

7  two grounds you used.  I mean you know we can -- we

8  have got to at least do this when this is

9  substantive, Your Honor.  I am trying to move this

10  along.

11      A.  To terminate due to insubordination and

12  failure to be courteous or cooperative with the

13  public or a fellow employees.  I think I wrote the

14  second one because, just moving this along here, I

15  wrote the second one because I wrote the first one

16  and I think somebody in legal or HR reviewed it and

17  said no, you've got to put -- you've have to put the

18  specific things you found there and so I re-wrote the

19  letter.

20      Q.  Okay.  So you listed five policy violations?

21      A.  In the pre-disciplinary letter.

22      Q.  And how many did you sustain?

23      A.  Um, really one.  I think it reads as two,

24  insubordination and failure to be courteous or

25  cooperative with the public or fellow employees.  But

52

yeah, those -- the insubordination which in my mind

included that failure to be courteous because she was

not courteous with Kelly.

Q. Do you feel the termination was justified?

A. Entirely and overdue.

Q. Are you being honest with the court and the

jury telling them this was the reason?

A. I am.

Q. Now, in this case, Ms. Bird is claiming that

the decision to terminate her was based on a desire

to retaliate against her because you believed she was

passing on information about the shelter to the

press. What is your response to that?

A. Um, I guess I would say two things. I

didn't believe that. I certainly didn't know it, I

didn't even believe it, number one.

And number two, you know, frankly we got

enough bad press all on our own we didn't need any

more help. It wasn't a matter of if things at that

point were going to get any better in that immediate

situation, to terminate somebody based on that would

be would be silly.

Q. Is that something that you would do?

A. No. We needed to take our licks on the

failed euthanasia of Andrea the Cat and I was happy

1  to stand up and say yeah, we screwed that up, um, and

2  I didn't blame any of our people for any of the

3  negative publicity surrounding that event.  Um, when

4  that -- when that -- when that publicity changed to

5  out of control wild and crazy things like we reviewed

6  earlier, that's when I knew I had to -- I had to fix

7  that.  That was a problem that needed to be -- needed

8  to be fixed.  And so I took the action that I thought

9  was necessary to fix it.

10  And frankly, it did.  After I had had the

11  meeting with Karen and Michelle kind of put that shot

12  across the bow that this had to stop, I don't

13  recollect that being a further issue where we had

14  people making these wild accusations.

15  Q.  So was your decision based in any way on

16  retaliation because of anything Karen Bird was

17  stating?

18  MS. HOLLINGSWORTH:  Objection.

19  THE COURT:  Sustained.

20  Q.  (By Mr. Preston) Was -- Well, I stated

21  the statement here that you -- the allegation is that

22  she was the victim of free speech retaliation.  What

23  is your response to that?

24  A.  My response to that is that there was no

25  retaliation, there was nothing to retaliate against.

There is no secrets, you know.  Nobody has a security
clearance at the shelter.  We don't have secrets.
So, um, when bad things happen and we have made a
mistake we need to own up to that and say yup, here
is where we went wrong and we need to fix that.  But
nobody leaked anything.  It's just a terrible word.
No, it is not -- there is nothing leaked.  Um, did we
have some communication that was hurting us,
absolutely.  And we need to get that communication
where it's helping us, where it's positive.  The
animal shelter we need to focus on the positives
we're doing there.  And so my only -- my concern
there I know Kelly and I don't blame him because
Kelly was getting drug through the mud in the press
as if he was the embodiment of all evil at the
shelter and loved to kill every -- I mean that is not
good for the City to -- to have that reputation that
they have an employee who is out there, you know,
killing everything that he possibly can any time they
have.  So I needed to stop that.  But my -- my
efforts in doing that was not to find somebody who
was doing it deliberately, I was thoroughly
unconvinced that someone was doing it deliberately.

        Now some of those that were crazy enough makes
you start to wonder especially when given the --

```
 1   given the circumstances, but that was not my focus to
 2   find, you know, somebody who had done something wrong
 3   and punish them.  My focus and I think it is in the
 4   -- in the recorded meeting, is that I'm just
 5   interested in how we can fix this as a team to get
 6   ourselves on a better standing with the public.  And
 7   so to say that I fired Karen based on that is -- is
 8   deeply troubling to me.
 9       Q.   When you joined the Army did you make an
10   oath?
11       A.   I did.
12       Q.   What was that oath?
13       A.   To obey -- uphold the Constitution against
14   all enemies foreign and domestic.
15       Q.   Do you believe in the Constitution?
16       A.   I do.
17       Q.   Would you knowingly violate anyone's rights
18   under the Constitution?
19         MS. HOLLINGSWORTH:  Objection, leading.
20       Q.   (By Mr. Preston)  Would you violate rights
21   under the Constitution?
22       A.   I would not.  And that was a consideration.
23   I am not an attorney.  I know that there are limits
24   on people's right to free speech and I think I say
25   that over and over again that I -- I'm not trying to
```

dictate to people how they should feel and what they
should say but it needs to be the truth and we need
to uphold the truth in this matter. And that's --
that's important to have people feel that they can --
that they can speak the truth. But, um, but we ought
to be able to find a way to do that that is
beneficial to both parties, the City, the Division
and the person. And whether they are a volunteer or
an employee, um, I think that responsibility is the
same.

    Q.  Did you blame Karen Bird for these false
statements that were being -- that you were
receiving?

    A.  I did not. And if I had to take a stab at
it I would have thought it was Michelle, the
volunteer. But again, it wasn't really my focus of
trying to fix the problem. I was trying to fix the
problem not go backwards, we're trying to go forward.
We just all had been through a traumatic event, and,
you know, we got to get -- let's get past this and
get back on track and move forward not spend the
next, you know, how ever many days, months, and weeks
trying to count up scores and find people to punish
or to blame. I was happy to take the blame for that.
It was my Division and it was screwed up on my watch

1    and I accept that.

2         Q.    These negative calls, were they disruptive

3    to the Animal Services Division?

4              MS. HOLLINGSWORTH:  Objection, leading.

5              THE COURT:  Sustained.

6         Q.   (By Mr. Preston)  When you received all

7    these calls, how did that impact the division?

8         A.    It stresses everyone out.  I mean all these

9    employees, I mean they have got to go home every

10   night and hear from their family, their extended

11   family, their friends.  Oh, you work at the shelter?

12   How many kittens did you strangle today?  No one -- I

13   mean these people work at the shelter because they

14   love animals and they want to -- they want to help

15   them and assist them.  And it's -- it's so unfair to

16   them to be painted with that brush that they don't

17   care, that they're callus murderers or that anybody

18   that works there is.  And so, yeah, it's horrible for

19   moral, it's horrible for those interpersonal

20   relationships especially if people think that these

21   are coming from inside the shelter.  Now everyone is

22   even further afraid to even interact with each other

23   because they don't know, you know, who the problem is

24   or who is saying what.  It's a -- it's just -- it was

25   a terrible situation and that was what needed to get

```
 1   fixed, not -- not finding out who said what, where or
 2   who told, you know, four and five phone calls down
 3   the line how it got translated out.  We just had to
 4   come up with a way to be able to communicate amongst
 5   ourselves and especially with all of the various
 6   partners we have out there in the community in ways
 7   that portray us in a positive light and make people
 8   want to help us and want to work with us.  A rescue
 9   agency doesn't want to come and help you out if they
10   think you're killing all of the animals for no
11   reason.
12            (Whereupon, the trial continued but was
13             not transcribed.)
14            (Whereupon, the following excerpt is
15             a sidebar conference between counsel
16             and the court.)
17        MR. PRESTON:  Could I have a quick sidebar
18   with the court?
19        THE COURT:  Sure.
20        MR. PRESTON:  So are the time limits are in
21   place now.
22        THE COURT:  Um, so yes.  Yes.  I would be
23   happy to hear from both of you on this particular
24   one.  The witness is you calling in your case in
25   chief.  The time limit is going to be the time that
```

04:53:55

04:54:12

04:58:49

04:59:03

```
 1    you use.  Since this was Ms. Hollingsworth -- since

 2    this one -- since Ms. Hollingsworth called this

 3    witness, um, I would be interested in hearing both

 4    your thoughts on how long for cross.  Do you have an

 5    estimate on how long you think you need?

 6         MS. HOLLINGSWORTH:  Um, and my guess is half

 7    an hour but I never am quite right on that.

 8         MR. PRESTON:  Well, I understood she had --

 9    you gave her an extra half an hour but all of that is

10    gone though.

11         THE COURT:  Right.  I did give her the extra

12    half hour and that is gone.  And so, um, but we

13    talked about this issue of the -- of the

14    cross-examination.  If I -- if I don't allow counsel

15    to cross a witness I think we run into a problem.  So

16    do you have a recommendation on a timeframe and I

17    will say, um, I would ask you to keep careful track

18    that you are crossing.

19         MS. HOLLINGSWORTH:  Okay.  Only new evidence.

20         MR. PRESTON:  I'll go with whatever the judge

21    decides.  It would be nice if we could let the jury

22    out a little early today, I guess that's my only

23    point since we're bringing them back.  We have three

24    witnesses to call.

25         THE COURT:  Okay.  I am going to -- I am going
```

```
 1  to go with -- limit the cross to half an hour.

 2          MR. PRESTON:  Thank you, Your Honor.  Three --

 3          THE COURT:  Three more to go?

 4          MR. PRESTON:  We have three witnesses.

 5          (Whereupon, the sidebar conference concluded.)

 6          (Whereupon, the trial continued but was

 7           not transcribed.)

 8          (Whereupon, the following is an excerpt

 9           regarding timing held during examination

10           of Layne Morris and where plaintiff

11           and defendant rest their cases and

12           argument on motion.)

13          Q.   (By Ms. Hollingsworth) I'm asking what the

14  reasons were that you were going to do a Loudermill?

15          A.   Because I was going to discipline her.

16          Q.   Why were you going to discipline her?

17          A.   Because it needed to be done.  She needed

18  discipline.  I'm not sure how to answer that.  I had

19  made a decision that this was a situation that needed

20  discipline.  I just had been to a meeting with her

21  where she was unable, unwilling, or whatever to even

22  function as a -- as a -- as an involved human being

23  let alone the shelter manager in our -- in our

24  discussion and come to any kind of meaningful

25  resolution where I felt she was an activity
```

participate instead of a reluctant I don't want to be

here participant.  And yeah, and that is the point

where I told her in that follow-up meeting it is --

it is pretty clear this isn't working and it is not

05:37:17  going to work.

Q.  And would you turn quickly to Exhibit 69,

Your Honor.

MR. PRESTON:  Your Honor, I am going to

object.  This is a -- we're past --

05:37:24  THE COURT:  I think we're close to -- I think

we're at the point to finish on this witness.

MS. HOLLINGSWORTH:  Okay.  Um, can I have one

more question?

THE COURT:  One more question with no follow

05:37:36  up.

MS. HOLLINGSWORTH:  Okay.

Q.  (By Ms. Hollingsworth)  Um, you talked with

Mr. Preston about all of the false allegations that

were out there?

05:37:45  A.  Yes.

Q.  So if there were false allegations out

there, why -- why didn't you just -- why didn't the

City just issue a press release to straighten out the

facts?

05:37:56  A.  I think we did multiple.  We -- it was not

just -- this wasn't just Layne against the world.  I

mean the City, like I said, this was kind of front

and center for the whole city.  So yeah, we had our

people working on that around the clock.  You know,

they would go onto the website, and, you know, we're

looking for all of the terrible comments people would

leave and react to those.  So I was not alone in

trying to fix this problem.  I was trying to fix this

problem with my people.  But there certainly were

other people engaged in trying to turn this ship

around, so to speak.

        MS. HOLLINGSWORTH:  Okay.

        THE COURT:  Thank you.  Mr. Preston, how much

time do you anticipate needing for redirect?

        MR. PRESTON:  I just have a couple of

questions.

        THE COURT:  Wonderful.  We'll go ahead with

that then.

        MR. PRESTON:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. PRESTON:

    Q.  Mr. Morris, you were directed to your

testimony at the Employee Appeals Board Hearing and a

snippet was read.  I wanted to get a more complete

response.  Do you still have that Employee Appeals

```
 1   Board Hearing in front of you?

 2       A.   Yeah.  And I messed up the pages though.

 3       Q.   We'll be back at pages 319, 320?

 4       A.   Okay.

 5       Q.   And there questioning about in the

 6   middle starting on Line 12 about whether Karen was

 7   disseminating negative information about the City.

 8   Did you think Karen was.  And skipping down to

 9   Line 24, you state, "so it could very well be an

10   inadvertent comment that anyone makes.  It could be

11   Kelly.  It could be -- it could be me in the way I

12   deal with people."  And then the question is asked on

13   Line 12.  "Okay, let me ask you again, did you

14   believe that that information was coming from Karen?

15   Answer, I thought it was a possibility it was coming

16   from Karen or Kelly or a number of employees.

17   Question, okay, is that one of the basis for her

18   termination?"  What was your answer?

19       A.   No.

20       Q.   Do you stand by that today?

21       A.   I do.

22       MR. PRESTON:  Thank you, Your Honor.  That's

23   all I have.

24       THE COURT:  All right.  Um, Ms. Hollingsworth,

25   do you rest?
```

MS. HOLLINGSWORTH:  Yes.

            THE COURT:  Okay.  In that case if we could
stand for the jury we'll take a break now.

            (Whereupon, the jury left the courtroom.)

            THE COURT:  You may be seated and you may be
excused, Mr. Morris.  Thank you.

            THE WITNESS:  Thanks.

            THE COURT:  Mr. Preston, did you want to make
a motion.

            MR. PRESTON:  I did, Your Honor.  Defendants
at this point, now that the plaintiff has rested,
move for judgment as a matter of law on this entire
case for a variety of reasons which I can articulate
now or later at the court's convenience.

            THE COURT:  I think it would be helpful if I
could have a brief summary now and hear a more
complete argument later but just so that I can have
that in mind.

            MR. PRESTON:  Thank you, Your Honor.

            First, Your Honor, under the first element of
the *Garcetti-Pickering,* with respect to the Andrea
the Cat statement the testimony is undisputed that --
I don't know how much detail you want I can get going
and I will talk too much, I'm sorry, but Andrea the
Cat we think fails under the first element because it

```
 1   is done with authorization.  And both Ms. Bird

 2   admitted that and so did Mr. Morris and it's on the

 3   recordings.  He knew it was going to get out.  It

 4   gets out and he was fine with that.  So -- she --

 5   that was part of her duty to talk to vets, talk to

 6   rescue groups.  She admitted it was part of her

 7   duties.  And so this is done in the official

 8   performance of her duties at the direction and with

 9   the authorization of the department head.  So it is

10   not protected speech.  And the Andrea the Cat should

11   be taken from the jury.

12        With respect to the what I have always

13   considered based on the summary judgment motion and

14   the complaint, the complaint was framed entirely in

15   terms of leaks to the press.  The jury instructions

16   we got leaks to the press.  And the example given and

17   the only evidence of it in the record is the

18   October 26th really should be 27th entry of Mr. Davis

19   about the false information.  Now, there has been

20   lots of oral testimony building upon that.

21        That testimony about mass execution and about

22   failing to starve all those things is false

23   information.  It was disruptive.  The employer has

24   the right to try to prevent false information as it

25   is disruptive to the City and its operations from
```

being spread.  And so that is the third element.  And
when you -- when you weigh the protected speech, the
assumed or believed speech, false statements are not
entitled to any protection under the First Amendment.
The City certainly has the right to -- in the
balancing the court has to do we think it fails the
third test.  And I submit that is really the only
other argument.  And I understand while I was out
this morning they have now put forward an amorphous
statement about, what was it, some statements of the
use of the gas chamber and her speech to the people
she worked with and issues about the AVMA and the
rescues.  Well, what's -- this has never been part of
the case what she is saying about the gas chamber.
If she is talking about statements in public
hearings, well nobody believes she was doing that.
There is no evidence she was doing that and which
ones are we talking about.  I'm very troubled if that
is going to be an issue that goes forward.

So I submit, Your Honor, that as to the -- I
think no reasonable jury can conclude that Mr. Morris
believed that she was the source of this which was
the first prong that they would have to establish
under the fourth factor.  No reasonable jury can
conclude that it was a substantial or motivating

factor.  But even if they did, no reasonable jury

could conclude that the City would not have fired her

in the absence of any such belief that she was the

one passing this information on.

And regardless, this is a case of overwhelming

evidence of a valid reason to terminate.  It's built

up on a head for many months, it comes to a head at

around the same time as all of these events, but

that's when Mr. Morris is meeting with Ms. Bird, he

sees this relationship is completely gone and he

feels now finally he has to step in and stop it.

If you have a supervisor, a manager, who

refuses to engage with, work with her supervisor, who

loathes him and can't even look him in the eye, which

she herself admits repeatedly she could not, that's a

legitimate reason to get rid of her when you have had

an ongoing dialogue with her and she has done nothing

to change it.  So I don't think -- I think there is a

legitimate reason to do this.  And on that basis, the

decision must be upheld.  If you just articulate that

also so I don't mess it up.

MR. CROWTHER:  No problem.  So for their third

basis that she actually spoke against the gas

chamber, that is an actual speech by plaintiff and

yesterday they represented to us and the court

they're only pursuing a belief of I guess statements

that she didn't make.  So that would be a complete

change of theory of claim and we would be dealing

with something entirely new.

05:47:16          MR. PRESTON:  That is not really fair to us.

So that, I'm sure, is a lot more than you wanted.  I

apologize.

          THE COURT:  That is helpful.  If I could just

ask Ms. Pagel did they have their snacks?

05:47:33          THE CLERK:  Yes.

          THE COURT:  All right.  So I -- I obviously

will want to hear from defendant and I would like to

hear more, but I think in the interest of finishing,

we'll go -- I'll take -- we'll take -- hear argument

05:47:47 on this later.  We'll go ahead with your case.  And

how long -- how long have we had them out?  Why don't

we take a 10 minute break ourselves and come back.

          MR. PRESTON:  Your Honor, could I just say I

apologize for speaking over the court and when I was

05:48:11 saying I hope the court didn't think I was

instructing the court to be quiet.  I was trying to

tell my client to because he was speaking over you

and then I end up speaking over you.  So I am very

sorry.

05:48:22          THE COURT:  Thank you.  I appreciate that.

```
 1              (Recess.)

 2              MR. PRESTON:  Your Honor, I had not

 3    anticipated this at all but we feel very good how

 4    this ended.  I've talked to my client at length and I

 5    don't think -- I think to take another couple of

 6    hours to put these last three witnesses on will be,

 7    if anything, cumulative.  So we're willing -- we are

 8    going to rest when the jury comes in without calling

 9    any more witnesses.

10              THE COURT:  All right.

11              MR. PRESTON:  So that might give us some time

12    to do the jury instructions without staying up until

13    midnight again tonight.

14              THE COURT:  I think it might.

15              MR. PRESTON:  But having an opportunity, I

16    mean if you want to do that, hold them and do it, I

17    mean if you want to do closings I'll do closings

18    right now, too, whatever you prefer to do.

19              THE COURT:  I would like to -- I mean we have

20    I think between the jury and the parties we have all

21    invested substantial time.  I would like to make sure

22    the jury instructions are good.  And so I think it is

23    best to let them go for the day, let us make sure we

24    get a good set, and get all of the objections

25    whatever they are on the record, and, um, then have a
```

06:05:36

06:05:47

06:06:00

06:06:11

06:06:25

```
 1   nice clean morning with --

 2           MR. PRESTON:  What time will we be coming

 3   back?  Do you want us here 8:00?

 4           THE COURT:  8:30.  In the morning?

 5           MR. PRESTON:  Yeah.

 6           THE COURT:  Unless there are other

 7   recommendations.

 8           MR. PRESTON:  Whatever you want.

 9           THE COURT:  Let's do 8:30 tomorrow morning.

10   Okay.  So in that case, let's get the jury back in

11   and we'll let them know that they can leave for the

12   day.

13           MS. HOLLINGSWORTH:  Your Honor, can I tell the

14   jury that I judged it right after all?

15           THE COURT:  I do not think so.  I do not think

16   that would be a good idea.

17           MS. FORTSON:  She had to ask.  She had to ask.

18           THE COURT:  I understand.

19           THE CLERK:  All rise for the jury.

20           (Whereupon, the jury returned to

21            the courtroom.)

22           (Whereupon, the trial continued but

23            was not transcribed.)

24

25
```

1        **REPORTER'S CERTIFICATE**

2

3              I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7              That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12             That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15             In witness whereof I have subscribed my name

16   this _____ day of _____, 2019.

17

18

19   _____

20                       Laura W. Robinson

21                       RPR, FCRR, CSR, CP

22

23

24

25

APPENDIX 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| KAREN BIRD, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. 2:12-CV-903EJF |
| vs. | ) | |
| | ) | |
| WEST VALLEY CITY, a | ) | |
| political subdivision of | ) | |
| the State of Utah, KELLY | ) | |
| DAVIS, in his official | ) | |
| and individual | ) | |
| capacities, | ) | |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |

BEFORE THE HONORABLE EVELYN J. FURSE

March 16, 2018

Partial Transcript
Excerpts from Trial

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

**Appearances of Counsel:**

For the Plaintiff:      April L. Hollingsworth
Attorney at Law
Hollingsworth Law Office LLC
1115 South 900 East
Salt Lake City, Utah 84105

Kathryn K. Harstad
Attorney at Law
Strindberg & Scholnick LLC
Plaza 721
675 East 2100 South
Suite 350
Salt Lake City, Utah 84106

Xernia L. Fortson
Attorney at Law
2935 Duke Of Windsor
Atlanta, Georgia 84106

For the Defendants:    Stanley J. Preston
Bryan M. Scott
Brandon T. Crowther
Attorneys at Law
Preston & Scott
111 E. Broadway
Suite 1200
Salt Lake City, Utah 84111

1          **Salt Lake City, Utah, March 16, 2018**

2                   **\* \* \* \* \***

3          (Whereupon, the trial was held but not

4           transcribed.)

5          (Whereupon, the following is a trial

6           excerpt dealing with final jury

7           instructions.)

8          THE CLERK:  All rise for the jury.

9          (Whereupon, the jury returned to the

10          courtroom.)

11          THE COURT:  All right.  Welcome back.  We have

12    given you all a copy of the jury instructions and I'm

13    going to be reading those into the record, reading

14    those to you and into the record shortly.  You're

15    welcome to follow along.  You don't have to follow

16    along, it's up to you.  It is just there for your --

17    you should listen to me no matter what, but you don't

18    have to follow along on the written instructions.

19    And it's just if that's easier for you.

20          And then one other housekeeping matter.  I had

21    on two of the exhibits that you're going to -- you're

22    going to get all of the exhibits that have been

23    introduced with you back in the jury room.  On two of

24    those during the trial I had ruled that you should

25    only -- that you should not consider them for the

3

truth of the matter.  We have discussed that further
and I have now ruled that you can consider all of the
exhibits for the truth of the matter.  So you don't
need to worry about which those were but those were
Exhibits 4 and 70 you can consider them just as any
other exhibits.

All right.  So with that, I will read you the
jury instructions.  Instruction number one, now that
you have heard the evidence and are about to hear the
argument, my duty is to give you the instructions of
the court concerning the law applicable to this case.
Your duty as jurors is to follow the law as stated in
the instructions of the court and to apply the rules
of law to the facts as you find them from the
evidence in this case.  You are not to single out one
instruction alone as stating the law but must
consider all -- consider the instructions as a whole.
Neither are you to concern yourself with the wisdom
of any rule of law stated by the court regardless of
any opinion you may have as to what the law is or
ought to be.  You would violate your sworn duty as
judges of the facts to base a verdict upon any thing
but the law as I instruct you and the evidence in
this case.

You should not take anything I say in these

```
 1    instructions as an indication that I have any opinion
 2    about the facts of the case or what that opinion is.
 3    My function is not to determine the facts.  That
 4    function is yours as jurors.  Justice through trial
 5    by jury depends on the willingness of each individual
 6    juror to seek the truth as to the facts from the same
 7    evidence presented to all of the jurors and to arrive
 8    at a verdict by applying the same rules of law as
 9    given in these instructions.  You must perform this
10    duty without bias or prejudice as to any party.  Our
11    system of law does not permit jurors to allow
12    sympathy, prejudice, or public opinion to influence
13    their verdict.  Both the parties and the public
14    expect that you will carefully and impartially
15    consider all of the evidence in the case, follow the
16    law as stated by the court, and reach a just verdict
17    regardless of the circumstances.
18          Instruction number two.  The evidence in this
19    case consists of the sworn testimony of the
20    witnesses, all exhibits received in evidence, all
21    facts that may have been admitted or stipulated, and
22    the applicable presumptions that will be stated in
23    these instructions.  Statements and arguments of
24    counsel are not in -- are not evidence in this case.
25    When, however, the attorneys on both sides stipulate
```

1   or agree as to the existence of a fact, the jury

2   must, unless otherwise instructed, accept that

3   stipulation and regard that fact as conclusively

4   proved.

00:06:18   5        During the course of trial, counsel has the

6   duty to make objections when needed.  You should not

7   consider or be influenced by the fact that counsel

8   objected to something.  You must entirely disregard

9   any evidence to which counsel objected and the court

00:06:39   10   sustained the objection and any evidence that the

11   court ordered stricken.

12        Do not try to do any research or make any

13   investigation about the case on your own.  You must

14   not try to get information from any source other than

00:06:54   15   what you saw and heard in the courtroom.

16        It's natural to want to investigate a case

17   but you may not use any printed or electronic sources

18   to get information about this case or the issues

19   involved.  This includes the internet, reference

00:07:13   20   books or dictionaries, newspapers, magazines,

21   television, radio, computers, Blackberries, I-Phones,

22   smart phones, PDAs or any social media or electronic

23   device.  You may not do any personal investigation.

24   This includes visiting any of the places involved in

00:07:34   25   this case, using internet maps or Google Earth,

|   |   |
|---|---|
| | 1 |

talking to possible witnesses or creating your own
experiments or re-enactments.  You must entirely
disregard anything you may have seen or heard outside
of this courtroom because it is not evidence.  You
may consider only the evidence in this case.
However, in your consideration of the evidence you
are not limited to the bald statements of the
witnesses.  On the contrary, you may draw reasonable
inferences from the facts that you find have been
proved such as seem justified in light of your
experience.  Any influence is -- sorry, any inference
is a deduction or -- sorry, let me try that again.
An inference is a deduction or conclusion that reason
and commonsense would lead you to draw from the facts
that are established by the evidence in the case.

            (Whereupon, the trial continued but was not

             transcribed.)

            (Whereupon, the following is West Valley's

             closing argument and rebuttal closing.)

            THE COURT:  And Mr. Preston, you may proceed.

            MR. PRESTON:  Thank you, Your Honor.  May it

please the court and Ms. Hollingsworth and counsel.

On behalf of my clients, I want to thank you for the

close attention you have paid throughout this

process.  This is a very important case to both sides

7

1   and so we appreciate it, you taking the time to be

2   here.

3           I have a few moments where I can tell you how

4   I think the pieces of the mosaic fit together and I'm

02:04:39   5   going to start again with three key points.  They're

6   the same three key points that I talked about in my

7   opening, I have kind of reversed the order because

8   that's how you'll deal with them on the special

9   verdict form.

02:04:51   10          First, Layne Morris's decision to terminate

11   Karen Bird was not based on free speech retaliation.

12   And I'll explain in detail why I believe the facts

13   show that.  Second, Mr. Morris had legitimate

14   appropriate reasons to terminate Ms. Bird,

02:05:20   15   insubordination being the primary concern in his

16   mind.  And third, Kelly Davis did not participate --

17   personally participate in the termination decision.

18          So, um, let's talk about the free speech

19   retaliatory firing.  Ms. Bird claims she was fired

02:05:40   20   based on a belief, not that she actually did it, but

21   a belief that she leaked two pieces of information to

22   the press.  First is the Andrea the cat incident; and

23   second, is the allegation that Kelly Davis ordered a

24   mass execution at the shelter in late October

02:06:03   25   of 2011.  Those are the two free speech issues at

1 issue here.  It's not -- it has nothing to do with

2 the AVMA guidelines and regulations on the carbon

3 monoxide chamber, it has nothing to do with her

4 statements at work to people about the gas chamber,

5 as they frame it.  These are the two statements and

6 you saw that in the court's jury instruction number

7 11.

8 　　　　　In this case, Ms. Bird alleges West Valley

9 City deprived her of her rights under the First

10 Amendment to the Constitution when it allegedly

11 terminated her employment because it believed she

12 leaked information to the press about one, Andrea the

13 cat, and two, a mass execution at the animal shelter

14 allegedly ordered by Mr. Davis.  That is what your

15 focus needs to be.  That's what she has to prove that

16 that was the reason that the city fired her in

17 accordance with the instructions that the court will

18 give you.

19 　　　　　I want to deal with the second alleged free

20 speech statement, the mass execution first.  The

21 first question you will be asked in the special

22 verdict form that you have to answer questions on is

23 did Mr. Davis order a mass execution in October 2011.

24 So is that a -- is this statement that was allegedly

25 passed onto the press a true statement or a false

```
 1    statement that Mr. Davis ordered this.

 2          So let's look at some of the evidence on that.

 3    You recall the phone call from the reporter came in

 4    the morning of October 27th, the day before there was

 5    this roll call meeting.  And what took place in that

 6    roll call meeting, if you look at Exhibit 71, page

 7    419, that is the key date in the log, and Mr. Davis

 8    explains what happened that day.  And he states that

 9    they had a number of animals, he goes through what

10    his normal questioning is.  He said it was the second

11    highest animals since moving into the new facility.

12    Said we need to get it down to a reasonable number.

13    He doesn't say we need to do that by a mass

14    execution.  He asks -- talks to Ms. Bird about the

15    due out list.  So that's where they each week this

16    committee goes over the animals, tries to determine

17    how long they have been there, what are the chances

18    of adoption, how is the animal doing, and they

19    discuss that.  And she goes through eventually and

20    talks about a number of dogs that are on that.  And

21    she gives explanations which he finds reasonable and

22    accepts.  Two border collies, some labs, and thinks

23    there are chances to move them.  Great.  They're not

24    moved to the euthanasia list.  He asks her for the

25    list.  Karen Bird puts together the euthanasia list.
```

The final euthanasia list generated by Karen, and
approved by Karen, was a total of eight cats and one
dog.  Two of the cats on the list were for time/space
reasons, the remainder were either feral or sick.
The one dog on the list was for time/space.

     This is the normal process they go through.
Layne Morris, you heard him testify, that this would
be an accumulation.  This isn't a daily number but an
accumulation of a week or two animals that are being
euthanized.  So what do you find absent in there?  No
reference to a mass execution.  We're talking about
nine animals out of 156.  Karen puts together the
list.  The animals she doesn't want on the list are
removed from the list.  And that's the list that is
approved.

     So Karen Bird claims he says that all the
time, refers to a mass execution of animals.  Now,
Ms. Bird has taped hours and hours and hours and
hours of conversations.  What about this key roll
call meeting?  Where is that tape where he allegedly
said "I order a mass execution"?  That tape doesn't
exist.  Ms. Bird says oh, the recording didn't work
that day.  How convenient.  You know Kelly wants to
save these animals, you could see that from how he
dealt with this, he was trying to save animals.  He

wasn't just killing them right and left as some

people have alleged here.  The other evidence they

have for this is what Michelle Johnson said, the

volunteer.  And you will recall I submit that

Ms. Johnson is not a credible witness.  She made

false statements to Mr. Morris.  We do have that

recording.  That's Exhibit 52 at the five minute

forty-two second to the six minute twenty-seven

section of that Exhibit 52.  And could we have --

switch this to Brandon and let him play that little

clip for us.

          (Whereupon, Exhibit 52 was played for the

jury.)

          MR. PRESTON:  It's not something that I'm

saying, these are not facts coming from me.  Go back

to my slide.  So she told Layne Morris she was not

spreading this information.  And then we showed you

Defendant's Exhibit 100 which was a post she did on

October 26.  And this blows up, it is a little tough

to read, but "the big man says bring down the numbers

now.  He wants them dead today."  That was what she

was saying.  So she is not a credible witness.  Do

you remember I also said that, you know, this is

available for the public?  She says oh, no, it is

private.  Only my friends can see it.  I said well,

do you know Brandon Crowther?  Oh, yeah, he is a
friend of mine, he works in a rescue shelter.  And I
said, well, let me induce you to Brandon Crowther,
he's my partner in this firm.  I mean she had an
answer and then when I said that oh, I must have put
it on public then.  You know, I just submit she is
not a credible witness on this point.  And how does
she say she heard it?  I was walking down the hall
and I just overheard Mr. Davis say loudly I want a
mass execution that day.  Again, I'll leave it to you
to decide who was telling the truth in this.

        And finally, Mr. Morris and Mr. Davis both
assert it is a false statement.  He never ordered
that.  And there was no mass execution.  There were
only nine animals accumulated over an extensive
period of time, a week maybe two weeks, that were --
that were put down that day.  So that is not a true
statement.  So is it false?  Yes.  The next question
that you need to think about with respect to the mass
execution is did Layne Morris believe Karen leaked
this statement to the press?  That's what you have to
have proven to you by a preponderance of the evidence
that Layne Morris believed that she leaked -- that
Karen Bird leaked that information to the press.  And
when you look at what Mr. Morris said, he said I

1  wasn't spending time investigating who said these

2  things, that wasn't my concern.  His concern was,

3  what he wanted to stop, was false information going

4  out.  He didn't say it was Karen.  He never formed

5  any opinion on that.  He was very adamant about that

6  point.  What he said, remember he said what he thinks

7  could have happened, he doesn't think it is malicious

8  it could be innocent, it could come from anybody.  Do

9  you remember he mentioned the telephone game.

10  Somebody says something that gets passed on and by

11  the time you get a few down the row it becomes a very

12  inflammatory statement.  That is -- so his way to

13  stop this is he is talking to Karen in that meeting

14  and to Kelly in October 31 how do we -- how do we

15  deal with this, how do we make sure as an

16  organization the right message is being communicated

17  to our shelter, to our volunteers, so that we don't

18  have this problem.  He said it could have been Kelly,

19  it could have been any employee, he said it could

20  have been me.  I say something and it gets blown out

21  of proportion.  There is no evidence that Layne

22  Morris believed it and he told you he did not believe

23  that she was doing that.  That wasn't his concern.

24  That wasn't what he was looking at.

25          Then the question you have to ask is if so, if

1  this was a belief that he had, was it a substantial

2  or motivating factor for the decision to terminate.

3  And Mr. Morris adamantly denies that that had

4  anything to do with his decision, he is the final

5  decision maker, he is the one who made the decision

6  alone as to what would happen here.  And he had other

7  reasons to terminate her, legitimate reasons, valid

8  reasons, and we'll talk about that in a moment.

9        And let's look at the Andrea the cat

10  information that got out.  Does Mr. Morris believe

11  Karen leaked this statement to the press?  There was

12  nothing to leak.  You remember he said the shelter

13  made a mistake with Andrea.  He took that as his

14  responsibility.  He said, we made a mistake, I made a

15  mistake and we pay the price for it.  He specifically

16  authorizes Karen to go out to the vets and to the

17  rescues and to get that story out there because that

18  might save that cat.

19        And if we could switch it to Brandon, and

20  Brandon if you could show us Exhibit 90, just the

21  transcript, we won't play everything.  And let's go

22  to -- let's go to the bottom of the third page.

23  Ms. Bird talks about getting it to a rescue.  Going

24  over to the next page, they're going to get the story

25  out.  This is Ms. Bird talking.  And then of course

the rescue they would probably get a story out to try
to find it a home because that's how rescues get
adoptions and get publicity to come in to find the
homes.  You get it to the vet and the rescues,
they're going to publicize it because that gets
donations for them.  And Mr. Morris, I'm okay with
that.  We can survive that.  Ms. Bird, skipping down,
I just don't want it to be like I'm causing problems.
Mr. Morris yeah no, I have got no problem with that
Karen.  I think that's a well deserved thing for this
cat.  So what was there to leak?  He authorized her,
tells her get it -- get the story out, talk to the
vets and the rescues knowing she tells him this will
become public.  Rescues will get it out.  And he says
I'm fine with that.  So he didn't believe she was
leaking anything to the press and that's what you're
asked to determine.  So then the question is was that
belief a substantial or motivating factor in the
decision to terminate.  In his mind, is that a
substantial factor, a factor that motivates him to
want to terminate her?  He is the one who authorizes
it.  He is not firing her for that and he
specifically testified on the stand that he was not.

        So if though you were to find that, then we
have a defense, the employer has a defense.  That's

set forth in jury instruction number 14. And that
instruction states, "West Valley City asserts as a
defense in this case that the City would have
terminated Ms. Bird even in the absence of the speech
at issue. If you find that West Valley City proved
by a preponderance of the evidence that the City
would have made the same decision and terminated
Ms. Bird's employment, even in the absence of the
speech issue, you must return a verdict for the City
and Mr. Davis."

So that gets to the issue of why Layne Morris
terminated Ms. Bird's employment. And he explains it
in detail why he terminated her. He had been
concerned about her insubordination for a long time.
He said it was based primarily on my personal
observations. When he is in these meetings in
October and late October and early November, he sees
that this relationship has gotten to the point where
she can't even work with Mr. Davis. She can hardly
stand to be in the room with him. She loathes him.
When Mr. Davis asked her a question, she looks over
to Mr. Morris and responds and has a difficult time
engaging with him. He says this relationship is
broken. Isn't it interesting you heard a couple of
times Shirlayne George in her meeting with Karen Bird

on November 3, three days after this meeting, where
Layne Morris observed this, and what does she say six
times?  I can't even stand to look at him.  There is
a personality conflict here, for whatever reason,
that has -- it has nothing to do with a perception
that she's leaking information to the press about
Andrea the cat or a mass execution, they are like oil
and water.  Layne Morris said they're like two
planets and they won't get in the same orbit.  She
even confirms to him on November 9th that the
relationship is broken.  He says this relationship is
broken.  She does not deny it, she says yes but we
believe it is broken for different reasons.  It is a
broken relationship.  It is causing division in the
animal shelter and Mr. Morris steps in to do
something about it.  She could not work with Davis.
She tells Ms. George the same thing that's
Defendants' Exhibit 93 and as I said, she admits the
relationship is broken.

        You can also look at Exhibit 70.  And if we
could switch to Brandon, and Brandon if you could
bring up Exhibit 70 and go to the third page.  Now,
this is the 2005 investigation that Shirlayne George
did.  As the court instructed at the outset today,
you can now accept this document for the truth of the

matter stated therein.  If you go down to the second
half, you heard a lot of some testimony and
allegations about Tess Hartwell and how supportive
she was of Karen.  These are complaints about Karen
in her favoritism of Tess.  Karen favors Tess.  I
have seen her reaction when people complain about
her.  Another statement, we are all afraid to express
an opinion or complain about something or make
suggestions because if Karen does not like it, we all
pay.  We just quit bringing up issues to keep the
peace.  Third from the bottom, Karen shows blatant
favoritism.  She is degrading in her talk, she
questions and reprimands in front of others.  I
reported something that one of her favorites had done
and Karen then had this person follow me around and
critique my work.  She then rode my butt for two
weeks.

        Go to the next page, Brandon, if you will.
Second point.  I have seen Karen stomp her feet and
clinch her fists when she gets mad to the point that
her face gets all red like a 10 year old.  Go down to
the bottom, third from the bottom.  Every one is
scared of her.  When she is in a bad mood you want to
run and hide.

        If you go to the last page, last paragraph,

first couple of lines there, Shirlayne reports to
Paul Isaac, Tess is ruthless.  She is protecting
Karen as if she were her young.  I did not even
include some of the things that she said about others
because it was obvious she was trying to discredit
those that don't seem to be on Karen's perceived
favorite list.

        So they want to use Tess in absentia and
Ms. Hollingsworth in her closing planted the seed in
your mind that she didn't want to come here because
she is afraid to lose her job.  You heard Mr. Davis
said he promoted her.  She still works there.  The
plaintiffs subpoenaed her and they chose not to call
her.  So I reject her suggestion to you there is no
evidence in the record that she was afraid of her job
and that's why she didn't sit on the stand.  She was
subpoenaed, they chose not to call her.  But what
this does is it shows longstanding problems with
Ms. Bird and her employment.  This is, of course,
backed up by the 2011 investigation and that's
Defendants' Exhibit 75 and 76.  75 is the handwritten
notes Shirlayne George did.  76 is the typewritten
notes.  And they contain a lot of, again, complaints
against Karen.  That's the bulk of the complaints.

        Let's talk for a moment about some of the

defenses Ms. Bird has offered.  They have said
repeatedly throughout the trial that she had never
had any notice that she had problems as an employee.
No one put her on notice.  Look at Defendants'
Exhibit 71, Davis's log.  Lots of times he documents
talking to her about issues.  Look at the 2010
performance evaluation.  A year before she is
terminated, puts her on notice of things that need
improvement.  Look at the Memorandum of Understanding
that Mr. Davis wrote at the same time.  Puts her on
notice of problems that he thinks she is undermining
his authority.  Then you have Mr. Davis or
Mr. Morris, excuse me, talking to her in January of
2011 saying, you know, Kelly really saved your job.
I was ready to initiate discipline and he said I want
to give her another chance, I want to give her an
opportunity.  Mr. Morris said he talked to her at
length about these issues.  She herself admitted that
after that event she knew her job was in jeopardy.
So to say that she didn't think she had any notice
about her problems is inaccurate.  And remember in
the opening when Ms. Hollingsworth said if you don't
remember anything else remember that she never
received any discipline under the personnel file
policy.  Well, let's look at that policy for a

moment.  This is Exhibit 2, and Brandon if you could
bring that up, please, to the page.  Actually, I
think I have it here, just a second.  I'll just bring
it up here, sorry, so we can switch it back to me.
Thanks, Lindsey.

This is the page on the personnel policy that
was shown to you as Plaintiff's Exhibit 2.  This is
the section I want you to look at.  "Employees whose
conduct constitute grounds for disciplinary action
are subject to one or more of the following."  Now,
it doesn't say you have to go through these
progressively.  You can do one and jump to four.  You
can go straight to four depending on the
circumstances.  But look at number one.  Informal
warning.  That is a form of disciplinary action.
What does that consist of?  An oral or informal
written warning.  So an oral warning is discipline
that is documented by the department.  These things
are documented and kept by the department.

She received numerous warnings and
discussions that go on for a long period of time.  So
to say that she has no notice, I mean you have heard
these gentlemen testify they worked and worked with
her.  You heard Shirlayne testify she counseled her
frequently about these issues, what she needed to do,

what she could do, what Kelly needed to do.  Layne
says I talked to them separately, I had them both in
my office.  I talked to them continually and it
increased and increased over time.  And yet she says
I had no idea there were problems.

Now what I warned you at the outset that they
would try to shift the focus to Kelly Davis.  Well
Kelly Davis had problems too, he didn't get
terminated.  It is an apples to oranges comparison
for several reasons.  Yes, the 2009 investigation
created significant concerns about his anger
management and Shirlayne George sat down with him and
told him -- warned him if it continued his job was in
jeopardy.  He said he was humble, he received her
advice, and he said I'm going to work on it.  And he
did work on it as shown by the 2011 investigation,
two years later, there were not these complaints.
Shirlayne George said he was trying to do better.
Layne Morris said he improved.  He was given another
chance and he improved.  He was receptive to her
counsel.  The difference is Karen, she may change for
a little while, but she didn't fundamentally change
even though she had notice of these insubordination
issues.  That is the key difference and it's backed
up by this CD that Ms. Bird gave to Shirlayne George

in November, early November of 2003.  She said here

is a tape I have of a meeting on October 12th, 2011 a

few weeks earlier.  Listen to it.  It shows just how

mean and belittling and bullying Mr. Davis is for me.

Shirlayne listens to an hour of this.  She says Karen

he is just trying to help you.  He is pointing out

things you need to do.  She has this perception

that's why she can't stand him.  Anything he says she

just tunes out.  You can't have a manager doing that

to her supervisor.  It just cannot continue.  As

Layne Morris said it continued too long.  But this is

interesting.  They have that recording.  Did they

introduce it into this court?  You can bet if there

was anything on that recording that showed Kelly

Davis was bullying, intimidating, harassing, abusing

Karen Bird you would have heard it.  Did they play it

for you?  Did they play a moment of it?  No.  Now

think of this.  Karen Bird recorded hours and hours

and hours and hours of recordings.  Roll call

meetings, one after the other.  You have got a tiny

fraction of the hours and hours of recordings she

made.  Have they played from this huge library a

single snippet of a single recording where Kelly

Davis was belittling or bullying?  She is complaining

about it daily.  You haven't heard a single recording

that shows that.  This was a critical moment for
Shirlayne George and Layne Morris.  Layne Morris says
oh, she has a recording of what he has done.  Great,
I want to hear it.  I want to see if there is
something to this.  I haven't seen him be that way,
but if there is something there and you can bet she
is recording it secretly, probably hoping she can get
something over the months, he said let me hear it.
There is nothing there.  That shows he is trying to
help her.  You have to take what Karen Bird says with
a grain of salt, maybe more than a grain.  Her
perception is such that it doesn't correspond to
reality.  I don't know why but this is, I think, a
fundamental problem with her case.  She is claiming
throughout months that Kelly is rude to her and
belittles her.  She wants him gone.  Kelly saves her
job.  I want to give her another chance, continues to
work with her.  On October 12th, 2011, Shirlayne
George, Layne Morris listened to that, yeah he is
trying to work with you, he is trying to help her.
Even then he is trying to help her.  That has nothing
to do with free speech.  This is two people at
loggerheads and one of them is trying to communicate,
is willing to change, and the other one even in this
courtroom says I did nothing wrong.  I was never

insubordinate.  That is not an accurate picture.  But
again, that has nothing to do with free speech.  But
the focus is oh, it is Kelly Davis, he is just mean,
aggressive, angry guy.  Where is the recording?  They
claim Ms. Bird was a model employee.
Ms. Hollingsworth in her opening said she is the type
of employee we should all aspire to be.  You might
ask yourself if you would want her as a co-worker or
your supervisor or your subordinate.  She undermines
Kelly Davis, she secretly records conversations
without telling anybody, even her own co-workers.
She admits she is doing it at least at the end for
litigation purposes.  That tells you a lot about
Ms. Bird.  She refuses to work with her supervisor.
She claims she does nothing wrong.  Claims that she
is never subordinate.  She never recognizes her
problems.  Now this is very important.  Layne Morris
spent all this time counseling with her.  So did
Shirlayne George.  Shirlayne George said it was like
butting my head against the wall trying to work with
her.  I would say well try this, do this.  Let's try
to solve this this way.  No.  The only way to solve
this, according to Ms. Bird, was to get rid of Kelly
Davis and get me a supervisor I liked or make me the
supervisor.  That's what's going on here.  Layne

Morris has these meetings with her November 1,
November 9, November 22nd in the pre-disciplinary
hearing. I asked him, how did she respond to being
told there is all these problems? He said she never
once recognized she was the problem or said she loved
this job like she says and I'm sure she did, she
loves the animals, nobody is questioning that. But
why didn't she then say when she knew her job is in
jeopardy 11 months before give me another chance.
Why didn't she say to Mr. Morris, you know, I'm
really sorry for everything that has happened. I'm
going to turn over a new leaf. I'm going to change.
He doesn't make a decision until he has met with her,
until he has got the investigation, until he has
listened to the take and until he has heard her
story. When you start a disciplinary process that
doesn't mean that you have determined as Ms.
Hollingsworth said that you're going to discipline
someone. I don't care what Paul Isaac said. Paul
Isaac is not the guy who makes the decision. Layne
Morris is. And Layne Morris said I feel there is
something wrong. I'm going to start a disciplinary
process because that means I will get material and I
can evaluate it. Based on my personal observation,
this is not working. I got to do something. So get

me the information.  Great, you're doing an
investigation, Ms. George, I want to see it.  Oh, you
have a CD?  Let me listen to it.  I want to hear what
Ms. Bird has to say.  And only then, when he has all
of that information, does he at the end of November
does he make the decision one to discipline and two
to terminate.  That is due process.  Throughout any
point in that process Ms. Bird had the opportunity of
saying give me another chance, I'm going to do X, Y
and Z.  She never does it.  We all feel badly for
her.  But ladies and gentlemen, you get the chance,
you have the opportunity and sometimes there are
consequences to your actions.  Nobody wants to fire
her.  She was a star employee.  She had great
attributes.  Ms. Hollingsworth said well, I even got
Mr. Morris to say she was a star employee.
Mr. Morris said that absolutely, I thought she was a
star.  He was a big supporter.  She comes -- Karen
comes to Layne in -- when the new building they move
into it, she says is my job in jeopardy?  Of course
not, Karen, we need you.  We need you at this
shelter.  Even at the end he is telling them in that
November 9th meeting, actually it's the November 1st
meeting, hey, I need both of you folks there.  How do
I resolve this?  That's what Shirlayne George asked

on November 3rd?  How can I resolve this Karen?  How can we make this work?  I can't even stand to look at his face.  I can't even stand to look at his face.  How do we resolve it?  I don't know what resolution there is.  Why not say ask him to do this, this, and this, I'll do this, this, and this.  Give me a chance to solve -- to salvage this.  She does none of that.  Him or me, that's what she put Layne Morris into a position of.  I can't work with him, I refuse to work with him, I can't stand him.  What are you supposed to do?  You can't let this continue.  And their whole claim rests on the fact that it took place while these other events are going on and so that was the reason she was terminated.  Free speech.  She never said I will do better.  The drama ceased when she was gone.

So let me show you an exhibit that we stipulated to.  Exhibit 40.  Brandon, if you could bring that one up and we'll switch the panel to him.  This is Susie Ternoois, a letter she wrote to Shirlayne George when Shirlayne George was doing this later investigation December for the Workforce Services.  Do you remember she said which investigation are you talking about?  So this is like the second one.  This is a pretty interesting letter

about her concerns about Karen Bird.  At the very

bottom it says, I have to add that since Karen has

been gone, rest staff has all changed.  It is working

more as a team.  And that tension that had been there

between the officers and the shelter sides is getting

better.

Kelly Davis testified we have to get the

cleaning done, we have to do this by 10 a.m. But

Ms. Bird says it can't be done, I need more staff.

Do you remember when they played her -- or they

showed him his testimony at the EAB hearing?  He said

all those excuses that it can't be done, I can't do

it were gone the.  The problem ceased once Karen was

done because the rest of the people fell in line and

did what Kelly wanted.  She resisted that.  These are

the tensions that were building up.  If I can go back

to my screen, please.

The third point I wanted to make is Kelly

Davis did not participate in the decision.  Kelly

Davis hired her, he promoted her, he allowed her to

be insubordinate for years.  He saved her job and

gave her a second chance.  The old saying no good

deed goes unpunished now he has been a defendant for

six years.

They are seeking punitive damages for

malicious conduct against Kelly Davis.  That's what
Ms. Hollingsworth has asked you to do.  He wasn't
even involved in the decision because Layne Morris
said I've got to step in and fix this.  He never even
contacted Kelly, got input from him.  He testified
Kelly never recommended I terminate her.  They want
to say that Kelly was upset, he wanted to stop these
leaks.  Well, who wouldn't when your name is being
plastered through out the community as being somebody
who is killing animals right and left with no regard
for them.  But Kelly doesn't make the decision.
Layne does.  And he's the one who initiates it and
who follows it through and he doesn't make the
decision until November 22nd.

     Jon Andus.  I think the first and the last
witnesses you heard in this case are appropriate
bookends.  Jon Andus was a volunteer.  He was -- you
saw how combative and defensive he was on the stand.
I think you saw how he embellishes the truth.
Perfect example, we're in this meeting and Kelly
wants a list of items to be purchased and Karen
writes it and slides it to him.  And according to Jon
Andus, Kelly Davis wadded that up and threw it at her
face.  And you saw what Ms. Bird said happened.  He
slid it back across the table.  Jon Andus is not a

credible witness.  He has some agenda here, he is
going after somebody.  But several times he told us
oh, I have nothing against Kelly Davis.  Me thinks he
protests too much as Shakespeare would say.

02:46:57    What was Kelly Davis's explanation of this?  I
told the employees I needed it in a memo which lists
the items to be purchased, I needed it prioritized,
and I needed the amounts so I could determine when
the request comes to me whether I would have the
02:47:14  funds to purchase.  That is what a responsible
manager who is trying to live within his budget does.
They make it sound like he is just some bully.  He
was doing what he should be doing.  But again, this
gets perceived as something that it was not.  Jon
02:47:38  Andus said that in his EAB hearing he says, do you
know why she was terminated?  Oh yes, I do.  And he
says, Kelly told me she was the mole and that's why
she is being terminated.  That is November 10th.
Kelly knows nothing about it.  Is it credible to you
02:47:58  that a police officer of 20 plus years service who
has been a manager for years, who has been an officer
rising to the rank of lieutenant, would go to a
volunteer and talk about the personnel managers --
problems of one of his subordinates.  You don't do
02:48:16  that.  You don't spread information like that.  Kelly

1    Davis absolutely denies it.  He did not make that

2    statement.  But on the stand, Mr. Andus doubles down.

3    So not only did he say that, but then later in this

4    day now none of this is in the Post-It Note that he

5    posted that he testified that he tried to put

6    everything in so he wouldn't forget it, but later in

7    the day he hears Kelly Davis say I'm going to do

8    everything I can to get rid of her.  So six years

9    later suddenly he comes up with another

10   embellishment.

11        Not even Ms. Bird believes she was fired for

12   her free speech issues.  Remember, when I had her

13   review her deposition, I said why did Kelly Davis

14   want to get rid of you?  He is the guy you sued, why

15   did he want to get rid of you.  He gave several

16   reasons.  He wanted to get rid of me because his

17   secretary was forced to resign after I accused her of

18   theft.  Mr. Davis wanted to get rid of me because I

19   was disagreeing with him.  Mr. Davis wanted to get

20   rid of me because I do not want to use the CO

21   chamber.  Another reason he wanted to get rid of me

22   was because after my car -- while I was off work

23   after my car accident, some of Hitler

24   responsibilities he had to take over and do.  Now

25   this deposition is taken in 2014, she has heard John

33

1 Andus and all this stuff, not once did she say he

2 fired me because he believed I was leaking

3 information to the press.  Not even she thinks it's a

4 substantial or motivating factor for her termination.

02:50:20    5 How can you find that if she doesn't think it?

6 Brandon can you bring up the special verdict

7 form, please.  I want to show you the verdict form

8 you're going to have to fill out and talk to you for

9 just a moment about that.  So as I indicated, the

02:50:44   10 first question you will be asked to respond to is did

11 Kelly Davis order a mass execution at the West Valley

12 City Animal Shelter in October 2011.  I submit that

13 allegation is false and the answer should be no.

14 Second, do you find that Karen Bird has proven

02:51:05   15 by a preponderance of the evidence that West Valley

16 City's belief that she leaked information to the

17 press regarding Andrea the cat and/or a mass

18 execution at the animal shelter allegedly ordered by

19 Kelly Davis was a substantial or motivating factor in

02:51:22   20 the decision to terminate her employment?  I submit

21 that for the reasons I told you that the answer

22 should be no.  If the answer is no, do not answer any

23 remaining questions.  Have the foreperson sign this

24 form and turn it in.

02:51:42   25 If you do find it was a substantial or

1    motivating factor, you will be asked to decide which

2    one was it or was it both of them.  And then you will

3    be asked the question on question four, this is on

4    the second page, do you find that West Valley City

5    has proven by a preponderance of the evidence that it

6    would have terminated Karen Bird's employment in the

7    absence of any belief that she leaked information to

8    the press regarding these two incidents?  Absolutely

9    they had grounds to terminate her.  Had nothing to do

10   with this.  If that answer is yes, do not answer any

11   remaining questions and have the foreperson sign the

12   verdict form and return it.  I submit that the

13   farthest you need to go in this special verdict form

14   is the fourth question.  And I submit it should be

15   done after dealing with the second question.

16        Credibility of witnesses.  For you to find

17   that the City acting through the final decision-maker

18   who was Layne Morris terminated her because of a free

19   speech retaliation motive, you have to find that

20   Kelly Davis was lying, that Shirlayne George was

21   lying, and that most importantly that Layne Morris is

22   lying to you.  Layne Morris is not a man who would

23   lie.  Look at his character.  He has been a public

24   servant.  He has served this country and the citizens

25   of West Valley City his entire life.  You don't

| | |
|---|---|
| | 1 become a First Class Sergeant in the Green Berets |
| | 2 unless you are a leader and a man of integrity. |
| | 3 There is a movie out called *12 Strong.* It's about |
| | 4 one group of the first special forces responders that |
| 02:54:02 | 5 was sent to Afghanistan right after 9-11. |
| | 6     MS. HOLLINGSWORTH: Your Honor, I'm going to |
| | 7 object to improper vouching about the -- |
| | 8     THE COURT: You may proceed. |
| | 9     MR. PRESTON: Thank you, Your Honor. Kelly |
| 02:54:18 | 10 Davis -- I'm sorry, I got off here. Layne Morris was |
| | 11 one of the first responders in the Green Berets to go |
| | 12 out there as a special forces man to go to |
| | 13 Afghanistan. Now, he is not as tall, doesn't have as |
| | 14 much hair, and he is not as handsome as Chris |
| 02:54:40 | 15 Hemsworth who stars in that movie, but Layne Morris |
| | 16 is the real deal. Did you see how emotional he got |
| | 17 when I asked him about his oath to defend the |
| | 18 Constitution? He knows by firsthand what it is to |
| | 19 live and fight against a country, a leadership, a |
| 02:55:04 | 20 government, that doesn't have these constitutional |
| | 21 rights. The Taliban. And he put his life on the |
| | 22 line doing that. But now you're asked to find that |
| | 23 he would violate Karen Bird's Constitutional rights |
| | 24 and he would lie in a United States Courtroom about |
| 02:55:25 | 25 it. That is not what this case -- that is not why |

she was terminated.  I'm going to play you a brief
2  clip which shows why she was terminated.
3          (Whereupon, an audio clip was played for the
4  jury.)
02:55:57  5          MR. PRESTON:  He is just -- Kelly Davis is
6  just trying to show me he is the boss.  Layne Morris
7  says Karen, he didn't say it rudely, he said Karen,
8  he is the boss.  I know that.  That's why she was
9  terminated.  She refused to accept Kelly Davis as her
02:56:15  10  boss.  Thank you very much for your time and
11  attention.
12          THE COURT:  Ms. Hollingsworth?  Do you need to
13  switch the computers Ms. Hollingsworth or --
14          MS. HOLLINGSWORTH:  No.
02:56:31  15          MR. PRESTON:  Let me unplug my stuff.
16          MS. HOLLINGSWORTH:  Ladies and gentlemen,
17  Mr. Preston talked to you about a recording that
18  Ms. Bird had presented to Ms. George that was from
19  October 12, 2011.  And on October -- from that
02:57:10  20  recording on October 12th, Ms. George determined that
21  Mr. Davis was simply trying to help Ms. Bird.  So I
22  want to ask you what happened then after
23  October 12th?  And we have Tess Hartwell's e-mail to
24  Ms. George saying -- as of November 1st saying
02:57:32  25  Kelly's bullying of Ms. Bird has gotten so much worse

```
 1    in the last two weeks.  And what happened was the

 2    articles came out in the newspaper about Andrea the

 3    Cat and then a reporter called Mr. Davis about a mass

 4    execution.  And to the point that Mr. Morris had

 5    authorized the leaks to the press for -- about Andrea

 6    the Cat that simply is not correct.  What he said

 7    was, you can go to the vet and you can talk to the

 8    vet and I'll accept the consequences.  But he

 9    specifically said in this November 1st meeting, I

10    don't have the recording up but I have the transcript

11    from the meeting and you heard this clip where he

12    said, and he was talking to Michelle in that

13    November 1st meeting, he said, I explained to Karen

14    that it's her job to make it stop.  She needs to be

15    telling that story like she did to Channel 4 the

16    other day.  She needs to be telling our story and

17    defending us and giving out the good information like

18    a loyal employee.

19           So Mr. Morris was okay when he thought the

20    Andrea the Cat story through the vet might be about a

21    miracle cat, but the debate became about the gas

22    chamber and its effectiveness and its use by the

23    shelter.  And then there was subsequent information

24    out of the shelter about a mass execution.  And so

25    the debate was not positive as Mr. Morris had hoped
```

1    and he clearly thought that Ms. Bird had gone beyond

2    what he had authorized to talk to the media herself.

3              Mr. Preston said there's -- there's not --

4    there wasn't any statements about a mass execution on

5    -- in late October.  We have many sources to support

6    that although we don't and wish we had the recording

7    of the October 24th meeting.  Obviously, if we had

8    the recording and it disproved the allegations then

9    defense would have brought it up.  Ms. Bird testified

10   that recording was lost or inadvertently deleted.

11   But what we have from that meeting was Mr. Davis's

12   notes which reflect that he said the numbers in the

13   shelter were high and that he needed to get them

14   down.  We have Michelle Johnson's simultaneous

15   Facebook post saying the big man says we got to get

16   the numbers down, he wants them all dead.  We have

17   Jon Andus who testified that he was in that meeting

18   and he heard the mass execution statement made in

19   that meeting.  Not only that, he had heard it several

20   times before.

21             So we have several sources that confirm what

22   was said in that meeting not to mention the fact that

23   a reporter called Mr. Davis on an anonymous tip and

24   Mr. Davis's notes reflect that he didn't say that's

25   not true, he said I'm concerned about how this

```
 1    information is getting out.  So there is all kinds of
 2    information to support that that's what was said.
 3    And as counsel pointed out, on your verdict form the
 4    very first question you're asked is, "did Kelly Davis
 5    order a mass execution in October of 2011?"  And
 6    while that statement doesn't go to the liability that
 7    you are to determine, it's something that figures
 8    into what the court has to decide later.
 9          Counsel talked about that Mr. Morris wouldn't
10    lie about these motivations.  What we have is
11    recordings that show both Mr. Davis's and
12    Mr. Morris's motivations.  That they were concerned
13    about the negative information that was in the press.
14    And we have Mr. Morris's boss on November 10th
15    saying, you're going to be placed on leave and we'll
16    figure out -- we'll send you a letter about why but
17    it -- let's just say it's because of your opposition
18    to the gas chamber.  That's a violation of policy.
19    And he says even if I were to think that people
20    crossing the road outside our building might get
21    killed, I can't say anything about that because it
22    would be against policy.  So these officials have a
23    really skewed view of what the First Amendment
24    protects but it's clear from all of the evidence that
25    that was their motivation.
```

1      Mr. Morris, when I asked him why he would

2  recommend terminating an employee who had never been

3  disciplined, he said what do you think that's a get

4  out of jail free card, our disciplinary process?  No,

5  it's the process that the defendant uses to terminate

6  employees or discipline employees when they're going

7  about it for legitimate reasons.  They have a process

8  in place because that's what makes sense.  And when

9  you -- when you have an employee with problems, then

10  you document those problems so that they have notice

11  of what the problem is and so that they can improve.

12  That never happened in this case and that's because

13  the -- the problems that were attributed to Ms. Bird

14  were made up after the fact to legitimize an

15  illegitimate termination that they knew they needed

16  to cover up because it was based on a violation of

17  the First Amendment.

18      The defendant wants you to believe that a

19  tenured employee was terminated without any

20  discipline for giving away a bag of dog food with

21  maggots in it, or maybe for cleaning protocols that

22  weren't figured out but that Mr. Morris testified

23  were actually figured out long before this, or maybe

24  for her discipline of Ed Trimble who we know was gone

25  for many months before the events that are at issue

1  in this case.  That is simply not credible.

2          Instead we have a number of witnesses who

3  testified as to what was going on in the shelter.  We

4  have Jon Andus to start with who might, I grant you,

5  be a bit unhinged, but he had no reason to lie about

6  what was going on at the shelter.  We had Michelle

7  Johnson to testify about the reasons she put out the

8  Facebook post when she did.  And when challenged on

9  whether or not Mr. Davis had said do you want them

10  all dead?  She said yes, that is exactly what I

11  heard.

12          We had Ms. Bird's testimony which wasn't

13  impeached on any point.  We have the fact that the

14  defense could not put on a single witness to validate

15  the concerns that they had about them, about

16  Ms. Bird, except for Mr. Davis and Mr. Morris whose

17  only information was through Mr. Davis.

18          We had finally Mr. Breisch, the volunteer, who

19  had no dog in this fight but happened to have made a

20  recording of Mr. Davis telling him he was not welcome

21  as a volunteer in the shelter any more because he had

22  exercised his First Amendment Rights.  And although

23  Mr. Davis attributed it to negative attention that a

24  Facebook page was getting, Mr. Breisch told you he

25  had just as we established 10 days earlier with his

girlfriend testified at City Council about the
problems that the gas chamber was having.

So these are officials who did not want the
truth of what they were doing getting out.  So they
fired everybody including volunteers but including a
long-term exceptional employee of the animal shelter
who volunteers referred to as Mother Earth.  That is
a tragedy for our entire community and I ask now that
you set this right.

And I made one promise to Ms. Fortson that I
would tell you something so I'm going to do that.
The formatting on our PowerPoint was messed up
because we had to switch I-Pads and that put it into
a different program.  So we do know how to hyphenate
words.  So if there was an R at the bottom of the
page on November, for instance, it was due to
computer problems.  So thank you.

THE COURT:  All right.  Thank you very much.
All right.  At this time if I could have the
Courtroom Deputy swear in the Court Security Officer.

THE CLERK:  Please raise your right hand.

(Whereupon, the Court Security Officer was
given an oath.)

THE COURT:  Thank you.  All right.  And I will
instruct you to go into the jury room and begin your

1  deliberations.  Would you all rise for the jury,

2  please.

3          (Whereupon, the jury left the courtroom.)

4          (Whereupon, the trial continued but was

5           not transcribed.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **REPORTER'S CERTIFICATE**

2

3         I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7         That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12        That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15        In witness whereof I have subscribed my name

16   this 13th day of March, 2019.

17

18                    _____

19                    Laura W. Robinson

20                    RPR, FCRR, CSR, CP

21

22

23

24

25

45